# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | Civil No.:  21-15031 |
| THE STATE OF NEW JERSEY and THE NEW JERSEY DEPARTMENT OF CORRECTIONS, | |
| Defendants. | |

## SETTLEMENT AGREEMENT

## I.    INTRODUCTION

1.    On August 10, 2021, the State of New Jersey, the New Jersey Department of Corrections ("NJDOC") and the United States of America enter into this Agreement ("Agreement") with the goal of ensuring that prisoners at the Edna Mahan Correctional Facility for Women ("Edna Mahan") are provided with constitutional conditions that protect them from sexual abuse by staff.

2.    The Civil Rights Division of the United States Department of Justice and the United States Attorney's Office for the District of New Jersey ("DOJ") commenced an investigation of allegations of staff sexual abuse at Edna Mahan pursuant to the Civil Rights of Institutionalized Persons Act, 42 U.S.C. § 1997 ("CRIPA").

3.    On April 13, 2020, DOJ issued an investigative notice that concluded that certain conditions at Edna Mahan violated prisoners' constitutional rights ("CRIPA Notice"). Specifically, DOJ stated that it had reasonable cause to believe that NJDOC violated the Eighth Amendment of the United States Constitution by failing to protect prisoners at Edna Mahan from harm due to sexual abuse by correctional staff.

4.    DOJ acknowledges and appreciates the cooperation and good faith shown by the Governor of New Jersey, the New Jersey State Attorney General's Office, NJDOC's leadership, and the administration and staff at Edna Mahan.  DOJ was given full access to Edna Mahan's physical plant, its prisoners, its staff, its vendors, and thousands of pages

of documents requested by DOJ and its experts for review.  The Governor, the New Jersey State Legislature, and the NJDOC's management team have demonstrated a commitment to improving conditions at Edna Mahan for the prisoners who reside there and staff who work there and have devoted significant effort towards making Edna Mahan a safer facility.

5.  DOJ recognizes New Jersey's and NJDOC's high level of cooperation and willingness to enter into this Agreement without the need for litigation.  As a result of this cooperation, DOJ, NJDOC, and New Jersey believe this Agreement represents the best opportunity to address the United States' allegations regarding staff sexual abuse at Edna Mahan.

6.  In order to resolve the issues pending between the Parties without the expense, risks, delays, and uncertainties of litigation, the Parties agree to the terms of this Agreement as stated below.  This Agreement resolves the United States' investigation of Edna Mahan's alleged constitutional violations.

7.  This Agreement is being filed in the United States District Court of New Jersey.  The Court has jurisdiction over this action pursuant to 28 U.S.C. §1331; 28 U.S.C. § 1345; and 42 U.S.C. § 1997.  Venue is proper in this district pursuant to 28 U.S.C. § 1391(b).

8.  This Agreement shall constitute the entire integrated Agreement of DOJ and New Jersey. Except for the United States' April 13, 2020, CRIPA Notice, no prior or contemporaneous communications, oral or written, or prior drafts shall be relevant or admissible for purposes of determining the meaning of any provisions of the Agreement.

9.  This Agreement is binding upon DOJ and New Jersey, by and through their officials, agents, employees, and successors.  This Agreement is enforceable only by DOJ and New Jersey.  No person or entity is intended to be a third-party beneficiary of the provisions of this Agreement or any reports drafted, compiled, completed, or filed as a result of this Agreement for purposes of any civil, criminal, or administrative action, and accordingly, no person or entity may assert any claim or right as a beneficiary or protected class under this Agreement or any such reports.  This Agreement and any reports drafted, compiled, completed, or filed as a result of this Agreement are not intended to impair or expand the right of any person or organization to seek relief against the NJDOC for its conduct or the conduct of NJDOC employees; accordingly, they do not alter legal standards governing any such claims, including those under New Jersey law.  This Agreement and any reports drafted, compiled, completed, or filed as a result of this Agreement do not authorize, nor shall they be construed to authorize, access to any documents created by or in the possession of NJDOC, Edna Mahan, or DOJ by persons or entities not parties to this Agreement.  Entrance into this Agreement does not constitute an admission of liability by NJDOC or the State of New Jersey.

## II.   **DEFINITIONS**

A.    "NJDOC" means the New Jersey Department of Corrections.[1]

B.    "Compliance" is discussed throughout this Agreement in the following terms:  substantial compliance, partial compliance, and non-compliance.

     i.    "Substantial Compliance" indicates that NJDOC and Edna Mahan have achieved material compliance with the components of the relevant provision of the Agreement.

     ii.    "Partial Compliance" indicates that NJDOC and Edna Mahan have achieved material compliance on some of the components of the relevant provision of the Agreement, but significant work remains.

     iii.    "Non-compliance" indicates that NJDOC and Edna Mahan have not met the components of the relevant provision of the Agreement.

     iv.    "Material Compliance" requires that, for each provision, NJDOC and Edna Mahan have developed and implemented any relevant policies incorporating the requirement and trained relevant personnel on the policy.

C.    "Contractor" means a person who provides services on a recurring basis pursuant to a contractual agreement with the State of New Jersey or NJDOC.

D.    "Corrections staff" means all NJDOC employees and contractors, irrespective of job title, whose regular duties include the supervision and control of prisoners throughout Edna Mahan.

E.    "Direct Supervision" means active management of prisoners through continuous staff interaction and direct contact with prisoners in housing units, without physical barriers routinely separating staff and prisoners in the housing units.

F.    "Document" is defined to include any designated documents or electronically stored information - including writings, handwritten notes, letters, emails, memoranda, policies, procedures, protocols, curricula, drawings, graphs, charts, photographs, sound recordings, images, and other data or data compilations - stored in any medium from which information can be obtained either directly or, if necessary, after translation by NJDOC and New Jersey into a reasonably usable form.  A draft or non-identical copy is a separate document within the meaning of this term.

G.    "DOJ" shall refer to the United States Department of Justice, which represents the United

---

[1] For purposes of this Agreement, the NJDOC's commitments are limited to the Edna Mahan Correctional Facility for Women.

States in this matter.

H.   "Edna Mahan" refers to the Edna Mahan Correctional Facility for Women located in Union Township, New Jersey and includes all buildings located on the Edna Mahan campus or any facility that is built or used to replace the Edna Mahan Correctional Facility for Women.

I.   "Employee" means a person who works directly for NJDOC or Edna Mahan.

J.   "Exigent circumstances" means any set of temporary and unforeseen circumstances that require immediate action in order to combat a threat to the security or institutional order of Edna Mahan.

K.   "Effective Date" shall mean the date the Agreement is entered on the docket of the Court.

L.   "Gender-responsive principles" reflect operational practices in a prison setting based on empirical and gender-based differences.  Being gender-responsive means adopting the principles, training employees, and creating and maintaining a prison environment that is grounded in evidence-based practice, experience, research, and theory that acknowledges women's pathways into the criminal justice system and addresses issues such as history of sexual and physical abuse, violence, family relationships, substance abuse, mental illness and co-occurring disorders.

M.   To "implement" a policy means:  the policy has been drafted and disseminated to all staff responsible for following or applying the policy; all relevant staff have been trained on the policy; compliance with the policy is monitored and tracked through compliance tools; the policy is consistently applied and followed, as demonstrated by the compliance tools; and there are corrective action measures to address lapses in application of the policy.

N.   "Include" or "including" means "include, but not be limited to" or "including, but not limited to."

O.   "Prisoner" means any person incarcerated or detained at Edna Mahan or any facility that is built or used to replace Edna Mahan.

P.   "Medical Practitioner" means a health professional who, by virtue of education, credentials, and experience, is licensed (if required by law) and permitted to evaluate and care for patients within the scope of his or her professional practice.

Q.   "Mental Health Practitioner" means a mental health professional who, by virtue of education, credentials, and experience, is licensed (if required by law) and permitted to evaluate and care for patients within the scope of his or her professional practice.

R.   "Monitor" means an individual selected to assess implementation of the Agreement.

S.   "Pat-down search" means a running of the hands over the clothed body of a prisoner by an employee to determine whether the individual possesses contraband.

T.      "PREA" means the Prison Rape Elimination Act of 2003 and implementing regulations, 28 C.F.R. § 115.

U.      "Sexual abuse" of a prisoner by a staff member, includes any of the following acts, with or without consent of the prisoner:

    1.      Contact between the penis and the vulva or the penis and the anus, including penetration, however slight;

    2.      Contact between the mouth and the penis, vulva, or anus;

    3.      Contact between the mouth and any body part where the staff member has the intent to abuse, arouse, or gratify sexual desire;

    4.      Penetration of the anal or genital opening, however slight, by a hand, finger, object, or other instrument, that is unrelated to official duties or where the staff member has the intent to abuse, arouse, or gratify sexual desire;

    5.      Any other intentional contact, either directly or through the clothing of, or with the genitalia, anus, groin, breast, inner thigh, or the buttocks, that is unrelated to official duties or where the staff member has the intent to abuse, arouse, or gratify sexual desire;

    6.      Any attempt or threat by a staff member to engage in the activities described in paragraphs (1)-(5) immediately above;

    7.      Any display by a staff member of his or her uncovered genitalia, buttocks, or breast in the presence of a prisoner; and

    8.      Voyeurism by a staff member.

V.      "Sexual harassment" of a prisoner by a staff member includes:

    1.      Sexual advances or requests for sexual favors; and

    2.      Repeated verbal comments or gestures of a sexual nature to a prisoner by a staff member including demeaning references to gender, sexually suggestive or derogatory comments about body or clothing, or obscene language or gestures.

W.      "Staff" or "staff member" includes all persons who are assigned to work at Edna Mahan or provide services to prisoners at Edna Mahan, including corrections staff, medical practitioners, mental health practitioners, and employees of any agency of the State, and including contractors and volunteers who provide services at Edna Mahan without pay.

X.      "Strip search" means a search that requires a person to remove or arrange some or all clothing so as to permit a visual inspection of the person's breasts, buttocks, or genitalia.

Y.      "Substantiated allegation" means an allegation that was investigated by NJDOC or Edna

Mahan and determined to have occurred.

Z.  "Supervisory staff" means any staff member who has the responsibility to oversee the work of another staff member or prisoner or groups of staff or prisoners and includes anyone that NJDOC designates as having the responsibility to oversee the work of another staff member and/or prisoner or group of staff and/or prisoners.

AA.  "Train" means that instructors with demonstrated subject matter expertise educate employees in the skills, knowledge and/or abilities addressed to a level at which the trainee has the demonstrated proficiency to implement those skills as, and when called for, in the training.  "Trained" means a demonstration of staff proficiency through documented testing or other means.

BB.  "Unfounded allegation" means an allegation that was investigated and determined not to have occurred.

CC.  "Unsubstantiated allegation" means an allegation that was investigated and the investigation produced insufficient evidence to make a final determination as to whether or not the event occurred.

DD.  "Volunteer" means an individual who donates time and effort on a recurring basis to enhance the activities and programs of NJDOC.

EE.  "Voyeurism" by a staff member means an invasion of privacy of a prisoner by staff for reasons unrelated to official duties, other than incidental viewing, such as peering at a prisoner who is using a toilet to perform bodily functions; requiring a prisoner to expose her buttocks, genitals, or breasts; or taking images of all or part of a prisoner's naked body or of a prisoner performing bodily functions.

## III.  SUBSTANTIVE PROVISIONS

A.  **General Policies and Procedures**

NJDOC and Edna Mahan shall develop and implement policies, procedures, and practices at Edna Mahan to ensure that prisoners are protected from harm due to sexual abuse and sexual harassment.  Accordingly and specifically:

10.     During the first nine (9) months following the Effective Date, NJDOC and Edna Mahan
        will ensure the policies and procedures related to the topics specified below are drafted
        and/or revised in accordance with this Agreement and to incorporate gender-responsive
        strategies, as applicable.  NJDOC and Edna Mahan shall provide any policies and
        procedures developed or revised in accordance with this Agreement to the Monitor for
        comment and approval to accomplish the timeframes in this Agreement.  The Monitor
        will provide feedback on these policies and procedures promptly to Edna Mahan, but at
        all times within thirty (30) days:

        a.      Sexual Assault, Sexual Abuse, and Sexual Harassment;

        b.      Prisoner Supervision;

        c.      Camera Management;

        d.      Staff/Inmate Over-Familiarity;

        e.      Reporting Incidents or Allegations of Sexual Abuse or Sexual Harassment;

        f.      Prisoner Education;

        g.      Cross-gender searches and viewing;

        h.      Protective Custody;

        i.      Prevention of Retaliation;

        j.      Response to Allegations of Sexual Abuse or Sexual Harassment;

        k.      Referrals and Investigations of Allegations of Sexual Abuse or Sexual
                Harassment;

        l.      Staff Reporting of Personal Relationships.

11.     Within one year of the Effective Date, all policies and procedures specified to be drafted
        and/or revised to incorporate and align them with the provisions in this Agreement will
        be adopted by Edna Mahan.  Edna Mahan will work with the Monitor to prioritize
        policies and procedures to accomplish the timeframes in this Agreement.

12.     Prior to adoption, Edna Mahan will provide a copy of the policy or procedure to DOJ for
        review, comment, and approval, with any disputes to be resolved by the Court.  DOJ will
        not unreasonably refuse to approve submitted policies or procedures.  DOJ will provide
        feedback on these policies and procedures promptly to Edna Mahan, but at all times
        within thirty (30) days so that NJDOC can satisfy mandated timeframes. Edna Mahan
        will address all comments or make any changes requested by DOJ within thirty (30) days
        after receiving the comments, and resubmit the policies and procedures to DOJ for review
        and approval as necessary.  DOJ will respond within thirty (30) days.

13. No later than ninety (90) days after DOJ's approval of each policy and procedure (except as otherwise stated in the Agreement), Edna Mahan will create a staff training plan that addresses the training requirements of each policy or procedure revised. Each training plan will specify (i) staff to be trained and (ii) the date(s) of training planned. Each staff training plan will be provided to both DOJ and the Monitor.

14. Unless otherwise agreed to by the Parties, all policies and procedures specified in Paragraph 10 will be fully implemented upon completion of the staff training plan, with a goal of all training being completed within eighteen (18) months or sooner of DOJ's approval of the policy or procedure (except as otherwise stated in the Agreement).

15. Edna Mahan will annually review its policies and procedures, revising them as it deems necessary.  Any revisions to the policies and procedures will be submitted to DOJ for approval in accordance with Paragraph 12 above.

16. NJDOC and Edna Mahan shall comply with Edna Mahan's Internal Management Procedure Titled Zero Tolerance Policy: Prison Sexual Assault, mandating zero tolerance toward all forms of sexual abuse and sexual harassment, and any revision to or replacement of that policy.

17. To the extent that a Party to this Agreement requires an extension on the timeframes set forth in this Section, the Party may request an extension, which will not be unreasonably denied by the other Party.

**B.    Prisoner Supervision**

18. Edna Mahan shall ensure that it provides written guidance outlining the job responsibilities of those staff members responsible for direct management of corrections staff assigned to all housing areas and dormitory settings in accordance with the policies and procedures developed pursuant to this Agreement.

19. Within six months of the Effective Date, Edna Mahan shall ensure that there is adequate supervision by corrections staff assigned to all housing areas and dormitory settings, in that:

    a.    Housing Unit Officers in units operated as Direct Supervision shall interact directly with the prisoners in the housing units providing supervision and contact from within the housing unit throughout the shift;

    b.    Housing Unit Officers in units not designated for Direct Supervision shall provide continuous supervision of inmates through indirect supervision from vantage points outside of the unit and routine, unannounced rounds in accordance with Paragraph 22; and

    c.    In all housing units, Housing Unit Officers shall conduct living area searches and cell/bed searches as required by policy.

20. All special management units, specifically units for prisoners with mental health issues,

close custody, protective custody, and any other segregated housing units, shall be operated as Direct Supervision.

21.   Within two years of the Effective Date, Edna Mahan shall ensure that there is Direct Supervision in all housing units.

22.   Edna Mahan shall ensure and document that, absent exigent circumstances, correction officers conduct unannounced rounds at least every hour inside each general population housing unit and at least once every 30-minute period for units that include special management prisoners (as referenced in Paragraph 20), or more often if deemed necessary by Edna Mahan.

23.   Edna Mahan shall ensure and document that intermediate level or higher-level supervisors (at the rank of sergeant or above) conduct and document unannounced rounds during all shifts to identify and deter staff misconduct or lapses in supervision.  The Housing Floor Officer in a unit undergoing a supervisory round shall not be alerted that the supervisory round is occurring.

24.   Edna Mahan shall ensure that all security rounds are documented on bound logs with pre-printed sequential page numbers that do not contain pre-printed rounding times, and that are maintained on each housing unit, or in an electronic format that does not contain pre-established rounding times and is accessible on each housing unit.  Edna Mahan shall also ensure that a master log of supervisory rounds is maintained for the entire Edna Mahan campus.  The logs should be reviewed at least weekly by Edna Mahan leadership, and not less than quarterly by the NJDOC Commissioner or his/her designee.

25.   Video surveillance may be used to supplement, but must not be used to replace, rounds by correctional officers.

## C.   Camera Management

NJDOC has contracted with an expert who has conducted a review of the Edna Mahan Camera Plan, including a review of each camera's placement.  As a result of that review, cameras are strategically placed to maximize supervision while protecting privacy.

26.   Edna Mahan will develop and implement camera management policies and procedures in accordance with this Agreement.

27.   Edna Mahan shall ensure substantial video coverage of all of the primary areas frequented by prisoners.  These areas consist of housing areas, entrances to shower and toilet areas, congregate activity areas (dining hall, yards, chapel), visiting rooms, entry and exits including vehicle access points and housing unit entry, stairways and stairwells, congregate areas of prisoner living units, and hallways.  Video coverage need not be contemporaneously monitored.

28.   All video shall be retained for at least 30 days, unless an unusual occurrence such as an alleged assault or sexual abuse, or display of contraband, occurs in an area surveilled, in which case the video shall be preserved until the matter is fully investigated and

prosecuted or dismissed by authority of the Commissioner, or at least five years, whichever is longer.

29.     Camera management policies and procedures, including the locations where cameras have been placed, will be reviewed by Edna Mahan at least annually to ensure that they are serving their goal of maximizing supervision.  To the extent that any changes to the Camera Management policies and procedures, or to a camera location, need to be made, they will be made within 30 days of the completion of the annual review.  If a change cannot be made within 30 days, the reason for exceeding 30 days will be documented and notice of the proposed change and reason for exceeding 30 days will be provided to DOJ. NJDOC and Edna Mahan will also provide to DOJ confirmation of completed change once it occurs.

**D.     Staffing**

30.     Within four months of the Effective Date, Edna Mahan shall develop a new staffing plan, designating the necessary security and custody posts to be staffed at Edna Mahan, based on gender-responsive principles, that provides for adequate security staffing levels, in accordance with the PREA requirements delineated in 28 C.F.R. § 115.13(a), to protect prisoners from sexual abuse and to achieve compliance with this Agreement on the timelines set out in this Agreement.  Edna Mahan's staffing plan shall be subject to review and approval by DOJ, which approval shall not be unreasonably withheld.  The staffing plan will be reassessed annually by Edna Mahan in accordance with Paragraph 34 of this Agreement.

31.     The Edna Mahan staffing plan shall designate gender-restricted posts at Edna Mahan, through a process that ensures that any such restriction complies with Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et seq*., and make efforts to ensure that the requirements are met for bona-fide occupational qualifications.

32.     Edna Mahan will take steps to staff the facility based on the staffing plan within one fiscal year of the completion of each staffing plan.  NJDOC intends to seek amendment to the consent order in the matter of *Csizmadia v. Fauver*, Civ. No. 88-786, to enable compliance with this provision.  In circumstances where the staffing plan is not complied with, Edna Mahan shall document and justify all deviations from the plan.

33.     NJDOC and Edna Mahan shall develop, and implement a plan to recruit and retain women correctional officers at Edna Mahan in a manner that complies with Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et seq*.  Edna Mahan's recruitment and retention plan shall be subject to review and approval by DOJ, which approval shall not be unreasonably withheld.

34.     For the annual reassessment of the staffing plan, NJDOC and Edna Mahan, in consultation with the Department-wide PREA Coordinator and Edna Mahan's PREA Compliance Manager, shall assess, determine, and document whether adjustments are needed to the Edna Mahan staffing plan, and implement such adjustments.  The annual reassessment will include documentation of the following information:

a.      An evaluation of existing staffing levels and need for adjustments;

b.      A listing of each post and position needed;

c.      The number of hours needed for each post and position;

d.      A listing of staff, by gender, working overtime at Edna Mahan and the amount of overtime worked by each staff member;

e.      A listing of supervisors by gender working overtime at Edna Mahan; and

f.      Edna Mahan's assessment of its ability to comply with the staffing plan.

35.   Quarterly, Edna Mahan will provide a Staffing Update to the Monitor and DOJ and shall include the following information:

a.      A listing of staff hired at Edna Mahan, by gender and positions filled; and

b.      A listing of staff who ended their employment at Edna Mahan, including gender, position, and reason for separation.

36.   NJDOC shall continue to employ an upper-level, Department-wide PREA Coordinator with sufficient time and authority to develop, implement, and oversee its efforts to comply with the PREA standards at Edna Mahan and all of its facilities.

37.   NJDOC and Edna Mahan shall designate a full-time (40 hours/week) PREA Compliance Manager who has no other duties within NJDOC or Edna Mahan and who is assigned to oversee PREA compliance at Edna Mahan.  This individual will have sufficient authority to coordinate Edna Mahan's efforts to comply with the PREA standards.

38.   NJDOC and Edna Mahan shall ensure that Edna Mahan's PREA Compliance Manager continues to report directly to the Administrator of Edna Mahan with dotted-line reporting to the Department-wide PREA Coordinator.  Dotted-line reporting refers to a relationship between an employee and a secondary supervisor who may provide additional oversight and guidance to the employee in the execution of his or her work.

39.   NJDOC and Edna Mahan shall develop a job description for Edna Mahan's PREA Compliance Manager with expected responsibilities, and submit this job description to the Monitor and DOJ for review;

40.   NJDOC and Edna Mahan shall provide training to the Edna Mahan PREA Compliance Manager necessary to fulfill his or her duties; and

41.   NJDOC's PREA Coordinator shall document semi-annual review meetings with the Edna Mahan PREA Compliance Manager, and other supervisors as appropriate, to discuss the Edna Mahan PREA Compliance Manager's activities and job responsibilities during the relevant period.

42.     Policies and procedures at Edna Mahan shall require that contractors and volunteers who have contact with prisoners but are not directly supervised by NJDOC or Edna Mahan employees comply with Edna Mahan's sexual abuse and sexual harassment policies and procedures.

**E.  Training**

NJDOC and Edna Mahan shall ensure that all staff have the adequate knowledge, skill, and ability to prevent, detect, and respond to sexual abuse and sexual harassment at Edna Mahan, and to manage, interact, and communicate appropriately with women prisoners.  Accordingly and specifically:

43.     Within six months of the Effective Date, NJDOC and Edna Mahan shall train or retrain all Edna Mahan staff who may have contact with prisoners on the following:

   a.     Its zero-tolerance policy for sexual abuse and sexual harassment;

   b.     How to fulfill staff responsibilities under its sexual abuse and sexual harassment prevention, detection, reporting, and response policies and procedures;

   c.     The right of prisoners to be free from sexual abuse and sexual harassment;

   d.     The right of prisoners and employees to be free from retaliation for reporting sexual abuse and sexual harassment;

   e.     The dynamics of sexual abuse and sexual harassment in confinement;

   f.     The common reactions of sexual abuse and sexual harassment victims;

   g.     How to respond to sexual abuse and sexual harassment, including:

      i.     How to respond professionally and in a victim-centered manner to individuals who report sexual abuse and sexual harassment;

      ii.    How and to whom to report allegations or suspicions of sexual abuse and sexual harassment, including how to comply with relevant laws related to mandatory reporting of sexual abuse to outside authorities; and

      iii.   How to initiate appropriate first response to initial reports of recent allegations of sexual abuse, pursuant to 28 C.F.R. § 115.64.

   h.     Signs of threatened and actual sexual abuse;

   i.     How to avoid inappropriate relationships with prisoners;

   j.     Gender-responsive principles; and

   k.     How to communicate effectively and professionally with prisoners.  This training shall emphasize that verbal abuse, including name calling and the use of sexually

explicit, profane, vulgar, or degrading language, will not be tolerated.

44.   NJDOC and Edna Mahan shall provide refresher training every other year to all Edna Mahan staff to ensure that they know the current sexual abuse and sexual harassment policies and procedures. NJDOC and Edna Mahan shall require that staff demonstrate proficient knowledge of the policies and procedures to complete the training requirements.

45.   To the extent that revisions are made to policies or procedures or new policies or procedures are developed to comply with this Agreement, NJDOC and Edna Mahan will work with the Monitor in drafting new training materials and/or revising current training materials to ensure the training materials are current.

46.   NJDOC shall certify and maintain documentation showing that all active Edna Mahan staff have been trained.

**F.  Prisoner Education**

Edna Mahan shall effectively communicate to all prisoners their right to be free from sexual abuse and sexual harassment and the protections in place at Edna Mahan to ensure that such abuse and harassment does not occur or, if it does occur, is reported so it can be responded to promptly, appropriately, and without retaliation.  Accordingly and specifically:

47.   Edna Mahan shall continue to ensure that, during the intake process, or within 30 days of intake, all prisoners receive information regarding the following:

a.   NJDOC's zero-tolerance policy regarding sexual abuse and harassment;

b.   Definitions of sexual abuse and sexual harassment;

c.   The right to be free from sexual abuse and sexual harassment and from retaliation for reporting such incidents;

d.   The right to be free from verbal abuse, including name calling, and sexually explicit, profane, vulgar, or degrading language;

e.   How to confidentially report incidents or suspicions of sexual abuse and harassment, including the availability of non-prisoner interpreters for prisoners with limited ability to speak or write in English;

f.   How to contact the Special Investigation Division; and

g.   How to contact the Office of the Corrections Ombudsperson.

48.   During the intake process, or within 30 days of intake, Edna Mahan shall continue to provide comprehensive orientation education to prisoners either conducted in-person or through a video presented by an in-person facilitator regarding their rights to be free from

sexual abuse and sexual harassment and to be free from retaliation for reporting such incidents, and regarding their policies and procedures for responding to such incidents.

49.     Current Edna Mahan prisoners will again receive the information and education described in Paragraphs 47 and 48 above within three months of the Effective Date.

50.     NJDOC and Edna Mahan shall ensure that the individuals conducting or facilitating the comprehensive prisoner educational orientation are trained on Edna Mahan and NJDOC's policies and procedures related to sexual abuse and sexual harassment, the PREA standards, and the terms of this Agreement.

51.     The individual conducting or facilitating the comprehensive prisoner orientation education shall remain in the room during the entire orientation.  If an exigent circumstance arises that requires the individual conducting or facilitating the orientation to leave the room, the individual will return to the room as promptly as possible.

52.     Consistent with current policy, Edna Mahan shall ensure that the comprehensive orientation information is conveyed and made available in formats accessible to all prisoners, including those who are limited English proficient, deaf, visually impaired, or otherwise disabled as well as to prisoners who have limited reading skills.

53.     NJDOC and Edna Mahan shall maintain documentation of prisoner participation in the comprehensive prisoner orientation sessions.

**G. Prisoners' Right to Privacy at Edna Mahan**

NJDOC and Edna Mahan shall prevent officers from unnecessarily viewing Edna Mahan prisoners who are naked or performing bodily functions.  Accordingly:

54.     Cross-Gender Searches

   a.     Edna Mahan shall comply with <u>N.J.S.A.</u> 30:1B-46 and NJDOC's policy to not conduct cross-gender strip searches or visual body cavity searches (meaning a search of the anal or genital opening) except in exigent circumstances or when performed by medical practitioners.

   b.     Prisoners' access to regularly available programming or other out-of-cell opportunities shall not be restricted in order to comply with cross-gender search restrictions.

   c.     Edna Mahan shall document all cross-gender strip searches, cross-gender visual body cavity searches, and cross-gender pat-down searches of women prisoners, and shall document the exigent circumstances that warranted the search.  To the extent any such searches were conducted, Edna Mahan shall provide this documentation to the Monitor and DOJ on a quarterly basis.

   d.     NJDOC and Edna Mahan shall train security staff in how to conduct cross-gender pat-down searches, when required, in a professional and respectful manner, and in

the least intrusive manner possible, consistent with security needs.

55.     Cross-Gender Viewing

    a.    NJDOC and Edna Mahan shall ensure that Edna Mahan prisoners are able to perform bodily functions–such as showering, bathing, and using the toilet– and change clothing without nonmedical staff of the opposite gender viewing their breasts, buttocks, or genitalia, except in exigent circumstances or when such viewing is incidental to routine cell checks.

    b.    Edna Mahan shall require staff of the opposite gender to announce their presence when entering a prisoner housing unit, and before entering the shower or toilet areas, except in exigent circumstances.

**H.  Reporting Allegations of Sexual Abuse and Sexual Harassment**

In order to adequately identify and respond to all instances of sexual abuse and sexual harassment at Edna Mahan, NJDOC and Edna Mahan shall ensure that Edna Mahan prisoners, staff, and third-parties have multiple unimpeded methods to report incidents of alleged or suspected sexual abuse and sexual harassment free from retaliation.  Accordingly and specifically:

56.     NJDOC and Edna Mahan shall provide multiple internal methods, including a grievance process, at least one method that allows prisoners to report privately, and at least one method that allows prisoners to report anonymously, for Edna Mahan prisoners to report sexual abuse and sexual harassment, retaliation by other prisoners or staff for reporting sexual abuse and sexual harassment, and staff neglect or violation of responsibilities that may have contributed to such incidents, consistent with 28 C.F.R. § 115.51.  The Edna Mahan prisoner reporting system must include:

    a.    Provisions for accepting reports made verbally, in writing, anonymously, and from third parties including other prisoners, Edna Mahan staff, and the prisoner's friends and family, advocates or legal representation. In the case of reports made verbally, staff shall promptly document those reports in writing;

    b.    Clear information on which reporting methods allow for anonymous reporting; and

    c.    Information on how to report alleged or suspected sexual abuse or sexual harassment on behalf of a prisoner, and that information shall be made publicly available.

57.     NJDOC and Edna Mahan shall also continue to provide at least one way for Edna Mahan prisoners to report abuse or harassment to a public or private entity or office that is not part of the agency, and that is able to receive and immediately forward prisoner reports of sexual abuse and sexual harassment to agency officials, allowing the Edna Mahan prisoner to remain anonymous upon request.  The preferred method provided should be through a toll-free number, or other method as agreed.

58.     NJDOC and Edna Mahan shall ensure that Edna Mahan prisoners may report abuse or harassment to  the Office of the Corrections Ombudsperson by methods that comply with Paragraphs 56-57 of this Agreement.

59.     NJDOC and Edna Mahan shall continue to provide a method for staff to privately report sexual abuse and sexual harassment of prisoners.

60.     Consistent with <u>N.J.S.A.</u> 30:1B-40, NJDOC and Edna Mahan shall require all Edna Mahan employees to report immediately:

   a.     Any knowledge, suspicion, or information regarding an incident or alleged incident of sexual abuse or sexual harassment of Edna Mahan prisoners that occurred in Edna Mahan, in transport vehicles, or in any off-site facilities under the control and supervision of NJDOC or Edna Mahan;

   b.     Retaliation against Edna Mahan prisoners or staff who reported such an incident; and

   c.     Any staff neglect or violation of responsibilities that may have contributed to an incident or retaliation.

61.     Apart from reporting to designated supervisors or officials, staff shall not reveal any information related to an Edna Mahan sexual abuse or sexual harassment report to anyone other than to the extent necessary to make treatment, investigation, and other security and management decisions.

62.     NJDOC and Edna Mahan shall continue to report all allegations of sexual abuse and sexual harassment of Edna Mahan prisoners, including third party reports, anonymous reports, and prisoner grievances, to NJDOC's Special Investigation Division ("SID") promptly, but at all times within 12 hours of receipt of the report.

63.     NJDOC and Edna Mahan shall report all allegations of sexual abuse of Edna Mahan prisoners, including third party reports, anonymous reports, and prisoner grievances, to Edna Mahan's Administrator, promptly, but at all times within 12 hours of receipt of the report.

**I.   Protecting Prisoners and Staff from Retaliation**

64.     NJDOC and Edna Mahan shall protect all Edna Mahan prisoners and staff who report allegations of sexual abuse or sexual harassment or cooperate with sexual abuse or sexual harassment investigations from retaliation by other prisoners or staff, and shall continue to designate Edna Mahan's PREA Compliance Manager with monitoring allegations of retaliation concerning prisoners.

65.     NJDOC and Edna Mahan shall employ multiple protection measures, such as housing changes or transfers for alleged prisoner victims, removal of alleged staff abusers from contact with victims, and emotional support services for prisoners or staff who fear

retaliation for reporting sexual abuse or sexual harassment or for cooperating with investigations.

66.     Whenever NJDOC or Edna Mahan receive an allegation that an Edna Mahan staff member has engaged in sexual abuse or sexual harassment, Edna Mahan's PREA Compliance Manager and Administrator shall confer to determine whether the staff should be removed from positions of prisoner contact at Edna Mahan until an investigation is concluded.  Edna Mahan's PREA Compliance Manager shall document the decision and forward the conclusion to the Department-wide PREA Coordinator.

67.     NJDOC and Edna Mahan shall monitor all prisoners and staff who report sexual abuse or sexual harassment and prisoners who have been reported to have suffered or cooperated with sexual abuse or sexual harassment investigations from retaliation by other prisoners or staff for at least 90 days following a report of sexual abuse or sexual harassment, to see if there are changes that may suggest possible retaliation by prisoners or staff, including prisoner disciplinary reports, housing or program changes, and negative performance reviews or reassignments, and shall act promptly to remedy any such retaliation.  NJDOC and Edna Mahan shall continue such monitoring beyond 90 days if the initial monitoring indicates a continuing need, as determined by NJDOC and Edna Mahan.  In the case of prisoners, such monitoring shall also include periodic status checks.

68.     If any other individual who cooperates with an investigation expresses a fear of retaliation, NJDOC and Edna Mahan shall take measures they deem appropriate to protect that individual against retaliation.

**J.  Response to an Allegation of Sexual Abuse and Sexual Harassment**

         NJDOC and Edna Mahan shall ensure that all Edna Mahan prisoners who are alleged victims of sexual abuse and sexual harassment are offered timely, unimpeded access to crisis intervention services as appropriate and that staff appropriately respond to and counsel the alleged victim while taking steps to preserve evidence and protect the victim, consistent with 28 C.F.R. § 115.64.  Accordingly:

69.     When NJDOC or Edna Mahan learns that a prisoner may be subject to a substantial risk of imminent sexual abuse, NJDOC or Edna Mahan shall take immediate action to protect the prisoner.

70.     Edna Mahan shall not place in involuntary restricted housing a prisoner who is alleged to have suffered sexual abuse or sexual harassment solely for the purpose of protecting that prisoner, unless a determination, documented in writing and reviewed by the PREA Compliance Manager or the Edna Mahan Administrator's designee within 24 hours, has been made that there is no available alternative means of separation from likely abusers.

71.     If it is necessary to hold prisoners who report sexual abuse or sexual harassment in restricted housing in order to keep them safe from abuse or retaliation, Edna Mahan shall ensure that such prisoners have access to privileges, including visitation, commissary, programming, and vocational opportunities to the extent possible, for example absent a threat to the prisoner's safety as determined by SID.

72.   Edna Mahan shall not place in restricted housing a prisoner who is alleged to have suffered sexual abuse or sexual harassment solely for the purpose of interviewing that prisoner as part of an investigation.

73.   Edna Mahan shall ensure access for prisoners to outside victim advocates for emotional support services related to sexual abuse by giving prisoners mailing addresses and telephone numbers, where available, of local, state, or national victim advocacy or rape crisis organizations. Edna Mahan shall enable reasonable communication between prisoners and these organizations and agencies in as confidential a manner as possible.

74.   NJDOC and Edna Mahan shall continue to maintain memoranda of understanding or other agreements with community service providers that are able to provide prisoners with confidential emotional support services related to sexual abuse or sexual harassment. NJDOC and Edna Mahan shall maintain copies of such agreements.

## K.  Referrals and Investigations

NJDOC and Edna Mahan shall ensure that all allegations of sexual abuse and sexual harassment at Edna Mahan are promptly, thoroughly, and objectively investigated and appropriately referred for prosecutorial review, and that alleged victims are advised of the outcome of their allegations.   Accordingly:

75.   Edna Mahan investigators shall continue to investigate allegations of sexual abuse or sexual harassment, consistent with NJDOC policy and New Jersey law.  Edna Mahan will continue to refer allegations of sexual abuse and sexual harassment to local prosecutors as appropriate.

76.   The provisions in this section that provide deadlines for NJDOC or Edna Mahan's issuance of an investigative report following an allegation of sexual abuse or harassment apply only to administrative investigations undertaken solely by NJDOC or Edna Mahan, and do not apply to criminal investigations undertaken by the prosecutors in collaboration with NJDOC or Edna Mahan.

77.   Edna Mahan shall investigate all allegations of sexual abuse or sexual harassment reasonably promptly, thoroughly, and objectively, including third party and anonymous reports.  The departure of the alleged abuser or victim from the employment or control of Edna Mahan or NJDOC shall not provide a basis for terminating an investigation. Administrative investigations shall be completed regardless of the results of any criminal investigations and regardless of the subject's continued employment by NJDOC.

78.   Edna Mahan shall use investigators who have received special training in institutional sexual abuse.  Specialized training shall include techniques for interviewing sexual abuse victims, proper use of *Miranda v. Arizona*, 384 U.S. 436 (1966), and *Garrity v. New Jersey*, 385 U.S. 493 (1967), warnings, sexual abuse evidence collection in confinement settings, and the criteria and evidence required to substantiate a case for administrative action or prosecution referral.  NJDOC shall maintain documentation that Edna Mahan investigators have completed the required specialized training in conducting sexual abuse investigations.  Consistent with current practice, the Department-wide PREA Coordinator

and Edna Mahan's PREA Compliance Manager shall not serve as investigators for sexual abuse investigations.

79. All NJDOC or Edna Mahan investigative staff must disclose any personal relationships with Edna Mahan staff who may be the subject of a current investigation, and must recuse themselves from participating in an investigation involving any Edna Mahan staff member with whom they have a personal relationship. A "personal relationship" is any relationship that interferes with the investigator's ability assess the facts of the investigation in an objective manner, including relationships with a family member, business partner, roommate, cohabitant, or person with whom they are involved in a dating or close social relationship.

80. The credibility of an alleged victim, suspect, or witness shall be assessed on an individual basis and shall not be determined by the person's status as prisoner or staff, consistent with 28 C.F.R § 115.71.

81. Within 90 days after an allegation of sexual abuse or sexual harassment is referred for investigation, NJDOC or Edna Mahan shall issue a written investigative report that indicates whether the allegation is substantiated, unsubstantiated, or unfounded. If the matter is referred to prosecutorial review, this 90-day period shall begin to run the day after NJDOC receives the prosecutor's decision as to whether the allegation is criminal or administrative (and therefore will be investigated solely by NJDOC or Edna Mahan). The investigator may request in writing, approved by the facility designee, an extension for cause that identifies the remaining actions necessary to complete the investigation. In no case shall the investigation be deemed to be unfounded solely due to the expiration of the 90 days. The investigative report shall include an effort to determine whether staff actions or failures to act contributed to the abuse, a description of the physical and testimonial evidence, the reasoning behind credibility assessments, and investigative facts and findings.

82. NJDOC shall ensure that an investigative summary sheet that provides an overview of the current status of an investigation is included in the investigative file. The summary information should include, among other things, basic information such as staff name(s), prisoner names(s), location of incident, type of allegation, and the date and time of day of the incident.

83. A review team, including upper-level management officials at Edna Mahan, with input from line supervisors, investigators, and medical and mental health practitioners, shall conduct an incident review within 30 days of the conclusion of every investigation of substantiated and unsubstantiated allegations of sexual abuse by staff. The review team shall:

    a.    Consider whether the allegation or investigation indicates a need to change policy or practice to better prevent, detect, or respond to sexual abuse by staff;

    b.    Examine the area in Edna Mahan where the incident allegedly occurred to assess whether physical barriers in the area may prevent detection of sexual abuse;

c. Assess the adequacy of staffing levels in that area during different shifts;

d. Assess whether monitoring technology should be deployed or augmented to supplement supervision by staff; and

e. Prepare a report of its findings and any recommendations for improvement and submit such report to the Department-wide PREA Coordinator, and Edna Mahan's PREA Compliance Manager.

84. NJDOC and Edna Mahan shall review the review team's recommendations for improvement and shall implement them or document their reasons for not doing so.

85. Edna Mahan's Administrator should have access to investigative files once they are complete, as well as the personnel files of involved employees, and regular briefings of PREA investigations that include sufficient details so that the facility Administrator and/or the incident review team has sufficient information to assess the incident and devise and implement any necessary movement, discipline, or corrective action.

## L.  Physical Plant

86. Edna Mahan shall ensure that access to and from the Edna Mahan compound is through secure, staffed checkpoints only.  Specifically, Edna Mahan shall conduct regular monitoring of the perimeters of the Edna Mahan grounds with the goal of preventing entry by persons or contraband outside of the secure checkpoints.

87. Edna Mahan shall ensure that every individual, including all staff, contractors, volunteers, visitors, and government officials entering the Edna Mahan compound receive thorough and effective contraband screening.

88. Edna Mahan shall conduct an inventory of all abandoned, dilapidated, or currently out of use structures on the Edna Mahan compound and develop and implement plans to demolish or secure any out of use buildings that pose a threat to institutional security or provide significant opportunities for sexual abuse.

89. If Edna Mahan determines that it will continue to utilize the old upholstery warehouse, Edna Mahan shall clear the space of unused equipment, inventory, and other visible barriers that pose safety concerns and create blind spots.

## M. Limited English Proficient (LEP) Prisoners

90. With respect to implementing the terms of this Agreement, NJDOC and Edna Mahan shall ensure that all LEP prisoners at Edna Mahan have access to interpretation and translation services as required by Title VI of the Civil Rights Act.

## IV.    QUALITY IMPROVEMENT AND DATA COLLECTION

91. Within eighteen (18) months of the Effective Date, NJDOC and Edna Mahan shall develop and implement a quality improvement program, as described in the paragraphs

below, to identify and address any trends and deficiencies in Edna Mahan's systems for prevention, detection and response to sexual abuse and sexual harassment at Edna Mahan, and to assess and ensure compliance with the terms of this Agreement.

92.   Within twelve (12) months of the Effective Date, Edna Mahan will draft and/or revise any quality improvement policies and procedures, consistent with the process in the Policies and Procedures Section, Section III.A, to identify and address systemic deficiencies, if identified, in Edna Mahan's sexual safety system. These quality improvement policies and procedures shall include:

   a.   Quarterly quality assurance meetings;

   b.   Qualitative review procedures to ensure investigations of sexual abuse and sexual harassment conform to the requirements of this Agreement;

   c.   Data collection requirements, including:

      i.    The procedures for data maintenance and collection for every allegation of sexual abuse and harassment;

      ii.   The sources for data collection, including documentation of announced and unannounced rounds, grievances, reports, investigation files, and incident reviews;

      iii.  The instrument(s) used to collect data;

      iv.   The standardized definitions used;

      v.    The methodology employed to analyze the data; and

      vi.   Quality control mechanisms to verify data accuracy.

   d.   A requirement to create or modify and implement policies and procedures to address problems that are uncovered during the course of quality improvement activities.

93.   NJDOC and Edna Mahan shall develop, implement, and maintain a Risk Management System ("RMS") that will document and track facility trends at Edna Mahan related to allegations of:  (1) sexual abuse; (2) sexual harassment; and (3) retaliation for reporting sexual abuse or sexual harassment.

   a.   The RMS shall ensure that trends and incidents involving sexual abuse and sexual harassment are identified and corrected in a timely manner.

   b.   The RMS will collect, consolidate, analyze, track, and otherwise use its data described in this Section to assist with the prevention of sexual abuse and sexual harassment.

94.     The Edna Mahan RMS data collection shall include:

a.      Number of substantiated prisoner and third-party reports of:

    i.      sexual abuse at Edna Mahan;

    ii.     sexual harassment at Edna Mahan;

    iii.    cross-gender staff presence in the shower and toilet areas of the bathrooms at Edna Mahan;

    iv.     Edna Mahan staff located in areas other than their assigned posts; and

    v.      retaliatory treatment and threats to prisoners or third-parties, including disciplinary actions or housing relocation;

b.      Number and names of Edna Mahan staff who:

    i.      engaged in or allegedly engaged in sexual abuse at Edna Mahan;

    ii.     engaged in or allegedly engaged in sexual harassment at Edna Mahan;

    iii.    allegedly violated the privacy rights of prisoners at Edna Mahan by entering the shower and toilet areas unannounced and without justification;

    iv.     allegedly used sexually explicit, profane, vulgar, degrading, or racially insensitive or offensive language on a frequent or repeated basis at Edna Mahan;

    v.      allegedly were located in areas other than their assigned post at Edna Mahan on a frequent or repeated basis;

    vi.     were disciplined for actions at Edna Mahan involving sexual abuse, sexual harassment, use of sexually explicit, profane, vulgar, degrading, or racially insensitive or offensive language, or unprofessional staff conduct with prisoners, including terminations, suspensions, and resignations; and

    vii.    resigned while a sexual abuse or sexual harassment allegation, or other investigation, was pending at Edna Mahan;

c.      Number of forensic medical exams, exams performed by sexual assault forensic examiners, and exams performed by sexual assault nurse examiners;

d.      Staffing levels, by gender, during different shifts;

e.      The number of sexual abuse and sexual harassment allegations that occurred on each shift;

f.      Locations within Edna Mahan where alleged sexual abuse and sexual harassment occurred;

g.      Number of prisoners who were held in or assigned to involuntary segregation because of a risk of or report of sexual victimization;

h.      Number and names of pregnant prisoners at Edna Mahan;

i.      Number of cross-gender strip, visual cavity, and pat-down searches;

i.      The number of all grievances related to sexual abuse or sexual harassment, emergency grievances, and number of grievances referred to Edna Mahan's Special Investigations Division for investigation;

j.      Number of times NJDOC or Edna Mahan has determined that an Edna Mahan prisoner was subject to substantial risk of imminent sexual or physical abuse;

k.      Number of administrative investigations initiated regarding allegations of sexual abuse or sexual harassment;

l.      Number of sexual abuse or sexual harassment investigations that involved extensions because a final decision had not been reached within 90 days;

m.      Number of instances when prisoners were used to act as interpreters for other prisoners in connection with sexual abuse or sexual harassment allegations or investigations;

n.      Total number of investigations, total number substantiated, total number unsubstantiated, and total number unfounded complaints of sexual abuse or sexual harassment;

o.      Number of PREA-related allegations involving staff from Edna Mahan referred for criminal investigation and the number of criminal prosecutions;

p.      Number of Edna Mahan staff disciplined for on- or off-duty conduct related to sexual abuse or sexual harassment or is a potential risk factor related to sexual abuse, such as employee misconduct at Edna Mahan related to contraband or undue familiarity, or for off-duty conduct related to domestic violence or drug trafficking;

q.      Number of times a substantiated incident of retaliation occurred involving Edna Mahan staff or prisoners;

r.      NJDOC, Edna Mahan, and staff reports of training attendance, frequency, and completion rates; and

s.      Incidents of self-harm.

95.   Edna Mahan shall aggregate the data collected on a quarterly basis and review data aggregated in order to assess and improve the effectiveness of its sexual abuse and sexual harassment prevention, detection, and response policies, practices, and training, including by:

   a.   Identifying potential patterns, changes, and problem areas (including for individual officers; for individual prisoners; and for housing units); to include problems in Edna Mahan's staffing levels, policies, practices, staff discipline system, and staff and prisoner training/education that might have contributed to those patterns if such patterns reflect increased sexual abuse and sexual harassment, decreased sexual abuse and sexual harassment detection, or inadequate responses to sexual abuse and sexual harassment;

   b.   Identifying staff or supervisors in need of retraining, performance plans, and discipline, while considering the employee's general responsibilities and specific assignment;

   c.   Developing intervention options, as appropriate, to facilitate an effective response to identified problems;

   d.   Taking corrective action on an ongoing basis; and

   e.   Preparing semi-annual reports of its findings and corrective actions, including a comparison to the findings in previous reports to assess progress.

96.   The RMS will rely on the data analysis described above.  All appropriate supervisors and investigative staff shall have access to this data described above.

   a.   Edna Mahan's Administrator shall use information from the RMS to improve quality management practices, identify patterns and trends, and take necessary corrective action both on an individual and systemic level.

   b.   Supervisors assigned to Edna Mahan will assure that remedial activities are completed, as well as report if the intervention was effective in changing behaviors.

   c.   The executive staff member responsible for women's facilities, or designee, will manage the RMS and will conduct quarterly audits of the RMS to ensure that analysis and intervention are working effectively, and to identify potential patterns or trends resulting in harm to prisoners.

97.   NJDOC and Edna Mahan will provide to the Monitor and DOJ on a semi-annual basis a list of all staff members identified through the RMS, and any corrective action, if taken.  The fact that a staff member is identified through the RMS does not necessarily mean any corrective action should be taken.  On an annual basis, NJDOC and Edna Mahan shall conduct a documented review of the RMS to ensure that it has been effective in identifying concerns regarding policy, training, or the need for discipline.  NJDOC and

Edna Mahan will document their review and conclusions and provide them to the Monitor and DOJ.

98.     If either the aggregated data referenced in Paragraph 95 indicates in three consecutive RMS reports a consistent failure to improve protection of prisoners from sexual abuse and sexual harassment by staff, or if there are increases in any of the following:

    a.     cases of staff-on-prisoner sexual abuse that are not unfounded;

    b.     cases of staff-on prisoner sexual harassment that are not unfounded;

    c.     cases of staff discipline for sexual abuse, sexual harassment or staff use of sexually explicit, profane, vulgar, degrading, or racially insensitive offensive language directed at a prisoner;

NJDOC and Edna Mahan shall make modifications to Edna Mahan's policies, procedures and/or practices to address the increase within 60 days of the third consecutive report. Nothing in this section prevents NJDOC and Edna Mahan from making modifications sooner than this or as data and/or incidents indicate a need for adjustment.

## V. IMPLEMENTATION

99.     Within 30 days of the Effective Date, NJDOC will designate an Agreement Coordinator to coordinate compliance with this Agreement and to serve as a point of contact for DOJ and the Monitor.

100.    NJDOC and Edna Mahan will create an Implementation Plan that describes the actions NJDOC and Edna Mahan will take to fulfill the obligations under this Agreement. Implementation of this Agreement will be completed in phases as outlined in the Agreement and the Implementation Plan.

101.    Within 30 days of the Effective Date, Edna Mahan will provide the first Implementation Plan to DOJ and the Monitor.  In its Implementation Plan, Edna Mahan will develop a specific schedule and deadlines for the upcoming year and a general schedule for successive years.  In its Implementation Plan, Edna Mahan will develop a specific schedule and deadlines for the first twelve months, in which Edna Mahan will: (a) draft or revise policies and procedures; (b) complete a staffing plan, (c) develop and deliver training to Edna Mahan staff and providers concerning the provisions of this Agreement and Edna Mahan's commitment to fulfilling its obligations under the Constitution; (d) develop and implement an RMS; and (e) develop and implement monthly quality improvement mechanisms to report on aggregate relevant data to prevent or minimize harm to prisoners from sexual abuse.

102.    DOJ and the Monitor will provide comments regarding the Implementation Plan (and any revisions to the Implementation Plan) within 30 days of receipt.  Edna Mahan will timely revise its Implementation Plan to address comments from DOJ and the Monitor; the Parties and the Monitor will meet and consult as necessary.

103.   As needed, Edna Mahan, in conjunction with DOJ and the Monitor, will supplement or revise the Implementation Plan  to focus on and provide additional detail regarding implementation activities.  Edna Mahan will address in its updated Implementation Plans any areas of non-compliance or other recommendations identified by the Monitor in his or her reports.

## VI. <u>NJDOC AND EDNA MAHAN'S REPORTING REQUIREMENTS</u>

104.   NJDOC and Edna Mahan shall provide to the Monitor and DOJ a semi-annual Status Report until the Agreement is terminated, the first of which shall be submitted within six months of the Effective Date.

105.   Each Status Report shall describe the actions NJDOC and Edna Mahan have taken during the reporting period to implement this Agreement and shall make specific reference to the Agreement provisions being implemented.  The report shall also summarize audits and quality improvement activities, and contain findings and recommendations that would be used to track and trend data compiled at Edna Mahan.

106.   NJDOC and Edna Mahan shall maintain sufficient records to document that the requirements of this Agreement are being properly implemented and shall make such records available to DOJ at all reasonable times for inspection and copying.  In addition, NJDOC and Edna Mahan shall maintain and submit upon request records or other documents to verify that they have taken such actions as described in their Status Reports (e.g., census summaries, policies, procedures, protocols, training materials and incident reports) and will also provide to DOJ all documents reasonably requested by DOJ.

## VII. <u>DOJ'S RIGHT OF ACCESS</u>

107.   DOJ and its attorneys, consultants, and agents shall have access to Edna Mahan, Edna Mahan prisoners, NJDOC and Edna Mahan staff and documents as is reasonably necessary to evaluate compliance with this Agreement.  DOJ will provide written notice prior to any site visits.  DOJ may participate in any compliance visits by the Monitor.

108.   Access is not intended, and will not be construed, as a waiver, in litigation with third parties, of any applicable statutory or common law privilege associated with information disclosed to DOJ under this Agreement.

109.   Within 72 hours of an incident or report, NJDOC shall notify DOJ upon any incident or allegations of sexual abuse or retaliation and/or injury requiring emergency medical attention related to an allegation sexual abuse.  With this notification, NJDOC and Edna Mahan shall forward to DOJ any related incident reports and medical and/or mental health reports and investigations as they become available.

110.   NJDOC shall provide to the Monitor and to DOJ copies of or applicable portions of any formal reports or recommendations from the Office of the Corrections Ombudsperson (not including ordinary course referrals and related documentation) or the Commission to Protect New Jersey Inmates from Sexual Assault and Sexual Misconduct concerning efforts to establish or revise Edna Mahan or statewide policies and procedures, including

reporting and data collection systems, related to sexual abuse or sexual harassment of prisoners.

## VIII. __PUBLIC TRANSPARENCY__

111.   Within ninety days of the Effective Date and for the duration of the Agreement, NJDOC will engage with the Edna Mahan Board of Trustees to identify goals, concerns, and recommendations regarding implementation of this Agreement.  NJDOC shall conduct periodic, but at least semi-annual, public meetings with stakeholders, including former Edna Mahan prisoners, prisoner advocates, and family members of current Edna Mahan prisoners.  The meetings shall serve to provide stakeholders and the public with an update on events, accomplishments, and setbacks during the previous period, and to respond to stakeholders' questions and requests for information related to Edna Mahan. Stakeholders also will be afforded the opportunity to ask questions and make proposals. Additionally, NJDOC and Edna Mahan shall conduct periodic, but at least semi-annual, meetings with available Edna Mahan staff to gather feedback from staff on events, accomplishments, and setbacks during the previous period.  Nothing in this Paragraph is intended to create any enforcement rights or standing other than those of the Parties under this Agreement.

## IX. __MONITORING__

112.   The Parties agree that Jane Parnell will be the Monitor retained by NJDOC to assess and report whether the provisions of the Agreement have been implemented.

113.   The Monitor will be appointed for a period of three years from the Effective Date, subject to an evaluation by the Court to determine whether to extend the Monitor's appointment until the termination of this Agreement as set forth below.  In evaluating the Monitor, the Court will consider the Monitor's performance under this Agreement, including whether the Monitor is completing its work in a cost-effective manner and on budget, and is working effectively with the Parties to facilitate Edna Mahan's efforts to comply with the Agreement's terms.  The Monitor may be removed for good cause by the Court at any time, on motion by any of the Parties which shall be granted for good cause shown, or the Court's own determination.

114.   NJDOC will pay the Monitor a maximum of $250,000 per year for performing all of the Monitor's duties under this Agreement.  The Parties recognize the importance of ensuring that the fees and costs of monitoring the Agreement are reasonable.  The Monitor will submit a proposed budget annually to the parties for comment, and to the Court for approval.  The Court has the discretion to increase the Monitor's cap by a specific amount for a specific year at the Monitor's request.  To grant the request, the Court must find that the increase is necessary for the Monitor to fulfill its duties under the Agreement and is not due to a failure in planning, budgeting, or performance by the Monitor.

115.   The Monitor will only have the duties, responsibilities, and authority conferred by this Agreement.  The Monitor will be subjected to the supervision and orders of the Court.

116.   The Monitor will conduct compliance reviews.  The purpose of the compliance reviews is to determine compliance with the material, specific requirements of this Agreement. Compliance reviews will be conducted in a reliable manner based on accepted means and methods.  The Monitor will provide the Parties with the underlying analysis, data, methods, and sources of information relied upon in the reviews.

117.   Neither NJDOC, Edna Mahan, DOJ, nor any of their staff or agents will have any supervisory authority over the Monitor's activities, reports, findings, or recommendations to implement the Agreement.

118.   The Monitor may contract or consult with other persons or entities to assist in the evaluation of compliance.  The Monitor will pay for the services out of his or her budget. The Monitor is ultimately responsible for any compliance assessments made under this Agreement.

119.   The Monitor will be permitted to engage in ex parte communications with NJDOC, Edna Mahan, DOJ, and the Court regarding this Agreement.

120.   In the event the Monitor is no longer able to perform his or her functions, is removed, or is not extended, within 60 days thereof, the Parties will together select and advise the Court of the selection of a replacement Monitor, acceptable to both.  If the Parties are unable to agree on a Monitor, each Party will submit the names of up to two candidates, along with the resumes and cost proposals, to the Court, and the Court will select and appoint from among the qualified candidates.

121.   Should a Party to this Agreement determine that the Monitor has exceeded his or her authority or failed to satisfactorily perform the duties required by the Agreement, the Party may petition the Court for such relief as the Court deems appropriate, including replacement of the Monitor, and/or any individual members, agents, employees, or independent contractors of the Monitor.  In addition, the Court, on its own initiative and in its sole discretion, may replace the Monitor or any member of the Monitor's team for failure to adequately perform the duties required by this Agreement.

122.   The Monitor will have full access to persons, employees, facilities, buildings, programs, services, documents, data, records, materials, and things that are necessary to assess Edna Mahan's progress and implementation efforts with this Agreement.  Access will include departmental or individual medical and other records.  The Monitor will provide 14 days' notice of any visit or inspection to the Agreement Coordinator.  Advance notice will not be required if the Monitor has a reasonable belief that a prisoner faces a risk of immediate and serious harm.  Access is not intended, and will not be construed, as a waiver, in litigation with third parties, of any applicable statutory or common law privilege associated with information disclosed to the Monitor under this Agreement.

123.   NJDOC and Edna Mahan shall direct all employees to cooperate fully with the Monitor.

124.   All information obtained by the Monitor shall be maintained in a confidential manner. Nothing in this Paragraph shall limit the access of Edna Mahan or NJDOC to such information.

125.    Monitoring Reports:

    a.      Within two months of the Effective Date, the Monitor will conduct a baseline site visit of Edna Mahan to become familiar with Edna Mahan and this Agreement.

    b.      The Monitor will conduct an on-site inspection and issue a Monitoring Report for Edna Mahan six months after the baseline site visit, and then every six months thereafter.  A draft Monitoring Report will be provided to NJDOC and DOJ in draft form for comment at least 30 days prior to its issuance.  NJDOC and DOJ will provide comments, if any, to the Monitor within 15 days of receipt of the draft Report. The Monitor will consider the responses of NJDOC and DOJ and make appropriate changes, if any, before issuing the final Monitoring Report.

    c.      The Monitoring Reports will describe the steps taken by Edna Mahan to implement this Agreement and evaluate the extent to which Edna Mahan has complied with each substantive provision of the Agreement, as set forth in the numbered Paragraphs herein, beginning with Paragraph 10 and ending at Paragraph 111.

    d.      Each Monitoring Report will evaluate the status of compliance for each relevant provision of the Agreement using the following standards: (1) Substantial Compliance; (2) Partial Compliance; and (3) Non-compliance.

    e.      The Monitor will review a sufficient number of pertinent documents and interview a sufficient number of staff and prisoners to accurately assess current conditions.  The provision of documents and scheduling of interviews shall be set up through the Agreement Coordinator.

    f.      Each Monitoring Report will describe the steps taken by each member of the monitoring team to analyze conditions and assess compliance, including documents reviewed and individuals interviewed, and the factual basis for each of the Monitor's findings.

    g.      Each Monitoring Report will contain the Monitor's independent verification of representations from Edna Mahan regarding progress toward compliance, and examination of supporting documentation.

    h.      Each Monitoring Report will provide specific, non-binding recommendations, if applicable, for each of the provisions in the Agreement outlining proposed actions for at least the next six months for Edna Mahan to complete toward achieving compliance with the particular provision.

126.    The Monitoring Reports will be filed with the Court and will be written with due regard for the privacy interests of individuals and will not include any information that could jeopardize the institutional security of Edna Mahan, or safety of Edna Mahan staff or prisoners.  The Monitoring Reports will provide relevant evidence regarding compliance. The Court determines the facts regarding compliance and the status of compliance pursuant to Sections X and XI of the Agreement.

127. Nothing in this Section prohibits the Monitor from issuing interim letters or reports to DOJ, NJDOC, Edna Mahan or the Court in this case should he or she deem it necessary.

128. Limitations:

   a. Except as directed by the Court, or as authorized by NJDOC, Edna Mahan, and DOJ acting together, the Monitor shall not make any public statements (at a press conference or otherwise) with regard to any act or omission of NJDOC or Edna Mahan or their agents, representatives or employees, or disclose information provided to the Monitor pursuant to this Agreement.

   b. The Monitor shall not testify in any other litigation with regard to any act or omission of NJDOC or Edna Mahan or any of their agents, representatives, or employees related to this Agreement, nor testify regarding any matter or subject that he or she may have learned as a result of his or her performance under this Agreement, nor serve as a non-testifying expert regarding any matter or subject that he or she may have learned as a result of his or her performance under this Agreement.

   c. Unless such conflict is waived by NJDOC, Edna Mahan, and DOJ, the Monitor shall not accept employment or provide consulting services that would present a conflict of interest with the Monitor's responsibilities under this Agreement, including being retained (on a paid or unpaid basis) by any current or future litigant or claimant, or such litigant's or claimant's attorney, in connection with a claim or suit against NJDOC or Edna Mahan, their departments, officers, agents or employees.

   d. The Monitor and members of the monitoring team are agents of the Court and not employed by the State or Edna Mahan or an agent thereof, and accordingly the records maintained by the Monitor shall not be deemed public records subject to public inspection.

   e. Neither the Monitor nor any person or entity hired or otherwise retained by the Monitor to assist in furthering any provision of this Agreement shall be liable for any claim, lawsuit or demand arising out of the Monitor's performance pursuant to this Agreement.

129. The Monitor shall provide NJDOC and Edna Mahan with reasonable technical assistance as requested.

130. The Monitor may convene regular monthly conference calls with DOJ, NJDOC, and Edna Mahan to discuss implementation of the terms of the Agreement, updates, and any other items that the Monitor and/or DOJ, NJDOC, and Edna Mahan wish to discuss.

## X. ENFORCEMENT

131. The United States District Court for the District of New Jersey will retain jurisdiction over this matter for the purposes of enforcing this Agreement.

132.　During the period that the Agreement is in force, the parties shall have semi-annual status conferences with the Court to update the Court on NJDOC's compliance with this Agreement.

133.　During the period that the Agreement is in force, if DOJ contends that NJDOC or Edna Mahan has not made material progress toward substantial compliance with a significant obligation under the Agreement, and such failure constitutes a violation of prisoners' constitutional rights, DOJ may initiate enforcement proceedings against NJDOC in Court for an alleged failure to fulfill its obligation under this Agreement.

134.　Prior to taking judicial action to initiate enforcement proceedings, DOJ will give NJDOC and Edna Mahan written notice of its intent to initiate such proceedings, and the Parties will engage in good-faith discussions to resolve the dispute.

135.　NJDOC and Edna Mahan will have 30 days from the date of such notice to cure the failure or otherwise resolve the dispute through the good-faith discussions.  The Parties may agree to extend this time, as reasonable, due to the nature of the issue(s).  At the end of the 30-day period (or such additional time as is reasonable due to the nature of the issue[s] and agreed upon by DOJ), in the event that DOJ determines that the failure has not been cured or that adequate remedial measures have not occurred, DOJ may initiate proceedings to address any such failure to cure or take adequate measures.  DOJ commits to work in good faith with NJDOC and Edna Mahan to avoid enforcement actions.

## XI.  TERMINATION

136.　Except where otherwise agreed to under a specific provision of this Agreement, NJDOC and Edna Mahan will implement all provisions of this Agreement within three years of the Effective Date.

137.　This Agreement may terminate earlier than the three-year period set forth in Paragraph 136, or at any time thereafter, if Edna Mahan has attained substantial compliance with all provisions of this Agreement and maintained that compliance for a period of one year, or as outlined in Paragraph 139, by order of the Court.

138.　NJDOC may seek termination of any full substantive section (*i.e.*, any section designated by Roman numeral or capitalized letter, such as "General Policies & Procedures," "Camera Management," "Staffing," etc.) by filing with the Court a motion to terminate that section.  The burden will be on NJDOC to demonstrate that Edna Mahan has attained and maintained its substantial compliance as to that section for at least one year.

139.　Beginning 24 months after the Effective Date, regardless of this Agreement's specific requirements, this Agreement will terminate, or substantive sections as described in Paragraph 138 may terminate, upon a showing by NJDOC that Edna Mahan has come into durable compliance with the requirements of the Constitution that gave rise to this Agreement.  In order to demonstrate durable compliance, NJDOC must establish with the Court that Edna Mahan is operating in accordance with constitutional conditions of confinement and adequate protection from harm from sexual abuse for Edna Mahan prisoners and has been doing so continuously for one year.

140.   The burden will be on NJDOC and Edna Mahan to demonstrate maintained substantial compliance with each of the provisions, or with a full substantive section as described in Paragraph 138, of this Agreement.  Monitoring assessments confirming compliance shall be considered presumptive proof of compliance.  Non-compliance with mere technicalities, or temporary failure to comply during a period of otherwise sustained compliance, will not constitute failure by Edna Mahan to maintain substantial compliance.  At the same time, temporary compliance during a period of sustained non-compliance will not constitute substantial compliance.

141.   In the event that it becomes impossible for NJDOC and Edna Mahan to satisfy any requirement of this Agreement due to a change of circumstances or the occurrence of other unforeseen circumstances, including but not limited to, a significant change in the size and/or composition of the prisoner population or the unforeseen closure of portion of the facility, then NJDOC and Edna Mahan shall notify DOJ in writing of the specific provisions in the Agreement impacted by the unforeseen circumstances and a description of the unforeseen circumstances rendering performance substantially unlikely or impossible.  Upon receipt of the written notice from the NJDOC and Edna Mahan, DOJ and the State shall meet and confer in good faith to determine whether there are reasonable alternatives to the requirements of this Agreement, which NJDOC and Edna Mahan can perform and which satisfy the DOJ's underlying concerns.  Nothing contained herein shall amend, increase, negate, or otherwise alter in any way the legal standard for modification of this Agreement.

142.   Should any provision of this Agreement be declared or determined by any court to be illegal, invalid, or unenforceable, the validity of the remaining parts, terms, or provisions will not be affected.  The Parties will not, individually or in combination with another, seek to have any court declare or determine that any provision of this Agreement is invalid.

143.   The Parties agree to work collaboratively to achieve the purpose of this Agreement.  In the event of any dispute over the language, requirements or construction of this Agreement, the Parties agree to meet and confer in an effort to achieve a mutually agreeable resolution.

144.   This Agreement will constitute the entire integrated agreement of the Parties.

145.   Any modification of this Agreement will be executed in writing by the Parties, will be filed with the Court, and will not be effective until the Court enters the modified agreement and retains jurisdiction to enforce it.

## XII.  GENERAL PROVISIONS

146.   NJDOC or Edna Mahan may coordinate with or enter into Memoranda of Understanding with all appropriate State, County, or municipal agencies in order for Edna Mahan to comply with provisions of this Agreement.

147.   DOJ and NJDOC will each bear the cost of their own fees and expenses incurred in connection with this case.

148.   All services mentioned or described in this Agreement are subject to reasonableness standards and nothing herein will be interpreted to mean that the provision of services are unlimited in amount, duration or scope.

149.   The Agreement is binding on all successors, assignees, employees, agents, contractors, and all others working for or on behalf of NJDOC and Edna Mahan to implement the terms of this Agreement.

150.   The Parties agree that, as of the Effective Date of this Agreement, litigation between these parties is not "reasonably foreseeable" concerning the matters described in this Agreement.  To the extent that any Party previously implemented a litigation hold to preserve documents, electronically stored information, or things related to the matters described in this Agreement, the Party is no longer required to maintain such a litigation hold.  Nothing in this paragraph relieves any Party of any other obligations imposed by this Agreement, including the document creation and retention requirements described herein.

151.   NJDOC and Edna Mahan will not retaliate against any person because that person has filed or may file a complaint, provided assistance or information, or participated in any other manner in DOJ's investigation or the Monitor's activities related to this Agreement. NJDOC and Edna Mahan will timely and thoroughly investigate any allegations of retaliation in violation of this Agreement and take any necessary corrective actions identified through such investigations.

152.   Failure by any Party to enforce this entire Agreement or any provision thereof with respect to any deadline or any other provision herein will not be construed as a waiver, including of its right to enforce other deadlines and provisions of this Agreement.

153.   The Parties will promptly notify each other of any court or administrative challenge to this Agreement or any portion thereof.

154.   The Parties represent and acknowledge this Agreement is the result of extensive, thorough, and good faith negotiations.  The Parties further represent and acknowledge that the terms of this Agreement have been voluntarily accepted, after consultation with counsel, for the purpose of making a full and final compromise and settlement of the allegations set forth in DOJ's CRIPA Notice dated April 13, 2020.  Each Party to this Agreement represents and warrants that the person who has signed this Agreement on behalf of a Party is duly authorized to enter into this Agreement and to bind that Party to the terms and conditions of this Agreement.

155.   This Agreement may be executed in counterparts, each of which will be deemed an original, and the counterparts will together constitute one and the same Agreement, notwithstanding that each Party is not a signatory to the original or the same counterpart.

156.   The performance of this Agreement will begin immediately upon the Effective Date.

157.   NJDOC and Edna Mahan will maintain sufficient records and data to document that the requirements of this Agreement are being properly implemented and will make such

records available to the Monitor and DOJ for inspection and copying on a reasonable basis. Such action is not intended, and will not be construed, as a waiver, in litigation with third parties or otherwise, of any applicable statutory or common law privilege associated with such information. Other than to carry out the express functions as set forth herein, both DOJ and the Monitor, and any staff or consultants retained by the Monitor, will hold such information in strict confidence to the greatest extent possible in view of the nature of the information at issue. In the event a subpoena or other information request is served on DOJ seeking documents or information provided to DOJ by NJDOC, DOJ will assert any applicable grounds for non-disclosure, including 28 C.F.R. § 16.26. DOJ shall notify NJDOC immediately in writing if a third party seeks disclosure of NJDOC's documents through an information request, a subpoena, or other means, so that NJDOC may take appropriate action to prevent or limit any objectionable disclosure.

158. "Notice" under this Agreement will be provided by email to the signatories below, and their counsel, or their successors.

## XIII. STIPULATION PURSUANT TO THE PRISON LITIGATION REFORM ACT, 18 U.S.C. § 3626

159. DOJ, NJDOC, and Edna Mahan stipulate and agree that this Agreement complies in all respects with the requirements for prospective relief under the Prison Litigation Reform Act, 18 U.S.C. § 3626 (a).

160. DOJ, NJDOC, and Edna Mahan stipulate and agree that all of the prospective relief in this Agreement is narrowly tailored, extends no further than would be necessary to correct the violations of federal rights as set forth by DOJ in its Complaint and Notice Letter, is the least intrusive means necessary to correct these alleged violations, and will not have an adverse impact on public safety or the operation of a criminal justice system.

161. The Parties further stipulate that this Agreement is structured to ensure that it terminates upon NJDOC's showing that it has achieved durable compliance pursuant to Paragraph 139 or as set forth in Paragraph 137.

162. Any admission made for the purposes of this Agreement is not admissible if presented by third parties in another proceeding. No statement in this Agreement shall be intended, implied, or otherwise construed to constitute an admission of fact or law by NJDOC or DOJ and shall not be admissible in any other matter or proceeding involving a third party. The Parties agree that this Agreement does not constitute an admission by NJDOC or Edna Mahan of the truth of any of the conclusions contained in the CRIPA Notice.

**For the UNITED STATES OF AMERICA:**

_s/Rachael A. Honig_
RACHAEL A. HONIG
United States Attorney
District of New Jersey

_s/Kristen Clarke_
KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division

_s/Michael E. Campion_
MICHAEL E. CAMPION
Chief, Civil Rights Unit
Civil Division
United States Attorney's Office
970 Broad Street, Suite 700
Newark, NJ 07102
973-645-3141
Michael.Campion@usdoj.gov

_s/Steven H. Rosenbaum_
STEVEN H. ROSENBAUM
Chief
Special Litigation Section

_s/Kerry Krentler Dean_
KERRY KRENTLER DEAN
Deputy Chief
Special Litigation Section

_s/Kelly Horan Florio_
KELLY HORAN FLORIO
Assistant United States Attorney
Civil Rights Unit
United States Attorney's Office
970 Broad Street, Suite 700
Newark, NJ 07102
(973) 645-2824
Kelly.Horan@usdoj.gov

_s/Helen Vera_
HELEN VERA
Trial Attorney
Special Litigation Section

**For DEFENDANTS:**

 *s/Christopher Edwards*
CHRISTOPHER EDWARDS
Executive Assistant Attorney General


 *s/Victoria Kuhn*
VICTORIA KUHN
Acting Commissioner
New Jersey Department of Corrections