# First Monitor's Report

Review Period:
8/24/2021 – 2/24/2022

THE UNITED STATES OF AMERICA
v.
THE STATE OF NEW JERSEY AND
THE NEW JERSEY DEPARTMENT
OF CORRECTIONS

Prepared by Jane Parnell
April 29, 2022

**TABLE OF CONTENTS**

**INTRODUCTION**                                                                 3

      Specific Actions to Evaluate Compliance

      Monitoring Tool

**EXECUTIVE SUMMARY**                                                     6

     Intent of the Report

     New Jersey Department of Corrections: Progress, Strengths, and Challenges

        A.  Progress
        B.  Strengths
        C.  Challenges

**LOGISTICS**                                                                     16

      Baseline Visit – October 2021

      Compliance Visit – February 2022

      Process of Monitor's Report and Monitoring Tool

**SUMMARY OF COMPLIANCE**                                          22

**CLOSING OBSERVATIONS**                                           23

**ATTACHMENTS**                                                              24

A. Curriculum Vitae (CV) of Ms. Parnell

B. First 78 Documents for review

C. Additional 95 Documents for review

D. Curriculum vitae (CV) of Jack Shireman

E. List of people to interview, questions and topics for compliance visit

F. 178 documents to review

**MONITOR TOOL** (SEPARATE PDF ATTACHMENT)

## *Introduction*

The State of New Jersey and the New Jersey Department of Corrections and  entered into a court-ordered settlement agreement with the United States of America on August 24, 2021 (Settlement Agreement).  Specifically, the Settlement Agreement involves a comprehensive set of provisions to ensure that prisoners housed at the Edna Mahan Correctional Facility for Women (Edna Mahan or EMCF) are provided with constitutional conditions that protect them from sexual abuse by staff.  The purpose of the compliance report is to document the progress of the actions of the New Jersey Department of Correction (NJDOC) and Edna Mahan in response to the specific requirements of the provisions  in the settlement. The first court report is due April 29, 2022, with subsequent reports due every six months after the initial report is filed.

The parties agreed on the selection of Jane Parnell as an objective settlement monitor to evaluate the NJDOC and Edna Mahan level of compliance with the requirements detailed in the settlement. The Monitor began her responsibilities on August 24, 2021. Attached to this report is the Curriculum Vitae (CV) of Ms. Parnell [attachment A] detailing her over 40 years of experience in the field of corrections.

This report will describe the level of compliance taken by NJDOC and Edna Mahan and the actions taken by the Monitor to determine compliance, as required by the Settlement Agreement. The period of evaluation is August 24, 2021 – February 24, 2022. The Settlement Agreement uses three (3) levels of measurements for compliance: Substantial Compliance, Partial Compliance, and Non-Compliance. The Monitor added a fourth level of measurement, non-Applicable to the monitoring tool.  The Settlement Agreement definitions for the three measures of compliance are as follows:

- **Substantial Compliance** indicates that NJDOC and Edna Mahan have achieved material compliance with the components of the relevant provision of the Agreement.  Material compliance requires that, for each provision, NJDOC and Edna Mahan have developed and implemented any relevant policies incorporating the requirement and trained relevant personnel on the policy.

- **Partial Compliance** indicates that NJDOC and Edna Mahan have achieved material compliance on some of the components of the relevant provision of the Agreement, but significant work remains.

- **Non-compliance** indicates that NJDOC and Edna Mahan have not met the components of the relevant provision of the Agreement.

For the purpose of this report, the Monitor added the term **non-Applicable** which is defined as "does not apply to a particular situation or expectation."  For example, if a provision in the Settlement Agreement requires an action be taken by the date of January 1, 2023, the Monitor would use "non-Applicable at this time" as the measurement for that provision in this report.

*Specific Actions to Evaluate Compliance*

Specific actions taken by the Monitor to evaluate compliance were as follows:

- The Monitor conducted two baseline visits. The dates were October 5-7 and October 26-28.  The Monitor and her Associate toured as much of the Edna Mahan facility as possible on October 27 and 28, 2021.  Parts of the facility were not accessible at that time, due to Covid cases in the facility.  These two baseline visits included 38 individual interviews with NJDOC and/or Edna Mahan staff. It also included three focus groups with approximately 18 Correctional Officers.  .  It should be noted that, due to the increase of Covid in the facility, the Monitor was not able to interview any prisoners during that visit.  However, NJDOC is contracting with The Moss Group, a private consulting firm out of Washington D.C., and they conducted seven focus groups with some of the women prisoners housed in Edna Mahan between the months of April – July 2021.  Details of the observations from The Moss Group, as well as the visits made by the Monitor, are included in the logistics section of this report.

- The Monitor met via a video conference call, the State of New Jersey Governor Phil Murphy.  This was an informative dialogue between the Governor and the Monitor specific to the Settlement Agreement.

- In preparation for the baseline visits, the Monitor requested 78 documents [attachment B].  During the actual baseline visits, the Monitor requested an additional 95 documents [attachment C].

- The Monitor conducted a compliance visit from February 28 through March 4, 2022. The Monitor and/or her Associate conducted "official" (scheduled) interviews with approximately 40 NJDOC and Edna Mahan staff who have specific responsibilities related to NJDOC and Edna Mahan's compliance with the settlement. The Monitor and/or her Associate also spoke with approximately 40 security and civilian staff during three staff focus groups: one from each shift (1st, 2nd, and 3rd).  The Monitor spoke with several additional staff during the tour of the facility.  The Monitor and/or her Associate conducted three prisoner focus groups, comprised of approximately twenty randomly selected prisoners at Edna Mahan that week. The Monitor also spoke with several additional prisoners during the tour of the facility.

- During the compliance visit, the Monitor and/or her Associate toured the entire facility, including all housing units.  They also observed the Administration's "morning briefings" and a prisoner PREA Orientation.  Details of these visits and observations are included in the logistics section of this report.

- The Monitor requested and reviewed 178 different sets and/or types of NJDOC and Edna Mahan policies, post orders, memos, written directives, and other documents in preparation for the compliance interviews  and  tour.  All these

documents were used to inform the Monitor's ratings for compliance, and included information gained during the interviews, and observations from conducting the tours of the facility.

- The Monitor participated in multiple discussions with NJDOC, The United States Department of Justice, and the leadership for Edna Mahan concerning the settlement provisions and compliance requirements.

## Monitoring Tool

The Monitor developed and proposed a "monitoring tool" and both NJDOC and the DOJ approved its usage.  There is a section in the 'monitoring tool' for each paragraph of the Settlement Agreement.  The top of each section identifies the specific paragraph of the Settlement Agreement and any requirements, as appropriate.

Each section lists the specific measures of compliance the Monitor will use to determine compliance for that paragraph.  The measure of compliance identifies the documents, interviews, and observations used to assess compliance for that specific paragraph.  Each of these measures of compliance were shared, and agreed upon, by both NJDOC and the DOJ.

The next section in the monitoring report is titled "NJDOC Discussion:  The Steps Taken by NJDOC and Edna Mahan Towards Implementation."  This section provides the opportunity for NJDOC and Edna Mahan to describe the actions that have been taken during the reporting period to implement the Settlement Agreement.

Each paragraph includes an evaluation of the extent to which Edna Mahan has complied with the substantive provisions of the Settlement Agreement by identifying the level of compliance (as discussed above) with the requirements specified for each paragraph.  There is also an opportunity for the Monitor to discuss how she determined that level of compliance.  This would include the documents she reviewed, what interviews she, or her Associate conducted, and what observations she made during the compliance visit.  The Monitor also described the steps taken by Edna Mahan to implement the Settlement Agreement.

Lastly, there is an opportunity for the Monitor to provide specific, non-binding recommendations, as applicable.  These recommendations would establish performance expectations for Edna Mahan in order to achieve compliance with the requirements of a particular provision of the Settlement Agreement during the next six-month period.

# Executive Summary

## Intent of the Report

This report is to inform the court and the parties of the Monitor's  assessment of the current progress and status of NJDOC's and Edna Mahan's compliance with the provisions and requirements of the Settlement Agreement. The Monitor completed this initial report through the following actions:

- Conducting a thorough examination of the Settlement Agreement, its provisions and the specific requirements listed in the monitoring tool.

- Requesting and examining specific documents to help identify and assess  the extent to which NJDOC's and Edna Mahan's actions meet the requirements of the Settlement Agreement. Examples include staff and inmate rosters for training; spreadsheets and monthly/quarterly reports that document actions; training curricula; logbooks; the implementation plan; the staffing plan; master log of supervisory rounds; etc.

- Selecting specific NJDOC and Edna Mahan staff for compliance interviews based on the individual's overall and direct responsibilities for settlement implementation.

- Conducting focus groups with staff, prisoners, and stakeholders to obtain feedback and perspective on Edna Mahan's activities and practices as related to the terms and requirements of the Settlement Agreement.

- Using routine communication practices with all parties to request additional information or seek clarification regarding NJDOC's and/or Edna Mahan's performance in meeting the terms and requirements of the Settlement Agreement.

## New Jersey Department of Correction: Progress, Strengths, and Challenges

## A. Progress

The Settlement Agreement includes several substantive provisions, as set forth in a number of paragraphs, beginning with Paragraph 10 and ending at Paragraph 111.  Each paragraph cites specific requirements for NJDOC and Edna Mahan to address in order to achieve substantial compliance by the required date. The assessment period for this first compliance report is August 24, 2021 – February 24, 2022.  The Monitor applied the terms and definitions for compliance as listed in the agreement, and as described above.

- NJDOC and Edna Mahan have made steady progress since the effective date of the Settlement Agreement, August 24, 2021.   The four major areas of improvement seen by the Monitor during the compliance visit are:  1) communication with both staff and prisoners specific to the terms of the Settlement Agreement; 2) updating of the Post Orders and Post Order books; 3) the completion of thirty-minute rounds in every housing unit; and 4) installation of a state-of-the-art video surveillance system.  The new camera system has 353 cameras, with 700 views, and 4 viewing stations.  The system went live on 12/13/21.  (This is discussed further in the "strengths" section of this report.)

Additionally, NJDOC and Edna Mahan have made considerable progress in areas that are not covered by the Settlement Agreement.  Some of those actions include:

- The Body-Worn Camera (BWC) pilot program at Edna Mahan began in April 2021. NJDOC began by issuing cameras to supervisors, and to officers assigned to areas that had a higher incidence of inmate violence, such as the restrictive housing units. The number of BWCs incrementally increased until on June 1, 2021, Edna Mahan reached full deployment with 190 BWCs in shift rotation, equipping all staff on each shift having regular contact with incarcerated individuals.

- Staff received Understanding and Inclusion training relating to working with transgender individuals.

- Releasing Trauma and Embracing Faith Program: A gender-informed program designed to assist participants with the techniques to activate spiritual pathways to healing from multi-dimensional forms of trauma such as incest, molestation, domestic abuse, sexual assault, poverty, and racialized trauma.

- HEART program:  Healing and Empowering those overcoming Abuse and Rape Trauma (HEART) is a gender-specific, trauma recovery program designed to educate and empower female participants who have experienced post-traumatic stress from abuse and/or rape.

- Structured Incentive Activities: Edna Mahan has added special incentive activities for those prisoners who remain infraction-free.  During these special incentive activities, Edna Mahan staff demonstrate their appreciation for those persons who have demonstrated the confidence to make positive choices for themselves.

- Honors Dorm: Edna Mahan has created an "Honors Dorm" for those persons willing to remove themselves from getting into trouble, live cohesively, and work together to help maintain their living space.  The greater goal is to help motivate persons living in other units to change their behavior as they wait to move to the Honors Dorm.  Incentives for living in this unit range from increased recreation time, weekend late nights, approved craft items, and/or additional unit activities (i.e., game night or movie night).

Lastly, it is important to note that during this reporting period, NJDOC and Edna Mahan have made progress in addressing the issue of mandatory overtime for security staff. The NJDOC has added additional staff positions at Edna Mahan. Also, another NJDOC facility located close to Edna Mahan closed. Subsequently, those staff were transferred to Edna Mahan. Staff, particularly those who work third shift, noted a significant decrease in the number of days per week they were "mandatoried" to work an additional eight-hour shift.

## B. Strengths

The New Jersey Department of Corrections (NJDOC) has begun to build a strong foundation for continued progress in reaching all the goals outlined and required in the Settlement Agreement.

### Executive leadership from Governor Phil Murphy

The governor has publicly committed to compliance with the Settlement Agreement and has responded to the challenges identified and affecting the NJDOC and Edna Mahan by retaining expert national resources, i.e., The Moss Group, Inc. The contract with The Moss Group was initiated in November 2020. The Moss Group and its role will be discussed in more detail below.

After a nationwide search, the governor has recently recommended Victoria Kuhn to be appointed as the Commissioner of the New Jersey Department of Corrections. Ms. Kuhn is a veteran corrections official, having worked for the Department of Corrections since 2007. Before she was appointed Acting Commissioner for the NJDOC, Ms. Kuhn served as the Department's Chief of Staff. She is supported by prison advocates throughout New Jersey. Prison Watch Program Director Bonnie Kermess said, "In the decades during which we've been advocates on behalf of people in prison in New Jersey, we have not – until now – had the experience of prisoner contact, transparency, and genuineness of interest and commitment evidenced by the present Acting Commissioner and her team," Volunteers of America CEO Daniel L. Lombardo stated "The work that Ms. Kuhn has already begun in the reestablishment of relationships with the State Parole Board, community providers, as well as departmental clients and their families is illustrative of what we can expect under her continued leadership".

Acting Commissioner Kuhn said, **"**I do not take this honor – or responsibility – lightly. This is the time for new beginnings – to launch new reform and reintegration initiatives, to ensure dignity and safety for our female offenders, and to establish mission-critical relationships with outside stakeholders and advocates." The Monitor believes Governor Murphy's decision to recommend Acting Commissioner Kuhn as Commissioner of the Department of Corrections publicly demonstrates his commitment to accomplish the culture change needed to achieve compliance with the Settlement Agreement.

Lastly, the Governor has publicly announced his support for a new facility for incarcerating women prisoners. The current location has many challenges, which are discussed in the "challenges" section of this report. A commitment to a new facility for the incarcerated women of New Jersey is seen by many as a substantive and positive action.

*New Jersey Department of Correction*

As noted above, Victoria Kuhn has been in the role of Acting Commissioner since June 2021. This Monitor is impressed with the knowledge, professionalism, and energy Ms. Kuhn exhibits in providing leadership for the NJDOC. Commissioner Kuhn has verbalized her commitment to provide all the agency resources and staff necessary to comply with the Settlement Agreement, and to rebuild the reputation of the New Jersey Department of Corrections, specifically the Edna Mahan Correctional Facility for Women.

In May 2021, Helena Tome was selected for the position of Assistant Commissioner of Women's Services. Assistant Commissioner Tome has 20 years of experience working in non-profit organizations that provided services for women. In her last position, she was the Prison Rape Elimination Act (PREA) Coordinator for a non-profit agency. Although Assistant Commissioner Tome has not worked in NJDOC previously, she is quickly learning their processes and procedures. The Monitor is impressed by Assistant Commissioner Tome's desire to meet the requirements of the Settlement Agreement and to provide leadership to NJDOC and Edna Mahan.

During the baseline visit, the Monitor interviewed 16 members of the NJDOC top level administrators and/or contractors and found them to be knowledgeable of their roles regarding the Settlement Agreement and committed to its successful implementation. Each member of the NJDOC Extended Leadership Team stated their commitment to see things improve at Edna Mahan. During the compliance visit, the Monitor interviewed several of these members again, as well as some new members of Acting Commissioner Kuhn's Leadership Team. As before, without exception, the Monitor found these individuals to be committed to making the changes needed to ensure compliance with the Settlement Agreement.

*Edna Mahan Prison for Women (Edna Mahan)*

The Monitor met the Edna Mahan leadership team during the baseline visit in October 2021. She has subsequently gotten to know them during this reporting period and the compliance visit. It is important to note that the top four members of this leadership team (The Administrator, the Associate Administrator, and the two Associate Superintendents) have all been appointed to their positions since July 2021. The primary purpose of the leadership staff is to provide a safe and secure environment for the staff and prisoners to live and work. The Monitor is impressed with Administrator Stem and her strong leadership to that purpose. Additionally, the staff are very supportive of Administrator Stem. She was described to the

Monitor as "invested in doing the right thing, a role model, willing to listen and help staff, and always does what's best for NJDOC."  She also appears to have a positive relationship with prisoners and stakeholders alike.  The entire Edna Mahan leadership team is positive, energetic, knowledgeable, and focused on their efforts to comply with the conditions of the Settlement Agreement.  Importantly, they "believe" in what they are doing, and this helps set a positive tone with staff and prisoners alike.

The Monitor notes for the Court that, in her experience, the presence of a strong, positive, and competent executive team is a critical stabilizing factor when a prison is subjected to the substantial institutional challenges involved in the level of change Edna Mahan is and has been facing. The quality of leadership provided by the Edna Mahan leadership team is, and will continue to be, a critical factor in the successful implementation of change necessary for compliance over the length of this agreement and beyond.

However, it is also noted that the recent appointments of the leadership team can include challenges as well. These challenges are discussed in more detail in the "Challenges" section of this report.  At the time of the baseline visit, two of the three majors at the facility (and part of the leadership team) have only been at Edna Mahan since March and April 2021. Neither of these individuals enjoy working at the prison and both have expressed their desire to leave as quickly as possible.  One major described Edna Mahan as a "pit of a place to work in" and did not recognize any differences between working with male and female prisoners. The third major worked at Edna Mahan in 2012 and 2018, and just returned in March 2021. He acknowledges that he only has a few months left to work before he retires.  It is worth noting that, six months later, at the time of this compliance visit, two of these three majors are no longer working at Edna Mahan.  This is an example of how quickly the leadership team can change. This is discussed in more detail in the "Challenges" section of this report.

*Camera Systems*

There have been two types of camera systems installed at Edna Mahan in 2021.  One type is Body Worn Cameras (BWC).   The BWC pilot program at Edna Mahan was initiated on April 26, 2021. The EMCF began by issuing a small number of cameras on each shift.  Initially, cameras were deployed to supervisors, and to officers assigned to areas that had a higher incidence of violence.  On June 1, 2021, EMCF reached full camera deployment, with 190 cameras in rotation equipping all staff on each shift having regular contact with incarcerated individuals with BWC.  The Monitor is aware that other prisons and jails who use Body Worn Cameras have seen significant decreases in the number of incidents involving staff and prisoners. At this point, it is too early to have the data reflect this trend, the BWC project is certainly seen as a "step in the right direction."

In 2019 Johnson Controls, an engineering firm, was hired to redesign Edna Mahan's camera system. The expansion and upgrade projects were completed on December 13, 2021.

Edna Mahan now has a total of 334 cameras at the facility, with 700 views and 4 viewing stations.  It is recognized that when video surveillance is used to supplement, but not replace rounds by correction officers, it can be indispensable to help monitor situations involving staff and prisoner safety.  Although there is still work to be done (fine-tuning the system, staff training, policy update, etc.), the Monitor believes that, like the BWC project, the new camera system is a "step in the right direction."

*The Moss Group, Inc.*

The Monitor refers to actions taken by the Moss Group consultants in various sections of this monitoring report. The NJDOC executed a contract with the Moss Group, Inc. in November 2020 to provide support and technical assistance prior to the effective date of the settlement. The exact wording in the Scope of Work states, "Providing the Department of Corrections with technical support in operational practice, policy development, and implementation of identified solutions related to Edna Mahan Correctional Facility for Women."  The core activities include Project Management, Strategic Planning for Women's Services, Policy Review and Guidance, Specialized PREA Investigator Training, Training for Trainers, Staffing Analysis, Gender Responsive Classification Review, Risk Management System Assistance, Training and Technical Assistance.  The Monitor is very familiar with the work of The Moss Group and believes they are well qualified to help Edna Mahan and NJDOC increase their sexual safety practices, identify best practices in the management of women offenders, support culture change, and build leadership practices that sustain systemic change.

*Lowenstein Sandler LLP ("Lowenstein")*

Lowenstein is a national law firm with over 350 attorneys working from five offices in New York, Palo Alto, New Jersey, Utah, and Washington, D.C.  The State of New Jersey has retained the services of Lowenstein to represent and support NJDOC in meeting the requirements of the Settlement Agreement.  The Monitor is impressed with the cooperative and communicative approach the primary attorneys exhibit towards DOJ and the Monitor.

*Civil Service Reform*

The NJDOC supported the passage of S3672, which was signed into law on January 6, 2022.  This law mandates that the Civil Service Commission exempt any person from the requirement to take an examination for an entry-level state corrections law enforcement officer position, who successfully completes a full Basic Course for Correction Officers training, at a school approved and authorized by the New Jersey Police Training Commission, within nine months from the date of hire as a temporary entry-level officer. The NJDOC anticipates this measure will assist in the overall recruitment of new officers.

## C. Challenges

*Bureaucracy*

One of the greatest challenges for the New Jersey Department of Corrections, is its own, or the State of New Jersey's, bureaucracy. In some cases, there has been an attitude of "that's the way it is" by NJDOC Executive Staff. There is a real or imagined sense that "that's the way it has always been, and nothing can be done about it" interferes with NJDOC's ability to accomplish things in a timely manner. The Monitor offers the following examples:

The State of New Jersey conducts Civil Service Testing for all applicants. The test is the same test that is given to law enforcement applicants. It can take six to eight months from the time of the application, to being accepted into the training academy. Apparently, most applicants subsequently do not "make it into" the training academy. This can be the result of many things, e.g., applicants simply cannot wait the length of time before accepting another position, or they don't meet the background or physical requirements for the training academy. Assistant Commissioner of Human Resources and Labor Relations Whitlock gave the example that for time period February 17 – July 20, 2021, of 1,400 applicants; only 109 "made it" to the Academy. Once an applicant has been accepted into the training academy, they have seventeen weeks of training at the Academy and two weeks at the facility they are assigned to work in. Out of the 109 applicants that began the Academy, only 54 ultimately graduated and began working for NJDOC. The Academy offers only three "Academy sessions" per year. All these factors contribute to low staffing throughout the New Jersey Department of Corrections.

NJDOC Human Resources falls under the "umbrella" of the State Civil Service Commission, which is the overall authority on hiring, promoting, etc. NJDOC is required to remain compliant with NJ Administrative Code 4A which governs Human Resources compliance to ensure consistency throughout New Jersey state government. The difficulty with this requirement, occurs when NJDOC has a "special" job classification such as PREA Compliance Manager or PREA Coordinator. No other agency in New Jersey has a requirement for this job classification. Thus, NJDOC must "find" an appropriate job classification. This process takes time, as evidenced by the delay in hiring a new full-time, department wide PREA Coordinator and a PREA Compliance Manager for Edna Mahan whose only responsibilities are PREA coordination and compliance. The passage of S3672 is seen as a step-in-the-right direction, but only applies to Corrections Officers. There remains a great deal of work to be done in this area.

The New Jersey Revised Statute Title 70 52:14-7, which is known as the "New Jersey First Act", restricts any state government agency from hiring anyone who resides outside the State of New Jersey. This law makes it particularly difficult to hire staff for the Edna Mahan Corrections Facility, due to its proximity to the state of Pennsylvania. This is discussed further in the section entitled "Location Challenges."

New Jersey Administrative Code 10A requires the New Jersey Department of Corrections to report inmate abuse to the county prosecutor of the county in which the State correctional facility is located. Once referred, the prosecutor's office reviews whatever information is available at that time and decides to either proceed with the matter criminally (i.e., continue an investigation or charge an offense) or refer the case back to the appointing authority for administrative review.

Edna Mahan is in Hunterdon County.  The Hunterdon prosecutor's office subsequently determines when the investigation is complete and what action is to be taken (i.e., charge a criminal violation or refer back to DOC). The prosecutor's office controls this time frame.  At Hunterdon, all background investigations are done first - then the 'target' is approached for a statement. That process can take months. This causes a lengthy delay in NJDOC being able to investigate an alleged allegation.

Once returned for administrative review, the administrative investigation can still take months to complete in order to make its way to the administrator for review on whether the 'target' should be charged with an institutional infraction. Consequently, it can take months for the victim and the alleged offender, to have any closure or consequence.

## *Prison Facility Challenges*

Edna Mahan opened as the State Reformatory for Women at Clinton in 1913.  It is New Jersey's only prison facility for state-sentenced women prisoners.  The prison is located in Union Township, Hunterdon County, in western New Jersey, near the Pennsylvania border.

The facility is comprised of three housing compounds, with ten operable housing buildings, and various support buildings.  As the only women's prison operated by the NJDOC, Edna Mahan houses women of all custody levels.  There is one housing compound for minimum security prisoners, one for maximum and medium security prisoners, and a third housing compound for prisoners with mental health needs. The difficulty with only having one housing compound for each classification level is the challenge of keeping prisoners separate from one another, considering the behavior issues involved.

As of February 24, 2022, 381 prisoners were incarcerated at Edna Mahan, including 129 prisoners in the minimum-security complex and 252 in the maximum-and-medium-security complex.  The State reports Edna Mahan's population capacity at approximately 985 prisoners.  The Monitor observed a well-used, old physical plant, which has been occupied by scores of female inmates for over 109 years. It is evident that Edna Mahan receives routine maintenance attention, and that crisis physical plant situations are handled, but the persistent problems inherent in old public facilities will continue.  Staff and prisoners alike, extensively

reported physical plant failings such as lack of hot water, electricity, numerous power outages, mold, etc.  It is apparent that that the poor condition of the physical facility has contributed to low morale among both prisoners and staff and has interfered with "best practices" in a correctional setting.  Additionally, the facility has several buildings that have been condemned and cannot be used.  These buildings pose a security risk; as a result, staff time and resources are required to ensure no person is able to enter these buildings.

## Location Challenges

The location of Edna Mahan is itself a challenge.  For staff who do not live in the area, it is consistently a 60-to-90-minute commute to work each way.  This length of commute makes the facility less desirable to work at than other prisons in the NJDOC system.  Additionally, as noted above, the "New Jersey First" law affects Edna Mahan more than other facilities in the NJDOC system, since it is so close to the Pennsylvania border.  Without the "New Jersey First" law, Human Resource experts believe they would be able to recruit and hire people who live in Pennsylvania to work at Edna Mahan.

Another challenge of the location of Edna Mahan is that staff traditionally promote to Edna Mahan with the intention to "get their time in grade" and transfer back to another NJDOC facility closer to where they live.  Examples given were that a person promoting from a lieutenant to a major, must "serve" 4 months as a major at Edna Mahan before they are eligible to transfer.  An administrator must "serve" 8 months before s/he is eligible to transfer.  During our baseline visits, staff shared with us that "Edna Mahan is where you come to get promoted, do your time, and leave."

As noted above, at the time of the baseline visit, two of the three majors at Edna Mahan acknowledge they came to Edna Mahan "strictly for the promotion" and both express openly their desire to leave as soon as they achieve their "time in grade."  Six months later, only two of these three majors remain working at Edna Mahan.  This process contributes to the lack of a consistent leadership team and stable leadership culture.  As one staff stated, "Why should I listen to leadership?  They'll be gone in a few months anyway."

## Staffing Challenges

In addition to the staffing challenges because of the physical location of Edna Mahan, the facility faces staffing challenges for a variety of additional reasons.  Many are due to the bureaucracy Human Resources and Training challenges discussed above.

As of February 24, 2022, Edna Mahan has 28 employees out of work because they were being investigated.  Some of those investigations date as far back as January 2021.  Additionally, the process used to hire and train staff is incredibly lengthy.  As a result, in the most recent class, only 54 out of 1400 applicants were ultimately hired to work inside a NJDOC facility.

The officer vacancy problem at Edna Mahan severely affects operations.  It also burdens the current staff as they perform their daily responsibilities and respond to various settlement requirements for implementation of new policies and procedures.  Common themes the Monitor heard from staff during the baseline visit was low staff morale due to staff shortages and mandatory overtime.  Some staff noted that "working at Edna Mahan" is sometimes considered "the bottom of the barrel" as a job assignment in NJDOC.  As noted in the "Progress" section, the issue of mandatory overtime seems to have been partially resolved, at least for 3rd shift.

Another challenge for retaining staff at the facility is the number of false allegations filed by the prisoners housed at Edna Mahan.  (This will be discussed in more detail in the next discussion of "Challenges"). The typical scenario reported to the Monitor is that when an allegation is made against a staff member, that staff member is considered to be "under investigation" until the allegation can be investigated, and the case closed.  While the case is "open," if the staff member is being considered for promotion or transfer within NJDOC, or being considered for employment with another agency, should that agency ask the Special Investigations Division if that staff member is being investigated, the answer necessarily is "Yes, there is an open investigation regarding this staff member."  That can result in the staff member not receiving the promotion or transfer.  Having an open investigation can also result in NJDOC holding up a staff member's retirement.

The Monitor spoke with several staff members regarding this scenario.  They acknowledged that, due to the length of time it takes to investigate allegations, staff don't want to come work at Edna Mahan originally, or they want to transfer to another facility as soon as possible, specifically because of this concern.  One lieutenant who is planning to retire in August 2022, stated that he is considering transferring out of Edna Mahan, because he doesn't want a false allegation to "hold up" his retirement.

## Weaponizing of PREA

Perhaps the most prevalent and vociferous message the Monitor heard from both staff and prisoners was the "weaponizing of PREA".  Staff, contractors, and prisoners all said that some prisoners are using the Prison Rape Elimination Act as a "verb."  Some prisoners have literally been known to say to staff and/or other prisoners, "I'm going to PREA you", meaning they are going to file a false PREA compliant on that person.  The way the "system" works is that, once an alleged victim files an allegation of sexual abuse, sexual harassment, or retaliation, the alleged staff perpetrator is physically moved to avoid any further contact with the alleged victim. Depending upon the seriousness of the allegation, the staff member may be removed completely from the facility, moved to a different part of the facility, or moved to another housing unit/position.  This separation of alleged victim and perpetrator is required by PREA standards and is completely appropriate for truthful allegations.

The challenge, however, is with prisoners who make false allegations for their own advantage. A false allegation can be made for a variety of reasons, e.g., retaliation against a staff person or prisoner whom they believe may have mistreated or disrespected them. False allegations have also been used as a means for some prisoners to manipulate their own housing situation, or to remove a staff person who legitimately holds the prisoner accountable. It may also simply represent an opportunity to get out of the facility briefly (e.g., alleged victims of sexual abuse are taken to the hospital for an examination), Or an allegation may simply be alleged out of boredom. The consequences of false allegations can be devastating, i.e., in terms of the staff and/or the prisoner's reputation; the ensuing stress of being investigated; and, as mentioned previously, postponement of a possible promotion or job transfer. The cost to the facility in terms of time and labor to respond and investigate a false allegation is considerable. Another important consideration with false allegations, is the ensuing lack of trust and accountability at all levels, in the PREA process. Unfortunately, this may result in true' allegations being minimized or ignored. One woman, whose allegation was ultimately substantiated, told the Monitor that she felt "discounted as a victim" because of all the false allegations that are being made. The Monitor would be negligent if she did not mention that while the concern of false allegations was raised from a large number of staff and prisoners, they also reported that it is a relatively small number of prisoners who are making false allegations, especially a couple of women who are making repeated false allegations. Regardless of the numbers, the affects remain the same.

The Monitor is familiar with this scenario. Unfortunately, the number of false allegations often increases when a lawsuit or Settlement Agreement due to incidents of sexual abuse/harassment at a prison or jail has recently been settled. The Monitor's experience is that there are two main actions that can be taken to address false allegations: The first is to increase the speed/efficiency in the investigation process. If the investigation is completed quickly, and found to be unfounded or unsubstantiated, the alleged perpetrator can be returned to their original post or housing unit. When this happens in an immediate and consistent manner, the prisoners quickly learn it doesn't "work" to file a false PREA allegation.

The second way to address false allegations is to hold those persons who file false allegations accountable. The Monitor recognizes that there can be a delicate "hard balance" between discouraging filing false allegations and reporting "true" allegations of sexual abuse, sexual harassment, and retaliation. In those instances, however, where the subsequent investigation reveals the allegation was "unfounded" and the person deliberately lied when they filed a false allegation, it is important that the person who initiated the false allegation, be held accountable in some manner.

## *Logistics*

### *Baseline Visit*

The Monitor began working on the Settlement Agreement, on August 24, 2021.  Due to scheduling difficulties, the parties (the New Jersey Department of Corrections, their counsel from the law firm of Lowenstein Sandler, the Department of Justice, and the Monitor) arranged for two baseline visits: October 5-7 and October 26-28, 2021.  Additionally, due to Covid, time, and/or travel concerns, the Monitor held video meetings with interested stakeholders, as noted below.  The agenda and participation for the two baseline visits included the following individuals:

October 5:

- EMCF Administrator Erica Stem
- EMCF Associate Administrator Ryan O'Dea
- EMCF Major
- NJDOC Medical Director Dr. Soliman
- NJDOC PREA Coordinator Director Jennifer Malinowski
- NJDOC Assistant Commissioner Training, Recruitment, and Professional Development Aaron Erven
- NJDOC Deputy Commissioner Tracy Shimonis-Kaminski

October 6:

- EMCF Assistant Superintendent Rios
- EMCF Major
- NJDOC SID Acting Chief of Investigations Ed Soltys
- NJDOC Acting Commissioner Victoria Kuhn
- NJDOC Assistant Commissioner Human Relations Whitlock
- The Moss Group Staff Maggie Black and Jennifer Shehan
- Board of Trustee Member Kristen Zgoba
- Board of Trustee Member Mary Diehl

October 7:

- EMCF Major
- EMCF Assistant Superintendent Bertha Lowery

- NJDOC Mental Health Director Dr. Kaldany
- NJDOC Assistant Commissioner for Women's Services Helena Tome.

October 18 Video Call:

- New Jersey State Ombudsperson Office employee
- New Jersey State Ombudsperson Office employee

October 21 Video Call:

New Jersey Governor Phil Murphy

October 26:

- Morning Briefing Meeting with EMCF Leadership Team
- Morning meeting with Special Investigations Staff
- NJDOC Special Investigations Principal (assigned to EMCF)
- NJDOC Special Investigations Senior Investigator (assigned to EMCF)
- Edna Mahan Medical Director Dr. Braimbridge
- Ruckers Chief Operating Officer Dr Arthur Brewer
- NJDOC Statewide Administrator of Nursing Services Christina Prestien-LaPenti
- Ruckers Chief Operating Officer Julie White
- EMCF Director of Education Denise Arthur-Smith
- EMCF Mahan Educator
- EMCF Director of Out-patient Mental Health Dr. Jim Cassidy
- NJDOC Director of Psychology Dr. Rusty Reeves Ruckers
- EMCF Director of Inpatient Mental Health Services Dr. Deborah Skibbee
- Ruckers Manager of Clinical Services Dr. Mitch Abrahams
- Focus Group with Security Staff from 1st shift
- Received demonstration of JPay from Assistant Superintendent Rios

October 27:

- Morning Briefing Meeting with EMCF Leadership Team
- Morning meeting with Special Investigations Staff
- EMCF Training Lieutenant
- EMCF Training Officer

- Board of Trustee member Dr. Karma Warren
- Attended Classification meeting
- Prison Watch for American Friends Service Committee Advocate Bonnie Kerness
- Advocate Jean Ross
- Edna Mahan Social Worker Supervisor
- Edna Mahan Social Worker Supervisor
- Focus Group with Security Staff from 2nd shift
- Focus Group with Security Staff from 3rd shift

October 28:

- Morning Briefing Meeting with EMCF Leadership Team
- Morning meeting with Special Investigations Staff
- Tour of Facility.  During the tour, the Monitor routinely talked with officers assigned to housing areas and to inmates in those dorms. These inmates either approached the Monitor or the Monitor went over to group areas.  The Monitor also reviewed logbooks, read post orders, checked to ensure doors were locked, identified locations of cameras, etc.

During the second baseline visit, October 26 – 28, the Monitor included her colleague, John "Jack" Shireman.  Mr. Shireman is an experienced corrections and training professional and is nationally recognized in the field of Correctional Leadership.  His Curriculum vitae (CV) is attached [attachment D]. Including Mr. Shireman in this baseline visit provided the opportunity to be more comprehensive and conduct significantly more interviews and focus groups with staff and prisoners.

## Compliance Visit

The parties arranged the first compliance visit from February 28 through March 4, 2022.  The purpose of this visit was for the Monitor to conduct specific staff and prisoner interviews, and observe records, activities, and physical locations/buildings. In preparation for this visit, the Monitor developed a list of 124 people to interview, questions to ask, and/or topics to review during the compliance visit [attachment E].  Additionally, the Monitor developed a list of 178 documents to review [attachment F]. All of these documents are listed in the monitoring tool and are referred to when determining compliance.

As with the baseline visit discussed above, due to Covid, time, and/or travel concerns, the Monitor held video meetings with staff and stakeholders prior to the compliance visit.

These staff were selected by the Monitor according to the responsibilities they represented for managing and implementing various parts of the Settlement Agreement, directly or indirectly. Those video meetings are documented below.

- Assistant Superintendent Rios and Social Services Supervisor– two staff members who deliver PREA Orientation to prisoners

- NJDOC PREA Coordinator Jennifer Malinowski

- EMCF Sexual Assault Advisory Council Members Assistant Superintendent Rios, a Major, and Administrator Stem

- NJDOC Deputy Chief Investigator Ed Soltys, EMCF Special Investigations Division (SID), and two EMCF SID Investigators

- Administrator Stem

The agenda for the onsite compliance visit is as follows:

February 28:

- Two Ombudsperson Office Staff and
- Morning Briefing Meeting with EMCF Leadership Team
- Staff Focus Group – First Shift
- A Major assigned to EMCF
- EMCF Leadership Team – Administrator Stem, Associate Administrator Ryan O'Dea, Assistant Superintendent Rios, and Assistant Superintendent Lowery
- Entrance Gate Security Staff
- Training Lieutenant and Officer
- Staff Focus Group – Second Shift
- Staff Focus Group – Third Shift
- Social Worker Supervisor

March 1:

- Special Investigations Division (SID) Principal
- Commissioner Victoria Kuhn
- Inmate Focus Group – Maximum Classification

- Inmate Focus Group – Minimum Classification
- Assistant Commissioner Kelly Daniels
- Inmate Focus Group – Maximum Classification

March 2:

- Two Perimeter Security Officers
- Two Limited English Proficiency (LEP) prisoners
- Two prisoners who have been protected through retaliation monitoring measures
- Two Contractors with Edna Mahan
- Observed the Comprehensive Orientation Education for prisoners
- Began tour of facility

March 3:

- Tour of Facility included:  Housing Units: A, B, and C Cottages, Randall Cottage, Stowe, Hillcrest, North and South Halls; Programming Areas Silzer, Housekeeping, Food Service, Sewing, and Edna Mahan Hall; Administrative building Center Control; the Restricted Housing Unit, the Management Control Unit; and the abandoned buildings.
- Tour of two buildings in Mountain View Corrections Facility.  This facility (which recently closed and has no other prisoners living there at the present time) will house approximately 70 maximum-security prisoners who are currently living in Stowe Housing Unit.  Stowe building needs significant maintenance repairs and needs to be inoperable during those repairs.  These 70+ prisoners will be housed at Mountain View during the three – five months that it will take to complete the maintenance repairs.

March 4

- Stakeholders Meeting

During the compliance visit, the Monitor or her Associate conducted three (3) staff focus groups.  The focus groups included a mix of male and female, racially diverse officers. The Monitor and her Associate asked the same questions to each group regarding their roles and responsibilities specific to PREA and sexual safety, and then conducted discussions with them according to their comments.  Additionally, the Monitor and her Associate had conversations with staff, regarding similar topics, during their tour of the facility.

The Monitor and/or her Associate conducted three prisoner focus groups.  Focus groups were racially diverse persons from different housing dorms; two groups from the maximum-security units and one group from the minimum-security units. There was a total of 18 prisoners in the three groups. The Monitor and her Associate asked basic questions to the prisoners regarding their knowledge and awareness of PREA, their understanding of how to report an allegation, the sexual safety culture at Edna Mahan, and other safety concerns they may have had.  Additionally, the Monitor and her Associate had conversations with inmates, regarding the same topics, during their tour of the facility.

Additionally, the Monitor's Associate, observed a session of the Admission Orientation/PREA Orientation.  The orientation consisted of a member of the training staff providing prisoners with the following information in both Spanish and English:

- Inmate classification procedures.

- Orientation to the role of the Social Worker

- Explanation of the role of Social Services

- Reporting PREA allegations

- Use of the sexual abuse emotional support confidential hotline

- External emotional support services for victims of sexual abuse

## *Process of Compliance Report and Monitoring Tool*

1) NJDOC sent a semi-annual status report to DOJ and the Monitor on February 24, 2022.

2) The Monitor sent the first draft report and monitoring tool to both parties on March 30, 2022. The agreement allows for a two-week period of review by both parties.

3) The Monitor received the comments from the Department of Justice on April 11, 2022.

4) The Monitor received the comments from the New Jersey Department of Correction on April 14, 2022.

5) The Monitor participated in a conference call with both parties on April 18, 2022, to discuss the draft report.

6) The Monitor considered all of the comments submitted by NJDOC and DOJ. The Monitor made some revisions and provided additional information to the parties in response to comments.

7) The Monitor submitted the final report to the Court on April 29, 2022.

## *Summary of Compliance*

The Monitor was very pleased with what she saw during the tour of the facility as well as with staff and prisoner interviews.  It is evident that a great deal of work has been done to prepare the facility.  Although in desperate need of maintenance upgrades, the housing units were clean, free of clutter, and clear of blind spots.  Both the stationery and body worn cameras have added significantly to increasing supervision while protecting prisoners' privacy.

Without exception, every staff and prisoner that the Monitor spoke with was aware of the Settlement Agreement and the right of prisoners to be free from sexual abuse and sexual harassment, and retaliation of reporting such.  Additionally, without exception, every staff and prisoner that the Monitor spoke with knew how to report incidents of sexual abuse and sexual harassment, and retaliation.  It is worth noting that there was some confusion for some of the prisoners regarding confidential reporting and response (the Monitor discusses this more specifically in the monitoring tool).  Some of the confusion is a result of  a "systems error", (discussed in the monitoring tool) which  NJDOC and Edna Mahan have now been made aware of.  Each staff member knew their responsibilities when a prisoner reports an allegation and how to respond appropriately.  All prisoners and the majority of staff  have received training, or have been re-trained, specific to the Agency's zero-tolerance for sexual abuse and sexual harassment and the protections in place at Edna Mahan to ensure such abuse and harassment does not occur.

NJDOC and Edna Mahan have made the decision to operate all housing units as "direct supervision" meaning that staff interact directly with the prisoners in the housing units providing supervision and contact from within the housing unit throughout all shifts.  The Monitor is gratified to see this practice, as evidenced by the requirement of staff going into the housing unit (called "tours") of all housing units a minimum of every thirty minutes.

As noted above, the period of evaluation for this report is August 24, 2021 – February 24, 2022. The settlement uses three (3) levels of measurements for compliance: Substantial Compliance, Partial Compliance, and Non-Compliance. As previously mentioned, the Monitor added a fourth level of measurement, non-Applicable to the monitoring tool.  There is a total of 83 paragraphs in the monitoring tool.  Some of those paragraphs have a specified date of completion listed in the Settlement Agreement of February 24, 2002, or before.  Some of those

paragraphs had a "daily date" meaning the performance of this activity happens on a daily basis.  Some paragraphs had no specific date of completion identified in the Settlement Agreement, but NJDOC and Edna Mahan set the date of February 24, 2022, or before as the date of completion (either the date set in the monitoring tool or the implementation plan). Lastly, there are paragraphs that had no specified date of completion identified in the Settlement Agreement or who's specified date of completion was not due during this reporting period.

There is a total of 61 paragraphs to be evaluated during this reported period.  During the review, the Monitor determined 45 paragraphs achieved a "substantial compliance" rating; 14 paragraphs achieved a "partial compliance" rating; and two paragraphs achieved a "non-compliance" rating.  The specifics and rationale for each paragraph is included in the attached monitoring tool.

## Closing Observations

The Monitor and the Department of Justice have been updated on the NJDOC and Edna Mahan actions required in the Settlement Agreement since August 24, 2021. We have received immediate notifications of any incident or allegations of sexual abuse or retaliation. We have initiated a regular conference call between parties to discuss current open cases and any current issues.  The Monitor appreciates NJDOC's, and specifically, the EMCF Administrator and the Assistant Commissioner for Women's Services' prompt responses to questions, inquires, and requests.

In conclusion, the Monitor sees a strong commitment to the successful implementation of the Settlement Agreement by the State of New Jersey, The New Jersey Department of Corrections, and the Edna Mahan Correctional Facility for Women.  There is a collaborative working relationship between the NJDOC, Lowenstein Sandler, The Department of Justice, and the Monitor.  All parties recognize, and have verbalized, that each party is working toward the same goal of improved sexual safety for the persons incarcerated at Edna Mahan.

The Monitor recognized a positive and proactive culture in both NJDOC and Edna Mahan. Much of the leadership in both NJDOC and Edna Mahan is new and are anxious to change the "culture" of the prison to a culture of safety and mutual respect.  The Monitor sees a strong positive leadership set by the Commissioner, her staff, and the Edna Mahan Administrator and her staff.  Each of these leadership teams demonstrate a "we can do this" attitude specific to accomplishing what is required in the Settlement Agreement and making Edna Mahan Correctional Facility for Women a safer place for staff to work and the incarcerated persons to live.  The Monitor saw progress during the six months of this reporting period and looks forward to further progress for this facility.

# Jane Parnell
**11308 – 211th Ave. Ct. E.**
**Bonney Lake, Wash.  98391**
**253-278-2341**
**jandjshire@msn.com**

## *Summary:*

Senior executive-level manager with over twenty years' experience in management, organizational development, and communications.  Extensive background in program development and management, strategic planning, organizational change, and performance management.  Expert in team building and group/team dynamics.  Content expert on prison operations, current gender-responsive principles and practices, and leadership development for facility and executive-level teams in corrections.

## *Significant Accomplishments:*

### *Organizational Development*

- Served as internal consultant to executive leadership on organizational assessment and change
- Facilitated strategic planning process and agency Director's performance agreement with Governor
- Led facility in development and implementation of facility specific strategic plan
- Led agency in implementing process improvement principles
- Led agency in development of performance monitoring process
- Provided workshop presentations for supervisors and managers on communication, team building, leadership, problem solving, and process improvement
- Instructor in leadership and management practices, communication skills, strategic planning, quality practices, performance measures, and data analysis

### *Administration/Program Management*

- Senior staff for Chair, House of Representations Appropriations Committee.  Monitored budget activity of 47 government agencies in the state of Washington.
- Developed, implemented, managed, and evaluated program partnership between Department of Social and Health Services and Employment Security
- Assistant Director of Division of Community Corrections.  Responsible for annual operating budget of $4,600,000.

- Administer statewide quality program in Department of Corrections.
- Responsible for management of multi-disciplinary areas in prison facility, including all living unit operations; food services; recreation services; correctional records; offender library and law library programs; community involvement; and chaplain services.

## Consultant Management

- Coach and mentor executive leaders working in corrections
- Facilitate leadership development for executives including delivering NIC's New Warden's Training
- Facilitate and implement female services strategic planning processes
- Support agency implementation of gender-responsive disciplinary policy and practices
- Develop training products focused on communication, team building, conflict management, and supervisory skills for managers working in corrections
- Develop and facilitate curriculum focused on gender-responsive practices and trauma-informed principles
- Conduct assessments of current, and make recommendations for improved, facility operations

## Relevant Skills:

- Excellent interpersonal, listening and communication skills
- Change management expert
- Effectively facilitate decision-making and consensus building in group settings
- Ability to analyze and apply problem solving skills
- Understanding of principles of group/team dynamics and their application in organizational change
- Management of principles and practices of performance-driven organizations
- Implementation of strategic planning principles
- Development and monitoring of performance measures

## Work History:

| | |
|---|---|
| 2015 to 2021 | Corrections Consultant, The Moss Group |
| 2010 to 2015 | Superintendent, Washington Corrections Center for Women |
| 2008 to 2010 | Superintendent, Ahtanum View Corrections Center |
| 2004 to 2008 | Associate Superintendent, Washington Corrections Center for Women |
| 1998 to 2004 | Quality Administrator, Department of Corrections |
| 1994 to 1998 | Supervisor, Mobile Intensive Supervision Program, King County, DOC |

| | |
|---|---|
| 1991 to 1998 | Assistant Director, Division of Community Corrections, DOC |
| 1988 to 1991 | Supervisor, SE Seattle Office, King County, DOC |
| 1984 to 1988 | Community Corrections Officer - DOC |

- Lincoln Park Work Release
- Tacoma Pre-Release
- Intensive Supervision Officer, Downtown Tacoma

| | |
|---|---|
| 1983 to 1984 | Correctional Counselor, Cedar Creek Corrections Center, DOC |
| 1981 to 1983 | Senior staff for Chair, Appropriations Committee, House of Representatives |
| 1974 to 1977 | Counselor, Olympic Pre-Release |

## *Education and Certification:*

- Certified in Emotional Intelligence and Emotional Intelligence for Teams by Collaborative Grown
- Certified in Myers-Briggs Typology Instrument by Center for Applications of Psychological Type
- Certified in Situational Leadership by the Ken Blanchard Institute
- Certified in Quality Improvement by Deming Institute, Georgetown University
- Certified in Reality Therapy by the Institute for Reality Therapy
- Substance Abuse Certified, Evergreen State College
- B.A. Sociology/Psychology, Central Washington University

*List of Requested Documents*

The following is a list of documents necessary to review in preparation for an on-site visit.

LEADERSHIP, MANAGEMENT, AND CULTURAL INDICATORS
- Agency organization chart
- Facility organizational chart
- Facility schedule (meals, showers, programs, volunteer programs, services such as clinics, etc.)
- Agency vision, mission, and/or values statements
- Facility vision, mission, and/or values statements
- Agency strategic or action plans specific to gender-responsive practice
- Facility strategic or action plans specific to gender-responsive practice
- Documentation of expectations regarding boundaries between staff and the population to include the following:
  - Policy (and facility SOP)
  - Staff training on maintaining professional boundaries
  - Inmate education on appropriate boundaries
- Any recent audits, assessments, or evaluations, including those specific to Edna Mahan
- Population demographics, including, but not limited to, the number of women in the facility, race, age, custody level, category of offenses, etc.

FACILITY DESIGN, PHYSICAL PLANT, AND ENVIRONMENTAL FACTORS
- Edna Mahan facility schematic
- Agency policy (and facility SOP) on camera management
- Agency policy (and facility SOP) related to key control
- Agency policy (and facility SOP) related to camera management

HUMAN RESOURCES
- Example job description for all levels of custody staff
- Example job description for non-custody case management staff
- Policy (and facility SOP) on individual performance management

STAFFING
- Staffing plan, to include gender-restricted posts at Edna Mahan
- Master roster
- Shift rosters including exceptions
- Staffing plans; including staff to inmate and male to female custody staff ratios.

## LEADERSHIP, STAFF, CONTRACTOR, AND VOLUNTEER TRAINING

- Orientation materials for anyone who works with woman inmates
- Policy related to training for anyone who works with woman inmates
- Facility training plans for all classifications of staff, including both custody and non-custody
- Relevant training curriculum addressing key topics including the following:
  - PREA
  - Professional boundaries
  - Gender responsive
  - Trauma informed

## INMATE INTAKE AND ORIENTATION

- Agency policy (and facility SOP) on intake with accompanying forms
- Agency policy (and facility SOP) on orientation
- Orientation materials
- Inmate handbook

## PROPERTY, CLOTHING, AND STORAGE

- Agency policy (and facility SOP) regarding inmate property
- List of items available at commissary
- Agency policy (and facility SOP) on allowable and excessive property, and property storage

## VISITATION

- Agency policy (and facility SOP) on visitation for general population, as well as segregated or special management units
- Agency policy (and facility SOP) rules or guidelines for visitors
- Agency and Edna Mahan visiting procedures

## TRAUMA-INFORMED SEARCHES

- Agency policy (and facility SOP) on searches, including clothed searches, unclothed searches, and room searches
- Staff training related to conducting searches

## CROSS-GENDER SUPERVISION

- Agency policy (and facility SOP) on cross-gender supervision
- Agency policy (and facility SOP) on searches and viewing
- Agency policy (and facility SOP) on opposite gender staff in housing units
- Staff training related to cross-gender supervision

## USE OF FORCE

- Agency policy (and facility SOP) on use of force

- Agency policy (and facility SOP) on use of force training
- Facility use of force data for 2021

## AFTER-ACTION REVIEWS
- Agency policy (and facility SOP) on incident reporting
- Agency policy (and facility SOP) policy on after-action reviews or incident reviews

## GRIEVANCES AND REPORTING
- Agency policy (and facility SOP) on inmate grievances
- Facility inmate grievance data for 2021

## PREA
- Agency policy (and facility SOP) on Sexual Assault, Sexual Abuse, and Sexual Harassment
- Agency policy (and facility SOP) on reporting PREA incidents
- Agency policy (and facility SOP) on prevention of retaliation
- Agency policy (and facility SOP) on PREA screening and accompanying tools
- Agency policy (and facility SOP) on staff reporting of personal relationships
- Facility PREA data for 2021

## INVESTIGATIONS
- Agency policy (and facility SOP) on investigations
- Agency policy (and facility SOP) on referrals and investigations of allegations of sexual abuse or sexual harassment
- Investigations training

## DISCIPLINE AND SANCTIONS
- Agency policy (and facility SOP) on the disciplinary process, including sanction grids (as applicable)

## HEALTHCARE SERVICES
- Agency policy (and facility SOP) on intake exams and screenings
- Facility SOP on pregnancy and post-partum care
- Agency policy (and facility SOP) on use of restraints
- Agency policy (and facility SOP) on healthcare response to sexual abuse

## MENTAL HEALTH SERVICES
- Agency policy (and facility SOP) on access to mental healthcare
- Agency policy (and facility SOP) on screening and identification of trauma-associated symptoms during intake or admission
- Agency policy (and facility SOP) on the management of self-harm behaviors
- Edna Mahan mental health program list and schedule

## CLASSIFICATION, PROGRAMMING, AND CASE PLANNING
- Agency policy (and facility SOP) on classification and accompanying tools
- Agency policy (and facility SOP) on risk need assessment and accompanying tools

- Agency policy (and facility SOP) on case management
- List of programs delivered by facility staff and volunteers to include of programming available in restricted housing

## Miscellaneous material

- Any other information or material you think would be valuable for the Monitor to have

**Additional Document Requests from Federal Monitor** (10/5/21–10/7/21):

**A. Policies**

1. Body-worn Cameras

2. Housing (including special housing units (e.g., Restorative Housing Unit, Management Control Unit, etc.)

3. Transgender inmates

4. CISM (Critical Incident Stress Management)

5. JPAY

**B. Administrative**

1. Org chart (expanded version if possible)

2. List of Assistant Superintendents and their areas of responsibility

3. Monthly reports:

       i. CHANGE meeting minutes

       ii. Departmental meeting minutes

       iii. Board of Trustees meeting minutes

       iv. Tier representative (inmate liaison) reports

4. Weekly grievance summaries (Monitor to designate start date)

5. SAFE meeting minutes (as available)

6. SAFE committee and subcommittee lists

7. Camera vendor contract; camera implementation plan; status of implementation

**C. Training**

1. Chart of trainings provided at EMCF (provided by AC Erven)

2. Curriculums for all relevant trainings (domestic violence, trauma-informed care, PREA, undue familiarity, etc.)

3. Academy training schedule

4. Report of trainings provided to EMCF SID investigators

# Jack Shireman
11308 211th Ave. Ct. E.
Bonney Lake, WA 98391
(253) 278-2340

## Summary:

Senior executive level manager with over thirty years' experience in management, organizational development, and communications.  Thirty years' experience in corrections as parole officer, trainer, administrator, and consultant. Strong background in program development and management, strategic planning, managing systems, organizational change, and executive level organizational performance.  Expert in team building and group/team dynamics.

## Work History:

| | |
|---|---|
| 2010 to 2017 | Instructor/Consultant with The Moss Group |
| 2001 to 2005 | Associate State Director, CiviGenics |
| 1997 to Present | Management & Training Consultant with Personal Development Consultants |
| 1996 to 1997 | Internal Organization Consultant/Training Director, Department of Veterans Affairs |
| 1995 to 1996 | Executive Director for Kent Youth and Family Services |
| 1991 to 1995 | Training Director, Department of Veterans Affairs |
| 1980 to 1991 | Training Manager, Washington State Criminal Justice Training Commission |
| 1978 to 1991 | Administrator/supervisor, Juvenile Rehabilitation, King County |
| 1970 to 1978 | Juvenile Parole Counselor, Department of Juvenile Rehabilitation |

## Criminal Justice Experience:

As a Juvenile Parole Counselor began a comprehensive program for juveniles and their families, wrote a Title III grant and developed an alternative education program for troubled and delinquent youth.  Received the Pace Setters award from Washington D.C. for innovative achievement in the field of education.  Developed and managed an alternative group care living program for Department of Juvenile Rehabilitation delinquent youth.

As a training officer with the Washington State Criminal Justice Training Commission, managed various training academies for corrections personnel, e.g., corrections officer's, group life counselors, juvenile detention workers, and probation and parole officers.  Developed and managed much of the training for first and mid-management level corrections personnel.

As Associate Director with CiviGenics, managed 38 corrections programs throughout the State of Washington.  This included chemical dependency treatment programs in institutions, work release facilities, and community probation and parole programs.  As a consultant, developed

training programs for pre-supervision, first level supervisors, mid-level managers, and executive level corrections managers.  As a consultant with The Moss Group, provided training and consulting services throughout the United States, including Oregon, Texas, Alabama, Florida, Georgia, Louisiana, New Jersey, New York, North Carolina, North Dakota, Pennsylvania, and Tennessee.  Consultant services included strategic planning, team building, program development, staff, and management training, etc.

## Education/Certifications:

2015   Certified by Collaborative Growth Institute in EQi and Team TESI (Team and Emotional
        & Social Intelligence)
2005   Certified by Ken Blanchard & Associates for Situational Leadership II and
        Building High Performance Teams
2001   Certified by the Center for Application of Psychological Type, Seattle
1995   Certified by Power & Systems (Ken Blanchard) in the Organization Workshop, Boston
1981   Reality Therapy Certified, (Field Supervisor, State Director, Field Faculty)
1974   Master of Arts, Sociology/Criminal Justice, Pacific Lutheran University
1969   Bachelor of Arts, Sociology, Western Washington University

## Organizational Development

- Internal and external consultant to executive leadership on organizational development and change

- Facilitator of organizational strategic planning processes with both public and private sector

- Led agencies in implementing training and mentoring programs

- Led agencies in development of leadership teams

- Lead agencies in development of performance measures and implementation strategies

- Provided the Organization Workshop for managers and executive leadership

- Facilitated seminars on organizational development, communication, team building, effective leadership, problem solving, conflict resolution, leading people/managing systems, and managing effective meetings

- Instructor in leadership & management, coaching and counseling employees, mentoring, strategic planning, quality practices, managing systems, performance measures, and transitioning to management

**Proven Skills**:

- Experienced organizational consultant, coach, and mentor.

- Excellent training/facilitation skills incorporating adult learning principles.

- Conduct individual and organizational needs assessments.

- Comprehensive understanding of organizational dynamics and ability to create 'organizational partnership.'

- Establish positive working relationships/teamwork at all organizational levels.

- Facilitate strategic planning and balanced scorecard initiatives.

- Facilitate and train managers in managing organization systems.

**List of Interviews and Documents to Review for February 24, 2022, Compliance Visit**

**Interviews with Staff**

- P16 - Focus group meetings with staff regarding their knowledge and roles in implementing the PREA policy.
- P19A - Interviews with staff regarding their knowledge and roles to interact directly with the prisoners.
- P19B - Interviews with staff regarding their knowledge and roles to conduct routine, unannounced rounds.
- P19C - Interviews with staff regarding their knowledge and roles to conduct living area searches and cell/bed searches.
- P20 – Interviews with staff regarding their knowledge and roles to interact directly with Special Management Unit prisoners as safety allows.
- P22 - Interviews with staff regarding their knowledge and roles to conduct unannounced rounds at the appropriate times, based on the type of housing unit (60 minutes in general population housing units and 30 minutes in special management units).
- P28 - Interview with staff about the requirement that all videos shall be retained for at least 30 days during onsite visit.
- P43 - Interviews with staff to confirm that they attended the PREA/Gender-Responsive training.
- P44 - Interviews with staff regarding their knowledge of current sexual abuse and sexual harassment policies and procedures.
- P54d - Interviews with staff regarding their responsibilities to document all cross-gender strip searches, cross-gender visual body cavity searches, and cross-gender pat-down searches of women prisoners.
- P55a - Interviews with staff specific to their understanding of prisoners being able to perform bodily functions without non-medical staff of the opposite gender viewing their breasts, buttocks, or genitalia.
- P55b - Interviews with staff specific to the requirement that staff of the opposite gender announce their presence when entering a prisoner housing unit.
- P56 - Interviews with staff specific to the way prisoners can report any allegations of sexual abuse and harassment, including privately and anonymously.
- P57 - Interviews with staff specific to at least one way to report abuse or harassment to a public or private entity or office that is not part of NJDOC.
- P59 - Interviews with staff specific to the way staff can report any allegations of sexual abuse and harassment, including privately and anonymously.

- P61 - Interviews with staff during onsite visit specific to the requirement for confidentiality (apart from reporting to designated supervisors or officials, staff shall not reveal any information related to an incident of sexual harassment or sexual assault).
- P64 - Interviews with staff specific to their rights of protection from retaliation of reporting allegations of sexual abuse or sexual harassment.
- P65 - Interviews with at least two staff who have had protection measures from retaliation of reporting allegations of sexual abuse or sexual harassment.
- P70 - Staff interviews regarding their responsibilities in response to an allegation of sexual abuse or sexual harassment and specifically not placing a prisoner in involuntary restricted housing solely for the purpose of protecting that prisoner.
- P71 - Staff interviews specific to what access to privileges are allowed when a prisoner is held in restricted housing to keep them safe from abuse or retaliation .
- P73 - Interviews with staff regarding the requirement that prisoners have access to external sexual abuse emotional support services.
- P86 - Interviews with perimeter Correctional Police Officers specific to the requirement of regular monitoring of the perimeters of the Edna Mahan grounds with the goal of preventing entry by persons or contraband outside of the secure checkpoints.
- P87 - Interviews with security staff regarding how they conduct contraband screening on every individual, including all staff, contractors, volunteers, visitors, and government officials entering the maximum-security compound.
- P90 – Interviews with staff specific to how they accommodate LEP prisoners

**Interviews with prisoners**
- P16 - Focus group meetings with inmates regarding their knowledge of the right to be safe from all forms of sexual abuse and sexual harassment.
- P47- Interviews with new prisoners asking if they received PREA orientation within 30 days of intake.
- P51 - Interviews with prisoners asking if the individual conducting the comprehensive prisoner orientation education remained in the room the entire time.
- P52 - Interview with at least two inmates who are limited English proficient, deaf, visually impaired, or otherwise disabled, or who have limited reading skills and have received the training in an alternative format.
- P55a - Interviews with EMCF prisoners specific to prisoners being able to perform bodily functions without non-medical staff of the opposite gender viewing their breasts, buttocks, or genitalia.
- P56 - Interviews with inmates specific to the way they can report allegations of sexual abuse and harassment, including privately and anonymously.

- P57 - Interviews with prisoners specific to at least one way to report abuse or harassment to a public or private entity or office that is not part of NJDOC.
- P 64 - Interviews with prisoners specific to their rights of protection from retaliation of reporting allegations of sexual abuse or sexual harassment.
- P65 - Interviews with at least two prisoners who have had protection measures from retaliation of reporting allegations of sexual abuse or sexual harassment.
- P70 - Interviews with prisoners regarding how prisoners are treated in response to an allegation of sexual abuse or sexual harassment and specifically not placing a prisoner in involuntary restricted housing solely for the purpose of protecting that prisoner.
- P71 - Interviews with prisoners specific to what access to privileges they are allowed when they are put in restricted housing in order to keep them safe from abuse or retaliation.
- P73 - Interviews with prisoners regarding the requirement that prisoners have access to external sexual abuse emotional support services.
- P90 - Interview with at least two LEP identified inmates to ensure they have access to interpretation and translation services.

**Interview with "officials"**
- P16 - Interviews with various officials regarding their knowledge and roles in implementing the PREA policy.
- P 23 - Interviews with intermediate and higher-level supervisors regarding their knowledge and roles in conducting unannounced rounds.
- P24 - Interviews with Edna Mahan leadership regarding their knowledge and roles in reviewing the master log of supervisory rounds at least weekly.
- P24 - Interviews with NJDOC Commissioner or designee regarding their knowledge and roles to review Edna Mahan master log of supervisory rounds quarterly.
- P 28 - Interview leadership team at EMCF about the requirement that all videos shall be retained for at least 30 days during onsite visit.
- P43 - Interviews with trainers who provided PREA/Gender-Responsive training to confirm that required training took place.
- P51 - Interviews with two people who provide the comprehensive prisoner educational orientation asking if they understand the requirement that the individual conducting the comprehensive prisoner orientation education remain in the room the entire time and how that is documented.
- P-52 - Interview with at least two of the prisoner orientation education trainers asking how they provide the comprehensive prisoner orientation education to persons who are limited English proficient, deaf, visually impaired, or otherwise disabled, or who have limited reading skills.

- P57/58 - Interview with Corrections Ombudsman asking the number of prisoners who have reported abuse or harassment to them.
- P81 - Interview with NJDOC Deputy Chief Investigator regarding requirement that a written investigative report is completed within 90 days after an allegation of sexual abuse or sexual harassment.  (Note:  if case is referred to prosecutor's office, the 90-day period begins to run the day NJDOC receives the case back as "administrative").
- P82 - Interview with NJDOC Deputy Chief Investigator regarding completing the investigative summary sheet/closure report to include the status of an investigation.
- P83 - Interview at least two of the members who sit on the EMCF's Sexual Assault Advisory Council (SAAC) regarding the process and procedures of the SAAC.
- P84 - Interview with NJDOC PREA Coordinator regarding the process, and any examples, of the NJDOC's Review Team's recommendations for improvement.
- P110 - Interviews with staff from the Office of the Corrections Ombudsperson specific to efforts to establish or revise Edna Mahan or statewide policies and procedures, including reporting and data collections systems, related to sexual abuse or sexual harassment of prisoners.
- P110 - Interviews with at least two members of the Commission to Protect New Jersey Inmates from Sexual Assault and Sexual Misconduct specific to efforts to establish or revise Edna Mahan or statewide policies and procedures, including reporting and data collections systems, related to sexual abuse or sexual harassment of prisoners.

**Interview with EMCF Administrator**
- P61 - Interview with EMCF Administrator of any staff member violating the confidentiality provision (apart from reporting to designated supervisors or officials, staff shall not reveal any information related to an incident of sexual harassment or sexual assault).
- P63 - Interview with EMCF Administrator regarding how quickly Edna Mahan staff report allegations to the EMCF Administrator.
- P66 - Interview with EMCF Administrator regarding how s/he makes the decision regarding removal of the staff from positions of prisoner contact until the investigation is completed.
- P67/68 - Interview with EMCF Administrator regarding what methods EMCF uses for retaliation protection for staff and inmates.
- P70 - Interview with EMCF Administrator regarding under what circumstances victims of sexual abuse and sexual harassment are placed in involuntary restricted housing.

- P71 - Interview with EMCF Administrator to ensure that prisoners have access to privileges, including visitation, commissary, programming, and vocational opportunities if held in involuntary restriction after reporting a PREA incident.
- P72 - Interview with EMCF Administrator to ensure that prisoners are not placed in involuntary restriction solely for the purpose of interviewing that prisoner as part of an investigation.
- P73 - Interview with EMCF Administrator regarding access for prisoners to outside victim advocates for emotional support services.
- P74 - Interview with EMCF Administrator regarding MOUs with community service providers to provide prisoners with confidential emotional support services.
- P83 - Interview with EMCF Administrator regarding the process and procedures of the EMCF's Sexual Assault Advisory Council (SAAC).
- P84 - Interview with EMCF Administrator regarding the process, and any examples, of the Review Team's recommendations for improvement.
- P88 - Interview with EMCF administrator specific to the inventory of, and implementation plans for, all abandoned, dilapidated, or currently out of use structures.
- P89 - Interview with EMCF administrator specific to utilization of the old upholstery warehouse.
- P90 - Interview with Edna Mahan Administrator specific to interpretation and translation services for LEP prisoners.

**Interview with EMCF PREA Compliance Manager**

- P 40 – Ask what type of training did s/he receive?  Was it enough to fulfill his or her duties?
- P47 - Interview with EMCF PREA Compliance Manager specific to how do they ensure prisoners receive PREA orientation information within 30 days of intake.
- P51 - Interviews with EMCF PREA Compliance Manager asking if they understand the requirement that the individual conducting the comprehensive prisoner orientation education remain in the room the entire time and how that is documented.
- P52 - Interview with EMCF PREA Compliance Manager asking how they provide the comprehensive prisoner orientation education to persons who are limited English proficient, deaf, visually impaired, or otherwise disabled, or who have limited reading skills.
- P53 - Interview with EMCF PREA Compliance Manager asking how EMCF documents prisoner participation in the comprehensive prisoner orientation session.

- P59 – Interview with EMCF PREA Compliance Manager specific to the ways staff are able to report any allegation of sexual abuse and harassment, including privately and anonymously.
- P61 - Interview with EMCF PREA Compliance Manager of any staff member violating the confidentiality provision (apart from reporting to designated supervisors or officials, staff shall not reveal any information related to an incident of sexual harassment or sexual assault).
- P62 - Interview with EMCF PREA Compliance Manager regarding how quickly Edna Mahan staff report allegations to SID.
- P63 - Interview with EMCF PREA Compliance Manager regarding how quickly Edna Mahan staff report allegations to the EMCF Administrator.
- P64/65/67/68 - Interviews with EMCF Compliance Manager specific to the methods s/he uses to protect prisoners and staff from retaliation for reporting allegations of sexual abuse or sexual harassment.
- P66 - Interview with EMCF PREA Compliance Manager regarding how s/he and the EMCF Administrator make the decision about removing the staff from positions of prisoner contact until the investigation is completed.
- P70 - Interview with EMCF PREA Compliance Manager regarding under what circumstances victims of sexual abuse and sexual harassment are placed in involuntary restricted housing.
- P71 - Interview with EMCF PREA Compliance Manager to ensure that prisoners have access to privileges, including visitation, commissary, programming, and vocational opportunities if held in involuntary restriction after reporting a PREA incident.
- P72 - Interview with EMCF PREA Compliance Manager to ensure that prisoners are not placed in involuntary restriction solely for the purpose of interviewing that prisoner as part of an investigation.
- P73 - Interview with EMCF PREA Compliance Manager regarding access for prisoners to outside victim advocates for emotional support services.
- P74 - Interview with EMCF PREA Compliance Manager regarding MOUs with community service providers to provide prisoners with confidential emotional support services.
- P82 - Interview with EMCF PREA Compliance Manager regarding the investigative summary sheet/closure report.
- P83 - Interview with EMCF PREA Compliance Manager regarding the process and procedures of the EMCF's Sexual Assault Advisory Council (SAAC).
- P84 - Interview with EMCF PREA Compliance Manager regarding the process, and any examples, of the Review Team's recommendations for improvement.
- P90 - Interview with Edna Mahan EDNA PREA Compliance Manager specific to interpretation and translation services for LEP prisoners.

**Interviews with EMCF Training Lt/Staff**
- P43 - Interviews with EMCF training Lt/designee to confirm the PREA/Gender responsive training took place.
- P46 -Interviews with EMCF training Lieutenant and/or training staff to verify documentation is maintained showing that all EMCF staff have been trained.

**Interviews with EMCF SID staff:**
- P61 - Interviews with Special Investigations Principal and his/her staff (assigned to EMCF) of any staff member violating the confidentiality provision (apart from reporting to designated supervisors or officials, staff shall not reveal any information related to an incident of sexual harassment or sexual assault).
- P63 - Interview with Special Investigations Principal and her staff (assigned to EMCF) regarding how quickly Edna Mahan staff report allegations to SID.
- P72 - Interview with Special Investigations Principal to ensure that prisoners are not placed in involuntary restriction solely for the purpose of interviewing that prisoner as part of an investigation.
- P75 - Interview with EMCF Special Investigations Principle regarding referring allegations of sexual abuse and sexual harassment to local prosecutors.
- P77 - Interview with EMCF Special Investigations Principle to ensure all allegations of sexual abuse or sexual harassment are reasonable, prompt, thorough, and objectively investigated. And that administrative investigations shall be completed regardless of the results of any criminal investigations and regardless of the subject's continued employment by NJDOC.
- P79 - Interviews with EMCF Special Investigations Principle and his/her staff regarding staff recusing themselves from participating in an investigation involving anyone with whom they have a personal relationship.
- P80 - Interview with EMCF Special Investigations Principle and his/her staff to determine how they rate the credibility of an alleged victim, suspect, or witness.
- P81 - Interview with EMCF Special Investigator Principle regarding requirement that a written investigative report be completed within 90 days after an allegation of sexual abuse or sexual harassment.  (Note:  if case is referred to prosecutor's office, the 90-day period begins to run the day NJDOC receives the case back as "administrative").
- P82 - Interview with EMCF Special Investigations Principle and his/her staff regarding completing the investigative summary sheet/closure report.

**Review during On-Site Visit**
- P16 - On Site Tour impressions-posters advertising PREA and "PREA phone line" ensuring phone lines work to report an allegation, etc.
- P19A – review logbooks during Onsite Tour.

- P19B – Direct observations during on site tour (continuous supervision of inmates through indirect supervision from vantage points outside of unit and routine, unannounced rounds).
- P19B - Review logbooks during On Site Tour (for routine, unannounced rounds).
- P19C - Direct observations of living area and cell/bed searches during On Site Tour.
○ P19C - Review documentation on living area and cell/bed searches during On Site Tour.
- P20 - Review logbooks during On Site Tour to review logbooks specific to number of unannounced rounds in special management units.
- P20 - Direct observations during On Site Tour of unannounced rounds in special management units.
- P 22 - Review logbooks during On Site Tour to ensure rounds are made at the appropriate times, based on the type of housing unit (60 minutes in general population housing units and 30 minutes in special management units).
- P22 - Review Post Orders during On Site Tour to ensure instructions are specific that rounds are made at the appropriate times, based on the type of housing unit (60 minutes in general population housing units and 30 minutes in special management units).
- P23 - Review logbooks during On Site Tour to ensure intermediate or higher-level supervisors conduct and document unannounced rounds during all shifts.
- P26 - Random review of cameras during onsite visit.
- P46 - Training Records reviewed during On Site visit to ensure documentation is maintained showing that all active EMCF staff have been trained.
- P47 & P51 - Observation of a comprehensive prisoner orientation education during onsite visit.
- P53 - Review of documentation attendance at PREA education/orientation sessions during on site visit.
- P55b - Observations made during on site visit specific to the requirement that staff of the opposite gender announce their presence when entering a prisoner housing unit.
- http://www.state.nj.us/corrections/pages/PREA/PREA.html
- P56 – NJDOC's website includes information on how to report an allegation on behalf of a prisoner.
- P56 - Documentation of the SID 1# on the inmate telephone system at EMCF.
- P56 - Documentation of the Special Investigations Division (SID) confidential tip line 609-530- 2500
- P58 - Documentation of the Inmate Telephone System Number 1-555-555-5555 to Corrections Ombudsman
- P60 - Review of retaliation log during on-site visit

- P65 – Review documentation that information for emotional support services were provided to both staff and prisoners who fear retaliation for reporting (888-4BLUENJ hotline offering mental health resources to Corrections Staff).
- P66 - Monitor will review the documentation sent to NJDOC PREA Coordinator from EMCF PREA Compliance manager looking for trends in how decision are made regarding removing staff from positions of prisoner contact until the investigation is c
- P73 – Where is the pamphlet "NJDOC PREA: External Emotional Support Services for Victims of Sexual Abuse" located?
- "P87 - Observations specific to every individual, including all staff, contractors, volunteers, visitors, and government officials entering the maximum compound receiving thorough and effective contraband screening.
- P88 – Observations of the security risks that the out-of-use buildings pose to institutional security or provide significant opportunities for sexual abuse.
- P89 – Observation of the utilization of the old upholstery warehouse and if it is being used, is it cleared of unused equipment, inventory, and other visible barriers that pose safety concerns and create blind spots.
- P90 – Look for posters at several key areas of EMCF that notifies the inmate population of the availability of services to assist LEP inmates. (SHR. ID Intake, Medical, Hearing and Recording, Mental Hearth, Law Library, Classification, Parole, Social Services, Housing Units, EMH, Silzer, MIN Dining Hall, C Cottage Mental RTU/TCU.
- P90 – Review details of the usage of any LEP inmates to access interpretation services -records, logs, phone call use, etc.

# List of Documents to Review During Compliance Visit

P 16:

- NJDOC Level 1 Policy, IMM.001.004 "Zero Tolerance Policy: Prison Sexual Assault (Note: On shared drive)
- Edna Mahan Level 3 policies mandating zero tolerance
- Training schedules for staff attending PREA training at Edna Mahan
- PREA Training Curriculum for staff
- Any memos, written directives from the Commissioner, Deputy Commissioner and/or Administrator that direct PREA policy compliance and zero tolerance

P18:

- Post Orders, Level 3 policy, or job descriptions written outlining the job responsibilities of staff members responsible for direct management of corrections officers assigned to all housing areas and dormitory settings specific to the policies and procedures pursuant to the Consent Decree

P19a:

- Post Orders for Housing Units operated as Direct Supervision, documenting the requirement that Housing Unit Officers interact directly with the prisoners
- Any memos, written directives from the Commissioner, Deputy Commissioner and/or Administrator that direct Housing Unit Officers to interact directly with the prisoners

P19b:

- Post Orders for Housing Units not designated for Direct Supervision, documenting the requirement that Housing Unit Officers conduct routine, unannounced rounds
- Any memos, written directives from the Commissioner, Deputy Commissioner and/or Administrator that direct Housing Unit Officers to conduct routine, unannounced rounds

P19c:

- Agency Level 1 policy on Searches of Inmates and Correctional Facilities
- Edna Mahan Level 3 policy on Searches of Inmates and Correctional Facilities
- Training Curriculum provided to correctional staff on conducting living area searches and cell/bed searches
- Any memos, written directives from the Commissioner, Deputy Commissioner and/or Administrator that direct Housing Unit Officers to conduct living area searches and cell/beds searches

P20:

- Post Orders for Officer working in Special Management Units, documenting the requirement that the Officers conduct routine, unannounced rounds
- Any memos, written directives from the Commissioner, Deputy Commissioner and/or Administrator that direct Special Management Unit Officers to interact directly with the prisoners as safety allows.

P22

- Post Orders written for all Correctional Police Officer's working in general population housing units identifying the expectations that unannounced rounds will be conducted at least every hour
- Post Orders written for all Correctional Police Officer's working in all housing units that include special management prisoners identifying the expectations that unannounced rounds will be conducted at least 30 minutes
- Any memos, written directives from the Commissioner, Deputy Commissioner and/or Administrator that direct Housing Unit Officers conduct unannounced rounds at the appropriate period of times, based on the type of housing unit

P23

- Any memos, written directives from the Commissioner, Deputy Commissioner and/or Administrator that intermediate and higher-level supervisors conduct unannounced rounds

P28

- Any memos, written directives from the Commissioner, Deputy Commissioner and/or Administrator that addresses the requirement that all video shall be retained for at least 30 days,  unless an unusual occurrence such as an alleged assault or sexual abuse, or display of contraband, occurs in an area surveilled, in which case the video shall be preserved until the matter is fully investigated and  prosecuted or dismissed by authority of the Commissioner, or at least five years, whichever is longer.

P43

- Rosters of completed PREA, Gender-Responsive, or other subjects noted above training by assigned EMCF staff by February 24, 2022.
- List of all EMCF staff who may have contact with prisoners, including staff who work at other facilities who may work overtime at EMCF (i.e., maintenance, kitchen) and staff assigned to supervise SMCF prisoners at outside locations on February 24, 202Training Curriculum utilized for PREA (Note:  on shared drive)
- Training Curriculum utilized for Gender-Responsive (Note:  on shared drive)

- Training Curriculum utilized to train on any other subjects noted in paragraph 43 (not in PREA or Gender-Responsive curriculum)
- List of trainers providing training

P47

- NJDOC Policy Statement Number 001.008 "Prevention, Detection and Response of Sexual Abuse and Harassment" specific to Inmate Education (Note:  on shared drive)
- EMCF Level 3 policy requiring that Inmates are required to sign for receipt of PREA informational materials as well as for attendance at PREA education/orientation sessions. Level 3 policy will also require that copies of receipt documents are to be maintained in the inmate's classification folder and by the Institutional PREA Compliance Manager
- Copy of PREA video shown to prisoners (Note:  on shared drive)
- Copy of curriculum (including power point slides, if any) for orientation education for prisoners (Note:  on shared drive)
- Copy of PREA orientation material for prisoners (Note:  on shared drive)
- Copy of EMCF Inmate Handbook (Note:  on shared drive)
- Copy of EMCF Inmate Orientation schedule

P48

- NJDOC Policy Statement Number 001.008 "Prevention, Detection and Response of Sexual Abuse and Harassment" specific to Inmate Education (Note:  on shared drive)
- EMCF Level 3 policy requiring that Inmates are required to sign for receipt of PREA informational materials as well as for attendance at PREA education/orientation sessions. Level 3 policy will also require that copies of receipt documents are to be maintained in the inmate's classification folder and by the Institutional PREA Compliance Manager
- Copy of PREA video shown to prisoners (Note:  on shared drive)
- Copy of curriculum (including power point slides, if any) for orientation education for prisoners (Note:  on shared drive)
- Copy of PREA orientation material for prisoners (Note:  on shared drive)
- Copy of EMCF Inmate Handbook (Note:  on shared drive)
- Copy of EMCF Inmate Orientation schedule

P49

- Copy of PREA video shown to prisoners (Note:  on shared drive)
- Copy of curriculum (including power point slides, if any) for orientation education for prisoners (Note:  on shared drive)
- Copy of PREA orientation material for prisoners (Note:  on shared drive)
- Copy of EMCF Inmate Handbook (Note:  on shared drive)

- Any memos, written directives from the Commissioner, Deputy Commissioner and/or Administrator that addresses procedures, and practices to ensure all current EMCF prisoners will again receive the orientation information and education.

P50:

- EMCF Level 3 policy requiring that the individuals conducting the comprehensive prisoner educational orientation are trained on EMCF and NJDOC's policies and procedures related to sexual abuse and sexual harassment, the PREA standards, and the terms of the Settlement Agreement.
- List of all persons who provide the comprehensive prisoner educational orientation at EMCF.
- Documentation of trainers "training" and date when it occurred.

P51

- EMCF Level 3 policy requiring that the individuals conducting the comprehensive prisoner orientation education remain in the room during the entire orientation. That Level 3 policy should also require that the person provide the comprehensive prisoner educational orientation document that they did remain in the room the entire time and that they notify the EMCF PREA Compliance Manager immediately if they did leave the room, due to an exigent circumstance.
- Class rosters for the comprehensive prisoner educational orientations, dated and signed by the person who provided the training, verifying that they remained in the room during the entire orientation.

P52

- EMCF Level 3 policy requiring that the comprehensive prisoner orientation education is made available in formats accessible to all prisoners, depending on their specific needs.

P53

- EMCF Level 3 policy requiring that Inmates are required to sign for receipt of PREA informational materials as well as for attendance at PREA education/orientation sessions. Copies of receipt documents are to be maintained in the inmate's classification folder and by the Institutional PREA Compliance Manager.

P54a

- Copy of N.J.S.A. 30:1B-46
- NJDOC Level 1 policy prohibiting cross-gender strip searches or visual body cavity searches, except in exigent circumstances or when performed by medical practitioners. (If different than CUS.001.011)
- EMCF Level 3 policy prohibiting cross-gender strip searches or visual body cavity searches, except in exigent circumstances or when performed by medical practitioners.

- CUS.001.011 Searches of Inmates and Facilities) and Internal Management Procedure (CUS.001.SEA.001 Searches) which outline the department's rules regarding pat searches, strip searches and body cavity searches.
- Training curriculum for staff stating that cross-gender strip searches or visual body cavity searches, except in exigent circumstances or when performed by medical practitioners are prohibited.
- Documentation memo/training rosters confirming staff training stating that cross-gender strip searches or visual body cavity searches, except in exigent circumstances or when performed by medical practitioners are prohibited.
- Any memos, written directives from the Commissioner, Deputy Commissioner and/or Administrator that addresses procedures, and practices at Edna Mahan prohibiting cross-gender strip searches or visual body cavity searches, except in exigent circumstances or when performed by medical practitioners

P54b

- EMCF level 3 policy stating that prisoner's access to regularly available programming or other out-of-cell opportunities shall not be restricted in order to comply with cross-gender search restrictions.
- Documentation memo/training rosters confirming staff were informed that prisoner's access to regularly available programming or other out-of-cell opportunities shall not be restricted in order to comply with cross-gender search restrictions.
- Any memos, written directives from the Commissioner, Deputy Commissioner and/or Administrator that addresses procedures, and practices at Edna Mahan prohibiting prisoner's access to regularly available programming or other out-of-cell opportunities in order to comply with cross-gender search restrictions.

54c:

- EMCF level 3 policy requiring that staff document all cross-gender strip searches, cross-gender visual body cavity searches, and cross-gender pat-down searches of women prisoners.  And the same level 3 policy requires such documentation include the exigent circumstances that warranted the search.

54d:

- EMCF level 3 policy stating that all security staff shall be trained in how to conduct cross-gender pat-down searches in a professional and respectful manner and in the least intrusive manner possible. And plan to continue to provide this training.
- Training records, schedules for training for all security staff, who have been trained, regarding proper methods to conduct cross gender pat down searches.
- Copy of curriculum used for this training
- Any memos, written directives from the Commissioner, Deputy Commissioner and/or Administrator that addresses procedures, and practices at Edna Mahan in

how to conduct cross-gender pat-down searches in a professional and respectful manner and in the least intrusive manner possible.

55a:

- EMCF level 3 policy stating that EMCF prisoners are able to perform bodily functions without nonmedical staff of the opposite gender viewing their breasts, buttocks, or genitalia, except in exigent circumstances or when such viewing is incident to routing cell checks.
- Training curriculum for training all nonmedical staff to the fact that prisoners are able to perform bodily functions without nonmedical staff of the opposite gender viewing their breasts, buttocks, or genitalia, except in exigent circumstances or when such viewing is incident to routing cell checks.
- Training records for all nonmedical staff documenting they were trained in the above
- Training Curriculum for prisoner education orientation ensuring they are told that prisoners can perform bodily functions (such as showering, bathing, using the toilet, changing clothing, etc.) without nonmedical staff of the opposite gender viewing their breasts, buttocks, or genitalia, except in exigent circumstances or when such viewing is incident to routing cell checks
- Any memos, written directives from the Commissioner, Deputy Commissioner and/or Administrator that addresses procedures, and practices at Edna Mahan in how to ensure that prisoners are able to perform bodily functions (noted above) without nonmedical staff of the opposite gender viewing their breasts, buttocks, or genitalia, except in exigent circumstances or when such viewing is incident to routing cell checks.

55b:

- NJDOC Level 1 and EMCF Level 3 policy requiring staff of the opposite gender to announce their presence when entering a prisoner housing unit, and before entering the shower or toilet areas, except inexigent circumstances.
- Any memos, written directives from the Commissioner, Deputy Commissioner and/or Administrator that addresses procedures, and practices at Edna Mahan requiring staff of the opposite gender to announce their presence when entering a prisoner housing unit.

P56:

- NJDOC Level 1 and EMCF Level 3 policy directing multiple internal methods to report allegations of sexual abuse and harassment.
- Information/Level 1 and 3 policies state how "information on how to report sexual abuse or sexual harassment on behalf of an inmate" is distributed publicly
- NJDOC PREA: Zero Tolerance and How to report Sexual Abuse/Sexual Harassment or Retaliation at NJDOC brochure (Note: on shared drive)

- Documentation of allegations of sexual abuse and harassment submitted through the grievance system.
- Spreadsheet documenting all allegations of sexual abuse, sexual harassment, retaliation for reporting, and/or staff neglect or violation of responsibilities that may have contributed to these incidents.  The spreadsheet identifies how the prisoner reported.
- Copy of PREA video shown to prisoners (Note: on shared drive)
- Copy of curriculum (including power point slides, if any) for orientation education for prisoners (Note: on shared drive)

P57:

- NJDOC Level 1 and EMCF Level 3 policy identifying at least one way to report abuse or harassment to a public or private entity or office that is not part of NJDOC.
- NJDOC PREA: Zero Tolerance and How to report Sexual Abuse/Sexual Harassment or Retaliation at NJDOC (Note: On shared drive)
- Contract with Office of Corrections Ombudsman Inmate Request for Assistance Form

P58:

- Copy of PREA video shown to staff (Note: On shared drive)
- Copy of curriculum (including power point slides, if any) for PREA education for staff (Note: On shared drive)
- NJDOC Level 1 Policy, IMM.001.004 "Zero Tolerance Policy: Prison Sexual Assault (Note: On shared drive)
- EMCF Level 3 Policy, IMM.001.004 "Zero Tolerance Policy: Prison Sexual Assault
- Any staff training documentation for employees to understand their method for staff to report privately.

P60:

- NJDOC Level 1 Policy IMM.001.004 "Zero Tolerance Policy: Prison Sexual Assault (Note: On shared drive)
- EMCF Level 3 Policy, MM.001.004 "Zero Tolerance Policy: Prison Sexual Assault
- Spreadsheet documenting all allegations of sexual abuse, sexual harassment, retaliation for reporting, and/or staff neglect or violation of responsibilities that may have contributed to these incidents.  The spreadsheet identifies how, and to whom, the prisoner reported.
- Any memos, written directives from the Commissioner, Deputy Commissioner and/or Administrator that addresses procedures, and practices at Edna Mahan specific to the requirement that EMCF employees report any allegations of sexual abuse, sexual harassment, retaliation, or any staff neglect or violation of responsibilities that may have contributed to an incident or retaliation immediately.
- Reports sent to Monitor of any staff member violating this confidentiality provision

P62

- NJDOC Level 1 Policy and EMCF Level 3 Policy stating the requirement that EMCF shall report all allegations of sexual abuse and sexual harassment of EMCF prisoners to NJDOC's Special Investigation Division (SID) within 12 hours of receipt of the report
- ADM.006.011 Investigations by Special Investigations Division (Note: on shared drive)
- Spreadsheet documenting all allegations of sexual abuse, sexual harassment, retaliation for reporting, and/or staff neglect or violation of responsibilities that may have contributed to these incidents.  The spreadsheet should identify what time EMCF staff were made aware of allegations and what time EMCF notified SID.
- Any memos, written directives from the Commissioner, Deputy Commissioner, EMCF Administrator, or Deputy Chief Investigator that addresses procedures, and practices at Edna Mahan specific to the requirement that EMCF employees report any allegations of sexual abuse or sexual harassment to SID within 12 hours.

P63:

- EMCF Level 3 Policy stating the requirement that EMCF staff shall report all allegations of sexual abuse and sexual harassment of EMCF prisoners to EMCF Administrator within 12 hours of receipt of the report
- Spreadsheet documenting all allegations of sexual abuse, sexual harassment, retaliation for reporting, and/or staff neglect or violation of responsibilities that may have contributed to these incidents.  The spreadsheet should identify what time EMCF staff were made aware of allegations and what time the EMCF was notified.
- Any memos, written directives from the Commissioner, Deputy Commissioner and/or Administrator that addresses procedures, and practices at Edna Mahan specific to the requirement that EMCF employees report any allegations of sexual abuse or sexual harassment to the EMCF Administrator within 12 hours.

P64:

- NJDOC Policy Statement Number 001.008 "Prevention, Detection and Response of Sexual Abuse and Harassment." (Note: on shared drive)
- EMCF Level 3 policy regarding retaliation protection for staff and inmates.
- Spreadsheet documenting all allegations of sexual abuse, sexual harassment, retaliation for reporting, and/or staff neglect or violation of responsibilities that may have contributed to these incidents.
- Any memos, written directives from the Commissioner, Deputy Commissioner and/or Administrator that addresses procedures, and practices at Edna Mahan specific to the retaliation of staff or inmates for reporting an allegation.

P65:

- NJDOC Policy Statement Number 001.008 "Prevention, Detection and Response of Sexual Abuse and Harassment." (Note: on shared drive)
- EMCF Level 3 policy regarding retaliation protection for staff and inmates.
- Spreadsheet documenting all allegations of sexual abuse, sexual harassment, retaliation for reporting, and/or staff neglect or violation of responsibilities that may have contributed to these incidents.  The spreadsheet should identify what steps were taken to protect the alleged victim (removal of alleged staff abusers from contact with victims, etc.)
- Any memos, written directives from the Commissioner, Deputy Commissioner and/or Administrator that addresses procedures, and practices at Edna Mahan specific to the retaliation of staff or inmates for reporting an allegation.

P66:

- Spreadsheet documenting all allegations of sexual abuse, sexual harassment, retaliation for reporting, and/or staff neglect or violation of responsibilities that may have contributed to these incidents.  The spreadsheet should identify what steps were taken to protect the alleged victim (removal of alleged staff abusers from contact with victims, etc.)

P67/68:

- NJDOC Policy Statement Number 001.008 "Prevention, Detection and Response of Sexual Abuse and Harassment." (Note: on shared drive)
- EMCF Level 3 policy regarding retaliation protection for staff and inmates.
- Spreadsheet documenting all allegations of sexual abuse, sexual harassment, retaliation for reporting, and/or staff neglect or violation of responsibilities that may have contributed to these incidents.  The spreadsheet should identify what steps were taken to protect the alleged victim (removal of alleged staff abusers from contact with victims, etc.)
- Any memos, written directives from the Commissioner, Deputy Commissioner and/or Administrator that addresses procedures, and practices at Edna Mahan specific to the retaliation of staff or inmates for reporting an allegation.

P70:

- NJDOC Policy Statement Number 001.008 "Prevention, Detection and Response of Sexual Abuse and Harassment" (Note: on shared drive)
- EMCF Level 3 policy stating that no prisoner who is alleged to have suffered sexual abuse or sexual harassment shall not be placed in involuntary restricted housing, unless there is no available alternative means of separation from likely abusers.
- EMCF Level 3 policy stating that if a prisoner is placed in involuntary restricted housing, the placement must be reviewed and documented in writing as to the

reasons why by the PREA Compliance Manager or the EMCF designed within 24 hours.

P71:

- EMCF Level 3 policy stating that if, in exigent circumstances, a prisoner who is alleged to have suffered sexual abuse or sexual harassment is place in involuntary restricted housing, she will have access to privileges, including visitation, commissary, programming and vocational opportunities.
- Any memos, written directives from the Commissioner, Deputy Commissioner and/or Administrator that addresses procedures, and practices at Edna Mahan specific to placing a prisoner who is alleged to have suffered sexual abuse or sexual harassment in involuntary restricted housing

P72:

- EMCF Level 3 policy stating that no prisoner who is alleged to have suffered sexual abuse or sexual harassment shall not be placed in involuntary restricted housing for the purpose of interviewing that prisoner as part of the investigation.
- Any memos, written directives from the Commissioner, Deputy Commissioner and/or Administrator that addresses procedures, and practices at Edna Mahan specific to placing a prisoner who is alleged to have suffered sexual abuse or sexual harassment in involuntary restricted housing

P73:

- NJDOC Policy Statement Number 001.008 "Prevention, Detection and Response of Sexual Abuse and Harassment" (Note: on shared drive)
- EMCF Level 3 policy stating that EMCF prisoners have access to external sexual abuse emotional support services. And that same policy details, specifically, how prisoners can access these services.
- Inmate Handbook describing PREA Sexual Abuse Emotional Support Services and names, addresses, and phone numbers of such services (Note: on shared drive)
- Documents of agreements (memo of understanding) with any community providers that may provide prisoners with confidential emotional support services

P75/77:

- NJDOC Policy Statement Number 001.008 "Prevention, Detection and Response of Sexual Abuse and Harassment" specific to criminal and administrative agency investigations.  (Note: on shared drive)
- Special Investigations Division Internal Management Procedures #035, "Investigation Procedures"
- Spreadsheet documenting all allegations of sexual abuse, sexual harassment, retaliation for reporting, and/or staff neglect or violation of responsibilities that may

have contributed to these incidents.  The spreadsheet identifies which investigations are undertaken by the prosecutors and which are investigation by NJDOC.

P78:

- NJDOC Policy Statement Number 001.008 "Prevention, Detection and Response of Sexual Abuse and Harassment" specific to criminal and administrative agency investigations. (Note: on shared drive)
- List of EMCF Special Investigators and their resume/expertise.
- Training curriculum to train investigative staff.
- Documentation training to investigators on the Miranda and Garrity warnings.
- Training rosters or documents showing the completion of the New Jersey Division of Criminal Justice Basic Course for Investigators.
- Training rosters or documents showing the completion of all EMCF investigators specialized training.

P79:

- Special Investigations Division Internal Management Procedures #048, "Staff Reporting of Personal Relationships".

P80

- NJDOC/SID level 1 policy specifying how they rate the credibility of an alleged victim, suspect, or witness.

P81:

- Spreadsheet documenting all allegations of sexual abuse, sexual harassment, retaliation for reporting, and/or staff neglect or violation of responsibilities that may have contributed to these incidents.  The spreadsheet should identify:
  - The date of notification of the allegation
  - The date the case was referred to prosecutor's review
  - If the case is criminal or administrative
  - If the case was returned to NJDOC, the date returned
  - If an extension was requested, and if so, the date of the request, and the reason for the extension
  - The date of the completed investigation.
  - The finding if the allegation was determined to be unfounded, unsubstantiated, or substantiated.
  - The date the Sexual Assault Advisory Council (SAAC) was held

P83:

- NJDOC Policy Statement Number 001.008 "Prevention, Detection and Response of Sexual Abuse and Harassment" specific to criminal and administrative agency investigations.
- NJDOC PCS. 001.PREA .001 Sexual Assault/PREA Advisory

- EMCF's Level 3 policy on Sexual Assault/PREA Advisory
- Copies of the Sexual Assault Investigation Disposition form for all EMCF's cases
- Copies of EMCF's Sexual Assault Advisory Council (SAAC) monthly agenda and meeting minutes
- Copies of all report of EMCF's Sexual Assault Advisory Council findings and recommendations for improvement sent to NJDOC PREA Coordinator and Edna Mahan's PREA Compliance Manager

P84:

- NJDOC Policy Statement Number 001.008 "Prevention, Detection and Response of Sexual Abuse and Harassment" specific to criminal and administrative agency investigations.
- NJDOC PCS. 001.PREA .001 Sexual Assault/PREA Advisory
- EMCF's Level 3 policy on Sexual Assault/PREA Advisory
- Copies of all report of EMCF's Sexual Assault Advisory Council findings and recommendations for improvement
- Copies of all Corrective Action Reports developed by EMCF's Sexual Assault Advisory Council (SAAC)
- Copies of all completed EMCF's Corrective Action Reports as referenced above
- Copies of ANY subsequent actions that are recommended by the EMCF SAAC, to include, but not be limited to, memos, emails, new level 3 policies, procedures, Post Orders, etc.
- Copies of all Corrective Action Reports developed by NJDOC's Agency Sexual Assault Advisory Council (SAAC)
- Copies of all completed NJDOC's Corrective Action Reports as referenced above
- Copies of ANY subsequent actions that are recommended by the NJDOC's SAAC, to include, but not be limited to, memos, emails, new level 1 policies, procedures, directives, etc.
- All documents from EMCF or NJDOC's SAAC that describe "why" recommended actions were not taken.

P86:

- EMCF Level 3 policy requiring all access to and from the Edna Mahan Compound is through secure, staffed checkpoints only.
- Post Orders for perimeter Correctional Police Officers requiring regular monitoring of the perimeters of the Edna Mahan grounds with the goal of preventing entry by persons or contraband outside of the secure checkpoints.
- Any memos, written directives from the Commissioner, Deputy Commissioner and/or Administrator that addresses procedures, and practices to ensure access to and from the Edna Mahan compounds is through secure, staffed checkpoints only.

P87:

- EMCF Level 3 policy requiring that every individual, including all staff, contractors, volunteers, visitors, and government officials entering the Edna Mahan compound receive thorough and effective contraband screening.
- Post Orders for Correctional Police Officers working at the entrance to all buildings on the minimum-security compound (except the Administration Building, as noted above), requiring that all staff, contractors, volunteers, visitors, and government officials entering the compound receive thorough and effective contraband screening in addition to metal detection.
- Post Orders for Correctional Police Officers working the entry gate into the maximum compound requiring that all staff, contractors, volunteers, visitors, and government officials entering the compound receive thorough and effective contraband screening.
- Any memos, written directives from the Commissioner, Deputy Commissioner and/or Administrator that addresses procedures, and practices to ensure all every individual, including all staff, contractors, volunteers, visitors, and government officials entering the Edna Mahan compound receive thorough and effective contraband screening.

P88:

- Copy of inventory conducted of all abandoned, dilapidated, or currently out of use structures on the Edna Mahan compound.
- Copy of plans to demolish or secure any out of use buildings that pose a threat to institutional security or provide significant opportunities for sexual abuse.
- Any memos, written directives from the Commissioner, Deputy Commissioner and/or Administrator, or their designees, that addresses procedures, and practices regarding any abandoned, dilapidated, or currently out of use structures on the Edna Mahan compound

P89:

- Written decision sent to the DOJ and Monitor regarding determination to utilize the old upholstery warehouse.
- If decision is not to use old upholstery warehouse, copy of plans to demolish or secure the building to ensure institutional security and eliminate any opportunities for sexual abuse.
- If decision is to use the old upholstery warehouse, documentation that the building has been cleared of any unused equipment, inventory, and other visible barriers that pose safety concerns and create blind spots.

P90:

- NJDOC policy statement SUP.004.001 Limited English Proficient (LEP) Language Assistance
- Level 3 policy requiring that all LEP prisoners at Edna Mahan have access to interpretation and translation services, as required by Ti9tle VI of the Civil Rights Act.
- Documentation of ALL methods created to provide access for LEP inmates to interpretation and translation services, as required by Ti9tle VI of the Civil Rights Act.
- Any memos, written directives from the Commissioner, Deputy Commissioner and/or Administrator that addresses procedures, and practices to ensure all prisoners at Edna Mahan have access to interpretation and translation services ad required by Title VI of the Civil Rights Act.
- Details of the usage of any LEP inmates to access interpretation services -records, logs, phone call use, etc.

P99:

- Job Description for the person who serves as the Agreement Coordinator designating that position as the point of contact for the DOJ and Monitor.

P104:

- Status report submitted to the DOJ and Monitor on, or before, February 24, 2022

P110:

- Copies provided to the Monitor and DOJ of applicable portions of any formal reports or recommendations from the Office of the Corrections Ombudsperson concerning efforts to establish or revise Edna Mahan or statewide policies or procedures, related to sexual abuse or sexual harassment of prisoners.
- Copies provided to the Monitor and DOJ of applicable portions of any formal reports or recommendations from the Commission to Protect New Jersey Inmates from Sexual Assault and Sexual Misconduct concerning efforts to establish or revise Edna Mahan or statewide policies or procedures, related to sexual abuse or sexual harassment of prisoners.

P111:
- Agendas for Edna Mahan Board of Trustees meetings (Note: on shared drive)
- Minutes from Edna Mahan Board of Trustees meetings (Note: on shared drive)
- Dates and agendas of Public Stakeholder meetings