Ninth Compliance Narrative Report

Review Period:
8/25/25 – 2/24/26

THE UNITED STATES OF AMERICA
v.
THE STATE OF NEW JERSEY AND
THE NEW JERSEY DEPARTMENT
OF CORRECTIONS

Prepared by Jane Parnell

## TABLE OF CONTENTS                                                    Pg.

**INTRODUCTION**                                                       **3**

    Specific Actions to Evaluate Compliance

    Monitoring Tool

**EXECUTIVE SUMMARY**                                                  **5**

    Intent of the Report

    New Jersey Department of Corrections/Edna Mahan Correctional Facility for Women: Updates, Progress, Strengths, Challenges, and Opportunities for Improvement

        A. Updates

        B. Progress

        C. Strengths

        D. Challenges

**LOGISTICS**                                                          **15**

    Compliance Visit –March 2026

    Process of Monitor's Report and Monitoring Tool

**SUMMARY OF COMPLIANCE**                                              **17**

**CLOSING OBSERVATIONS**                                               **18**

**ATTACHMENTS**
**MONITORING TOOL (SEPARATE PDF ATTACHMENT)**

## INTRODUCTION

On August 24, 2021, the State of New Jersey and the United States Department of Justice (DOJ) entered into a settlement agreement establishing a comprehensive set of measures to ensure that individuals incarcerated at the Edna Mahan Correctional Facility for Women (EMCF), including those housed in the Satellite building, are provided with constitutional conditions that safeguard them from sexual abuse. This compliance report documents the progress made by the New Jersey Department of Corrections (NJDOC) and EMCF in meeting the specific requirements outlined in the agreement. It is the ninth court-mandated report and covers the period from August 25, 2025, through February 24, 2026.

The parties agreed to select Jane Parnell as an objective settlement monitor to evaluate the NJDOC and EMCF's compliance with the settlement requirements. The Monitor began her responsibilities on August 24, 2021. The Court has Ms. Parnell's Curriculum Vitae (CV) detailing her over 40 years of experience in the field of corrections.

This report will describe the level of compliance achieved by NJDOC and EMCF, as well as the actions taken by the Monitor to determine compliance, as required by the settlement agreement. This evaluation period spans from August 25, 2025, to February 24, 2026.  The settlement addresses three (3) levels of measurement for compliance: Substantial Compliance, Partial Compliance, and Non-Compliance. The Monitor added a fourth level of measurement, i.e., non-applicable, to the monitoring tool.  The definitions for these terms are provided in the Compliance Summary section of this report.

As in the last few compliance reports, the Monitor determined that the term "incarcerated person(s)" would be used throughout this and future reports to the Court. The term "prisoner(s)" will only appear when quoting policy or the settlement agreement.

*Specific Actions to Evaluate Compliance*

Specific actions taken by the Monitor to evaluate compliance during this reporting period were as follows:

- Prior to the on-site compliance visit, the Monitor conducted virtual interviews with 30 individuals with specific responsibilities related to NJDOC and EMCF's compliance with the settlement.

- The Monitor and her Associate conducted an on-site visit after the reporting period. The dates were March 18 and 19, 2026.  During this visit, the Monitor and her Associate met with approximately 32 security staff.  These focus groups included custody staff from each shift (1st, 2nd, and 3rd).  The Monitor also spoke with several additional staff during the facility tour.

- Additionally, the Monitor's Associate conducted a focus group with nine (9) civilian and contract staff. This group included medical and mental health staff from Rutgers University and substance abuse treatment staff from Gateway. Rutgers is the contracted medical/mental health services provider for NJDOC/EMCF, and Gateway contracts with NJDOC to provide substance

abuse treatment for incarcerated persons. The group also included NJDOC civilian staff (i.e., social workers, teachers, etc.).

- The Monitor or her Associate conducted four incarcerated persons (IPs) focus groups, comprised of approximately 32 randomly selected incarcerated persons at EMCF that week, including two focus groups at the EMCF Satellite Building.  The Monitor also spoke with several additional incarcerated persons during the facility tour.

- The Monitor or her Associate spoke with five (5) incarcerated persons who had submitted an allegation of sexual abuse, sexual harassment, or retaliation during this reporting period.  The purpose of these interviews was to determine how the IPs were treated during the investigation and to ask if these IPs felt they had been retaliated against for filing the allegation.

- The Monitor or her Associate spoke with three (3) incarcerated persons who had an investigation resolved during this reporting period. These interviews aimed to determine how the IPs were treated during the investigation, if they had been kept informed about the status and resolution of the allegation, and to ask if they felt they had been retaliated against for filing the allegation.

- The Monitor or her Associate spoke with three (3) LEP-incarcerated persons who participated in a disciplinary hearing during this reporting period.  These interviews were intended to determine how the staff communicated with the LEP-incarcerated persons.

- The Monitor or her Associate spoke with three (3) incarcerated persons who had requested to have their retaliation monitoring extended beyond the required ninety days.  The purpose of these interviews were to determine why this incarcerated person felt the need to have her retaliation monitoring extended.

The Monitor reviewed NJDOC and EMCF policies, spreadsheets, meeting agendas and minutes, training curricula, Prison Rape Elimination Act (PREA) investigative reports, and several other types of documents.  These documents were used to determine the Monitor's compliance ratings.

The Monitor participated in several conference calls with NJDOC, the United States Department of Justice, and the leadership for EMCF concerning the settlement provisions and compliance requirements.

## *Monitoring Tool*

The Monitor developed and proposed a "monitoring tool."  Both NJDOC and the DOJ approved its usage. The 'monitoring tool' has a section for each paragraph of the Settlement Agreement. The top of each section identifies the specific paragraph and any requirements, as appropriate.

Each section has specific measures of compliance the Monitor uses to determine compliance for that paragraph. The measure of compliance identifies the documents, interviews, and observations used to assess compliance for that specific paragraph. Each of these compliance measures was shared and agreed upon by the NJDOC and the DOJ.

The next section in the monitoring tool details the steps taken by NJDOC and EMCF towards implementation. NJDOC writes this section, which allows NJDOC and EMCF to describe the actions taken during the reporting period to implement the terms of the Settlement Agreement.

Each paragraph evaluates the extent to which EMCF has complied with the substantive provisions of the Settlement Agreement during the reporting period, identifying the level of compliance with the requirements specified for each section. It also provides the Monitor an opportunity to explain how that level of compliance was determined. This determination is based on documents reviewed, interviews conducted by the Monitor or her Associate, and observations made during the compliance visit. Additionally, the Monitor outlines the steps taken by NJDOC and EMCF to implement the Settlement Agreement.

Lastly, the Monitor may offer specific, non-binding recommendations, as appropriate. These recommendations are intended to set non-binding performance expectations for EMCF for the upcoming six-month reporting period.

Note that the monitoring tool has been adjusted to reflect the dismissal of twelve (12) sections, including 50 paragraphs of the Settlement Agreement.

## EXECUTIVE SUMMARY

### Intent of the Report

This report informs the Court, and all interested parties of the Monitor's assessment of the current progress and status of NJDOC's and EMCF's compliance with the provisions and requirements of the Settlement Agreement.

### New Jersey Department of Corrections/Edna Mahan Correctional Facility: Updates, Progress, Strengths, Challenges, and Opportunities for Improvement

## A.  Updates

### Support for the Administrative team at EMCF

The Moss Group continued onsite leadership training with the EMCF Administrative Team, building on efforts initiated in the previous reporting period. Sessions held in September, October, and November focused on developing a clear mission and values, strengthening effective communication, and grounding daily work in the principles of *The Seven Dysfunctions of a Team* and core strengths.

In addition, EMCF leaders met regularly with assigned subject matter expert mentors to address current challenges and develop strategies to strengthen existing systems. Together, these

efforts have played an important role in enhancing team cohesion and fostering a strong, team-oriented leadership culture that supports the implementation of meaningful and sustainable improvements across the organization.

*EMCF's PREA Coordinator wins The Dedication to Excellence Award*

Amelia Renshaw, EMCF's PREA Coordinator, won the Dedication to Excellence Award during this past reporting period. This Supervisory Award is awarded to a civilian employee who in the past year has gone above and beyond normal expectations, excelled in their positions and are highly regarded by their staff for their consistent leadership, integrity, understanding and support, both professionally and personally. Ms. Renshaw's peer, who wrote the nomination, stated, "Ms. Renshaw has been a pivotal leader in advancing PREA compliance and gender equality initiatives at Edna Mahan Correctional Facility. Her dedication and expertise have significantly strengthened the facility's alignment with the consent decree; through her active collaboration with EMCF Administration, the Special Investigations Division, Women's Services and the PREA Compliance Unit. She fosters a unified approach to ensuring the safety, dignity and respect of every incarcerated person. Ms. Renshaw's leadership has been instrumental to the successful implementation of the facility's new Risk Management System, and in advancing Women's Risk Needs Assessment (WRNA) research efforts. Her commitment to support all divisions has enhanced operational efficiency, strengthened compliance posture and promoted a culture where safety and respect are non-negotiable values. In addition to her professional achievements, Ms. Renshaw remains a well-respected leader through her constant support and dedication to the unit. Through her collaborative spirit, strategic insight and unwavering dedication, Ms. Renshaw continues to set the standard for excellence in correctional leadership."

*Retaliation*

In light of improvements in policy and practice, the Court has dismissed the Consent Decree provision specific to retaliation. The Monitor believes that all necessary systems are in place to address retaliation concerns, and this will be the final update on this issue.

The NJDOC and EMCF have made significant progress in addressing retaliation, including its more subtle forms. All critical policies and procedures for monitoring retaliation are well-established. EMCF's PREA Compliance Manager actively oversees allegations of retaliation involving incarcerated individuals. When asked directly, no staff member stated that they had seen or heard of any incidents of retaliation during the past reporting period.

The Monitor or her Associate conducted four focus groups with incarcerated individuals. Most incarcerated persons believed it still occurs. Two individuals said they would not report a PREA allegation because they were afraid that they would be retaliated against if they did. There was a significant discrepancy between what the staff and IPs report to the Monitor regarding retaliation. Sadly, it is an unfortunate reality of prison culture that some incarcerated individuals will always feel they are being retaliated against, and some form of perceived retaliation is likely to persist.

*Confidentiality*

In a prior compliance report, the Monitor advised the Court that this would be the final update on confidentiality unless significant changes occurred. However, given the ongoing challenges of maintaining full confidentiality in a prison setting, the Monitor determined that continued attention to confidentiality practices remained important. In light of improvements in policy and practice, the Court has dismissed the Consent Decree provision specific to confidentiality. Accordingly, unless the Monitor identifies a decline in confidentiality practices, this will be the final update on this issue.

Earlier compliance reports have documented the substantial steps taken by the NJDOC and EMCF to strengthen operational procedures and improve confidentiality. During the most recent compliance visit, the Monitor and her Associate interviewed 32 staff members, most of whom described clear and meaningful improvements in confidentiality practices following implementation of the Settlement Agreement.

They also spoke with more than 30 incarcerated individuals. While the majority recognized these improvements, some participants indicated that challenges persist, particularly regarding the confidentiality of PREA complaints. Among incarcerated individuals, there was disagreement as to whether any perceived lack of confidentiality stemmed from staff actions or from other incarcerated persons.

*Language Access*

Similar to the issues of retaliation and confidentiality, the Court dismissed the Consent Decree provision addressing Limited English Proficient (LEP) incarcerated persons due to several positive changes in policy and practice. Additionally, all LEP individuals interviewed by the Monitor or her Associate reported that they understand their right to be free from sexual abuse and harassment and know how to report such incidents, with many offering examples of how they can—or have—done so. These ongoing efforts demonstrate EMCF's commitment to reducing language barriers, to ensure the sexual safety of all individuals. Accordingly, unless the Monitor identifies a decline in language access specific to sexual safety, this will be the final update on the issue of Limited English Proficiency.

*New facility*

During this reporting period, planning for the new women's facility continued, with further progress toward finalizing the design. The proposed plan incorporates a direct supervision model, placing staff within housing units to enhance safety and reduce conflict.  The design includes dedicated space for programming, treatment, and services, integrating these functions into daily operations. It reflects the understanding that the physical environment shapes both staff practices and the behavior of incarcerated individuals, and is intended to better align operations, supervision, and programming. Structured visitation areas are also included to support family connections.

These developments are particularly important given the limitations of the current facility. Key challenges stem from infrastructure issues, including the age of the buildings, housing constraints, and a layout that does not reflect the needs of the current population or modern operational expectations. Additionally, the population is split across two separate campuses, creating ongoing challenges related to transportation, movement, staffing, supervision, and access to services.

The new design also provides for more structured intake and stabilization processes, along with improved access to medical and behavioral health care. It incorporates features that enhance privacy and safety, such as private search areas, appropriately designed shower and restroom facilities, and camera coverage that supports supervision while maintaining dignity.

Overall, these design elements align with the requirements of the Consent Decree and build on the progress already made at EMCF. Continued advancement of this project will be critical to sustaining compliance and supporting long-term improvements.

*Report published by the New Jersey Office of the State Comptroller*

As previously noted, the New Jersey Office of the State Comptroller (OSC) identified significant weaknesses in the quality and fairness of investigations conducted by the NJDOC's Special Investigations Division (SID). OSC reviewed 46 SID investigations dating from January 2018 through August 2022, None of these cases were from EMCF.

Following the release of the OSC report, the Monitor initiated a more in-depth review of EMCF investigations involving allegations of sexual abuse, sexual harassment, and retaliation. This review includes viewing recorded interviews with alleged victims, accused staff members, and witnesses. The Monitor, the Department of Justice (DOJ), and SID staff continue to meet monthly to review EMCF investigative reports and address any concerns raised by the Monitor or DOJ. Over the past eighteen months, the Monitor has observed measurable improvements in the quality of these investigative reports.

The OSC recommended that the NJDOC strengthen its internal audit program by involving personnel from the Office of the Correctional Ombudsperson (OCO). According to the OSC, OCO's participation would provide valuable insight, enhance objectivity, and add an extra layer of oversight. The report advised that NJDOC and OCO formalize this collaboration through a Memorandum of Understanding (MOU) outlining the audit schedule and requiring NJDOC to share case files with OCO in advance so they can thoroughly review each file and prepare questions. This MOU was finalized on October 8, 2025.

The Office of the Correctional Ombudsperson (OCO) conducted its first audit in February 2026, reviewing 14 cases, none of which originated from EMCF. Terry Schuster, head of the Office of the Correctional Ombudsperson, reported that he found SID investigations to be overwhelmingly thorough, complete, objective, professional, and fair.

Schuster further noted that the written investigative reports accurately reflected the corresponding video footage in each case. He also stated that investigations involving sexual

misconduct were of a high standard and expressed that the development of the Special Victims Unit represents a positive improvement.

In addition, Schuster described a meeting with the NJDOC and the Special Investigations Unit during which he provided feedback from the audit. He characterized the discussion among the three parties as highly productive.

He concluded by stating that he has observed significant improvement in SID investigations over the past few years, including better questioning of witnesses, more consistent use of correct pronouns, and improved information gathering from all available sources.

### *Executive Order 362 – Clemency*

During this reporting period, EMCF IPs were granted clemency under the State's executive clemency initiative. Two individuals received clemency on November 13, 2025, and seven additional individuals received clemency on January 19, 2026. These actions did not all result in immediate release. In some cases, clemency resulted in sentence reductions, making individuals eligible for parole consideration or advancing their eligibility for a parole hearing. In total, fourteen (14) women from EMCF were granted clemency by Governor Murphy prior to leaving office on January 20, 2026.

### *Female Incarcerated Person's Rights Protection Act*

The Incarcerated Women Protection Act (IWPA), enacted on January 20, 2026, establishes legally enforceable protections for women in custody and builds on existing practices by setting clear standards for privacy, safety, gender-responsive care, and staff training. The law enhances dignity and safety by requiring privacy in showers, bathrooms, searches, and medical care, and by limiting cross-gender searches and certain supervision practices. It also mandates that policies and daily operations reflect the needs of women, supported by required staff training on trauma, safety, and gender-responsive approaches.

In addition, the Act formalizes key services, including access to doula support and other gender-responsive programming, the creation of a Division of Women's Services, and the use of gender-specific classification tools to guide placement and programming. It further requires the establishment of a Special Victims Unit (SVU) within the Special Investigations Division and a PREA Compliance Unit (PCU). Finally, the Act strengthens oversight by creating a Board of Trustees for women to enhance response, accountability, and compliance efforts.

### *Survivors Justice Act*

The Survivors Justice Act (SJA) consists of two New Jersey laws that permit courts to consider an individual's history of domestic violence or abuse in both sentencing and post-conviction decisions. The legislation recognizes that experiences of abuse may contribute to criminal behavior and creates a pathway for more equitable outcomes. Under the law, courts may take this history into account at sentencing, impose reduced sentences when appropriate, and allow currently incarcerated individuals to petition for resentencing.

The second component of the Act provides opportunities to expunge certain convictions connected to abuse and ensures access to legal representation through the Office of the Public Defender. Taken together, the SJA establishes a structured framework to address the impact of abuse while expanding access to sentence reductions and record relief.

## B. Progress

NJDOC and EMCF have continued to make steady progress during this reporting period, in areas both required and not required by the Settlement Agreement.  The areas required by the Settlement Agreement are discussed in detail in the monitoring tool. The areas not required by the Settlement Agreement include, but are not limited to, the following:

### *The Peer Education Program*

A Peer Education Program for PREA orientation was implemented on November 7, 2025. During the previous reporting period, EMCF IPCM partnered with The Moss Group to conduct Train-the-Trainer sessions for selected incarcerated persons (IPs). Through the PREA Peer Education Program, trained IP Peer Educators deliver information about the Prison Rape Elimination Act to newly admitted IPs at EMCF.

The program has proven effective because Peer Educators offer a relatable perspective and emphasize the importance of maintaining sexual safety. The facility IPCM attends each session to provide oversight, support, and to ensure the accuracy of the information presented, but the majority of the information is presented by IPs to IP'.

### *Voices for Wellness:*

In early September, NJDOC's Division of Women and Veteran Services invited volunteers from the National Alliance on Mental Illness (NAMI), Hunterdon County Chapter, to facilitate an eight-session, biweekly mental health support group centered on the wellness model. Throughout the program, participants are guided in developing symptom awareness, self-awareness, and emotional regulation within a confidential setting. The group was launched on the Max Compound in September 2025 and later expanded to the Satellite facility in February 2026.

### *RISE – Respect, Insight, Strength, Empowerment:*

The Division of Women and Veteran Services collaborated with The Moss Group to develop an orientation program for incarcerated persons (IPs) designed to help newly admitted individuals understand the culture of EMCF and foster a sense of community. This two-hour session is facilitated by trained IP Peer Educators, who guide participants through topics such as identifying practical stress-management strategies, building compassion for oneself and others, finding positive ways to contribute to the EMCF community, recognizing personal strengths, and developing a legacy statement. The involvement of IP Peer Educators enhances the program's effectiveness, as their lived experience lends credibility, fosters trust, and allows them to connect with participants in a meaningful and relatable way.

*Community Connect Continues*

Community Connect is a biannual initiative developed by EMCF Administration to strengthen communication, promote transparency, and foster a unified sense of community within the facility. By providing timely updates, sharing information on initiatives and institutional goals, and creating space for respectful dialogue, the program aims to ensure consistency across housing units and reduce misinformation.

During this reporting period, the Associate Superintendent responsible for PREA met with each wing in Building 1 of the Satellite building to discuss sexual abuse and harassment and to provide educational information to incarcerated persons (IPs). Administration also solicited input from IPs on ways to improve the community. Based on this feedback, an incentive-level system was developed to support individuals who struggle to achieve long-term goals, such as remaining charge-free for one year. The initiative remains in the developmental phase, with ongoing consideration of implementation strategies and staff oversight.

During the holiday season, a facility-wide talent show was held and was highly successful, providing incarcerated persons with an opportunity to express themselves, build morale, and experience a sense of normalcy through creativity and shared entertainment.

Additionally, a Community Connect newsletter was launched to consolidate and communicate departmental initiatives and programs in a single, centralized format, addressing prior challenges with information being distributed across multiple departments using varying forms of communication.

*Incentive-Based Programming for Incarcerated Persons Continues*

EMCF continues to recognize accomplishments and promote positive behavior through incentive-based programming and special events. The Empowering Women! Speaker Series remains a central element of these efforts, providing monthly sessions that feature inspiring speakers for the incarcerated population. During this reporting period, the series concluded its 2025 focus on women's health and launched the 2026 series with workshops centered on self-empowerment and personal goal setting.

Additionally, EMCF is expanding access to incentive-based opportunities for incarcerated individuals who demonstrate responsible and positive behavior. Current programming includes ongoing initiatives such as the Design Studio, the IP-led Peer Orientation program, and RISE mentorship. Together, these efforts support constructive behavior while fostering skill development, peer engagement, and a stronger sense of community within the facility.

*Women's Risk Need Assessment (WRNA)*

During the reporting period, Women's Services continued advancing the implementation of the Women's Risk Needs Assessment (WRNA) at EMCF for the incarcerated population. The WRNA is a validated, peer-reviewed assessment tool specifically developed by and for justice-

involved women. Its adoption represents NJDOC's first use of a gender-responsive assessment to inform correctional decision-making, supporting the identification of higher-risk individuals for more intensive programming and lower-risk individuals for less intensive interventions. The goal of this approach is to reduce institutional misconduct and decrease the likelihood of recidivism after release. In addition, the tool is expected to streamline service delivery and improve the prioritization of program placements.

NJDOC has issued a formal Request for Proposals and selected a vendor. Implementation efforts are currently underway, with procurement anticipated to be completed during the next reporting period.

*Advisory Groups Continue*

NJDOC and EMCF leadership teams regularly engage with three key advisory groups: staff members, incarcerated individuals at EMCF, and the Board of Trustees (BOT). Ongoing collaboration with both staff and incarcerated persons is essential to understanding concerns and ensuring their perspectives inform current and future policies and programs. Regular engagement with the Board of Trustees provides an added layer of oversight, guidance, and accountability, helping align facility operations with broader organizational goals. Commissioner Kuhn, AC Tomé, and Administrator Fusaro recognize that these discussions play a vital role in shaping decisions related to facility operations, incentive programs, reentry initiatives, accountability measures, and other efforts that directly impact the well-being and success of those at EMCF.

## C.  Strengths

*Leadership*

The leadership of the New Jersey Department of Corrections, the Assistant Commissioner of Women's Services, and the administrative team at Edna Mahan Correctional Facility have built a strong foundation for continued progress toward the goals set forth in the Consent Decree. Their commitment to transparency, accountability, and open communication helps foster trust among both staff and the incarcerated population, ensuring that diverse perspectives and concerns are acknowledged and respected. This leadership is essential to guiding meaningful change, particularly in advancing the reforms and initiatives outlined in the Consent Decree, which require sustained effort, collaboration, and adaptability.

*Stakeholders/Partners*

The Monitor continues to be impressed by the breadth and quality of external resources and partnerships cultivated by NJDOC.  Ongoing support from The Moss Group and the attorneys at Lowenstein Sandler LLP has provided expert guidance, strategic insight, and practical assistance, all of which has been instrumental in helping NJDOC and EMCF meet the requirements of the Settlement Agreement.  These partnerships not only strengthen compliance efforts but also contribute specialized knowledge and best practices that enhance overall operations and staff development. In addition, the Board of Trustees has consistently demonstrated active and effective collaboration with NJDOC and EMCF leadership, offering oversight, guidance, and accountability that support institutional improvements and the

successful implementation of key organizational and legislative initiatives. Collectively, these external resources and partnerships play a vital role in ensuring compliance with the Settlement Agreement.

## D.  Challenges

It is noted that many of the challenges remain the same and are, for the most part, outside the influence of the NJDOC or EMCF.

*Police Training Act and the Police Training Commission*

NJDOC and EMCS continue to face significant bureaucratic barriers related to the Police Training Act and the Police Training Commission (PTC). This issue has been repeatedly identified by the Monitor across six consecutive compliance reports—from the 3rd through the 8th—spanning August 25, 2022, to August 24, 2025. Despite sustained attention over several years, no meaningful progress has been made, and the matter remains unresolved, underscoring the urgent need for immediate action.

As outlined in prior reports, NJDOC operates under the authority of the Police Training Act, with the PTC responsible, pursuant to N.J.S.A. 52:10B-71, for developing and certifying basic training courses for most law enforcement roles. The PTC's Basic Law Enforcement Course Trainee Manual, last revised on January 26, 2023, establishes uniform pre-academy physical fitness standards applied across all genders and age groups. Trainees are given two attempts to meet these requirements, and failure results in disqualification from academy admission. Data from the past five NJDOC academy classes consistently show that female candidates fail these assessments at significantly higher rates than male candidates.

The urgency of reform is further underscored by recent data from Class 261, which shows that 52% of female candidates failed the physical assessment after six weeks of processing. As a result, these candidates are unable to advance to the subsequent hiring phases or gain entry into the Academy. This pattern is consistent with prior classes and highlights the systemic nature of the barrier.

The continued inaction on this issue has direct and damaging consequences. It disproportionately excludes qualified female candidates, restricts NJDOC's ability to recruit and hire women, and undermines compliance with the Consent Decree requirements related to increasing the number of women correctional officers at EMCF. After more than four years of documented concern, the absence of any response or corrective action by the PTC reflects a critical breakdown in accountability. Without prompt intervention, this longstanding barrier to gender equity in recruitment and staffing will persist, further delaying progress and compliance.

*Prison Facility/Location Challenges*

As noted above, the plans for the new facility are in progress. Nonetheless, the challenges facing the current facility, as previously detailed in compliance reports to the Court, remain largely unresolved. EMCF's infrastructure—now more than 110 years old—continues to present persistent issues, including insufficient hot water, electrical disruptions, frequent power outages,

and mold infestations. Administrator Fusaro has reported that dozens of maintenance requests remain pending, underscoring the ongoing strain on facility operations.

EMCF's location further compounds these difficulties. Many employees endure long commutes of 60 to 90 minutes each way, and the knowledge that the facility is slated for eventual closure diminishes its appeal compared with other institutions within NJDOC. Together, these factors continue to impact staffing levels, employee morale, and overall operational stability.

### *Staffing*

Staffing challenges at EMCF persist due to several factors, including location, Police Training Act requirements for academies, difficulties hiring qualified staff, and the tight labor market.

Adequate custody staffing in women's prisons is fundamental to maintaining safety, order, and humane conditions. When there are enough well-rested officers on duty, they can properly supervise housing units, respond quickly to incidents, and build professional relationships with the incarcerated persons.  In contrast, understaffing or excessive overtime often leads to reactive rather than proactive management of the incarcerated persons, where officers are stretched too thin to monitor behavior effectively or intervene before situations escalate.  Understaffing can also increase the risk of violence and victimization of the incarcerated persons. Research on correctional environments has shown that lower staff-to-inmate ratios are associated with higher rates of assaults, including staff-on-inmate sexual incidents.

Understaffing also significantly endangers correctional officers themselves. Excessive overtime increases the likelihood of burnout and mistakes in judgment. Studies in correctional workforce management have found that fatigue and stress among officers are strongly linked to safety incidents, suggesting that staffing shortages not only affect the incarcerated persons' welfare but also directly compromises staff well-being.

Without proper rest, officers may rely on punitive or inappropriate responses that escalate tensions rather than defuse them. Research in corrections emphasizes that well-rested staff are better equipped to use communication, de-escalation techniques, and trauma-informed practices, all of which are critical in women's facilities.

Having enough well-rested correctional staff is critical for both male and female institutions.  EMCF has the added difficulty of not having enough female correctional staff working at the facility.   The presence of female correctional staff in women's prisons is widely considered essential to the reduction of sexual abuse and exploitation. Numerous investigations have shown that female inmates are particularly vulnerable to abuse by male staff due to power imbalances. For example, a large investigation by the Associated Press found that male correctional officers have often used their authority to exploit incarcerated women.  While misconduct can involve staff of any gender, the presence of female officers in women's prisons reduces the likelihood of cross-gender abuse and supports policies that restrict invasive searches

or supervision by male staff. This structural safeguard is especially important given the high rates of prior trauma among incarcerated women.

Staffing at EMCF was identified as a significant area of concern during the drafting of the Settlement Agreement in 2021. Section "D" of the Agreement, which focuses on Staffing, is the most detailed section, underscoring its critical importance. It includes six key paragraphs emphasizing the need to develop and maintain a staffing plan that ensures sufficient security personnel to protect incarcerated individuals from sexual abuse. Paragraph 33 explicitly addresses the recruitment and retention of female correctional officers in compliance with Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, et seq. Unfortunately, despite efforts to recruit female correctional officers since the start of the Settlement Agreement in August 2021, the facility has lost a net total of 17 female correctional officers.

Conversations with staff indicate that excessive overtime continues to be a major concern. Custody personnel reported regularly working two to three overtime shifts per week, with many accepting it as an unavoidable part of the job. Overtime is especially prevalent among those assigned Thursday through Sunday, as well as on the third shift (10 PM to 6 AM).  Third-shift staff face particularly demanding conditions. With the smallest number of assigned personnel and the highest volume of incoming activity, they often work overtime four to five times per week. This sustained workload has left many custody staff feeling exhausted, discouraged, and burned out.  These conditions further hinder recruitment and retention efforts and challenge the facility's ability to maintain adequate staffing levels.

## LOGISTICS

### *Compliance Visit*

The ninth compliance visit took place from March 18 and 19, 2026. During this visit, the Monitor and her Associate conducted interviews with staff and incarcerated individuals and toured multiple facility locations. In preparation, the Monitor identified over 60 individuals for interviews, selecting participants based on their direct or indirect roles in implementing and overseeing various components of the Settlement Agreement.

Additionally, prior to the compliance visit, the Monitor conducted video meetings with staff and stakeholders to accommodate scheduling needs and improve efficiency; these meetings are documented below.

- Administrator Bryan Fusaro
- Associate Administrator Tiffany Thompson
- Assistant Superintendent Amelia Renshaw, Edna Mahan PREA Compliance Manager
- Assistant Superintendent Randy Anema
- Assistant Superintendent Maureen Hayes
- Board of Trustee Member Kathleen Witcher
- Board of Trustee Member Bonnie Kerness
- Board of Trustee Member Dr. Mechele Morris
- Board of Trustee Member Cynthia Cupe
- Board of Trustee Member Dr. Sheila Trapp

- Board of Trustee Member Dr. Johanna Foster
- NJDOC Assistant Commissioner Kelly Daniels
- EMCF Special Investigations Principal Investigator Joseph Conway
- EMCF Special Victims Unit Principal Investigator Gregory Cirillo
- EMCF Major Ilg
- EMCF Major Karpew
- EMCF Major Zwolinski
- NJDOC Commissioner Victoria Kuhn
- EMCF Outpatient Clinical Psychologist and Sexual Assault Advisory Council Member Dr. Rachel Reed
- Assistant Commissioner of Women and Veterans Services Helena Tome
- Director of Women and Veterans Services Leanne Scott
- Rutgers Regional Nursing Manager and Sexual Assault Advisory Council Member Theresa Hernandez
- Two EMCF Volunteers
- 2 Lieutenants from EMCF, including one from the Satellite building
- 2 Sergeants from EMCF, including one from the Satellite building

The agenda for the onsite compliance visit was as follows:

Wednesday, March 18, 2026
- Observed Morning Briefing
- Interview with IP who filed an allegation against staff during this reporting period
- Interview with IP who filed an allegation against staff during this reporting period
- Interview with IP who filed an allegation against staff during this reporting period
- Interview with LEP Incarcerated Person who had a disciplinary hearing during this reporting period and who arrived at EMCF during this reporting period
- Interview with LEP Incarcerated Person who had a disciplinary hearing during this reporting period
- Interview with IP who filed an allegation against staff during this reporting period
- Interview with IP who had an allegation resolved during this reporting period
- Tour of the Hillcrest Dorm (in-patient drug and alcohol program)
- Tour of the South Hall Dormitory
- Interview with IP who requested to have their retaliation monitoring extended
- Interview with IP who had an allegation resolved during this reporting period
- IP Focus Group – Satellite Bldg. #1
- IP Focus Group – Satellite Bldg. #2
- IP Focus Group – Max #1
- Staff Focus Group – 2nd Shift Custody
- Staff Focus Group – 3rd Shift Custody

Thursday, March 19, 2026:
- Observed Morning Briefing
- IP Focus Group – Max #2

- Interview with IP who filed an allegation against staff during this reporting period
- Interview with IP who requested to have their retaliation monitoring extended
- Interview with Ombudsperson assigned to EMCF
- Interview with IP who had an allegation resolved during this reporting period
- Interview with IP who had an allegation resolved during this reporting period
- Interview with IP who requested to have their retaliation monitoring extended
- Interview with LEP Incarcerated Person who had a disciplinary hearing during this reporting period
- Staff Focus Group – 1st Shift Custody
- Non-custody Staff Focus Group
- Close out meeting with Administrators

*Process of Compliance Report and Monitoring Tool*

1) NJDOC sent a semi-annual status report to DOJ and the Monitor on February 24, 2026.
2) The Monitor sent the first draft report and monitoring tool to both parties on April 20, 2026, the agreement allows for a two-week period of review by both parties.
3) The Monitor received the comments from the Department of Justice on May 7, 2026.
4) The Monitor received the comments from NJDOC on May 6, 2026.
5) The Monitor participated in conference calls with both parties on May 15, 2026.
6) The Monitor considered all the comments submitted by NJDOC and DOJ. The Monitor made some revisions and provided additional information to the parties in response to comments.
7) The Monitor submitted the final report to the Court on May 22, 2026.

## SUMMARY OF COMPLIANCE

The settlement definitions for the three measures of compliance are as follows:

- **Substantial Compliance** indicates that NJDOC and EMCF have achieved material compliance with the components of the relevant provision of the Agreement. Material compliance requires that, for each provision, NJDOC and EMCF have developed and implemented any relevant policies incorporating the requirement and trained relevant personnel on the policy.

- **Partial Compliance** indicates that NJDOC and EMCF have achieved material compliance on some of the components of the relevant provision of the Agreement, but significant work remains.

- **Non-compliance** indicates that NJDOC and EMCF have not met the components of the relevant provision of the Agreement.

The Monitor added the following measure of compliance:

- **Non-Applicable** for the purpose of this report, the Monitor defines the term Non-Applicable as "does not apply to a particular situation or expectation". For example, if a provision in the Settlement Agreement requires an action to

be taken by January 1, 2026, the Monitor would use "not applicable at this time" as the measurement for that provision in this report.

The monitoring tool now consists of 36 paragraphs, following the dismissal of 50 paragraphs of the Settlement Agreement. In this review, the Monitor found that 35 paragraphs met the standard for "substantial compliance," while one was deemed "not applicable." It is important to emphasize that these ratings apply only to the current reporting period. All requirements of the Settlement Agreement must remain a central focus and be consistently upheld in future reporting periods. The issues that led to the Settlement Agreement are systemic and require sustained, ongoing effort to achieve the lasting improvements necessary to enhance safety at EMCF.

### CLOSING OBSERVATIONS

The dismissal of an additional six (6) sections and seventeen (17) paragraphs reflects substantial progress at EMCF during this reporting period, bringing the total number of dismissed provisions to twelve (12) sections and fifty-five (55) paragraphs. Leadership at both the New Jersey Department of Corrections and EMCF has demonstrated a strong and sustained commitment to fulfilling the requirements of the Settlement Agreement and improving safety for both staff and incarcerated individuals.

The Monitor also acknowledges and appreciates the strong cooperation demonstrated by NJDOC and EMCF throughout this reporting period. Requests for documents and information were consistently fulfilled in a timely and comprehensive manner, and both the Monitor and the Department of Justice (DOJ) were promptly informed of any incidents or allegations of sexual abuse or retaliation.

Overall, the Monitor acknowledges and commends NJDOC and EMCF for their strong commitment to the full and effective implementation of the Settlement Agreement. During this reporting period, all provisions of the Agreement were found to be in compliance, reflecting a consistent, system-wide effort to enhance the safety and well-being of both staff and incarcerated individuals.

The working relationship among NJDOC, Lowenstein Sandler, the Department of Justice, and the Monitor remains collaborative, constructive, and focused on solutions, with all parties aligned in their shared goal of improving sexual safety at EMCF. The Monitor recognizes the substantial progress achieved over the past six months and expects these efforts to continue strengthening a culture of safety, accountability, and support within the facility.